George CORDOVA, SID No. 0213157, Petitioner,

v.

Gary L. JOHNSON, Director, Texas Department of Criminal Justice, Institutional Division, Respondent.

No. CIV. SA–95–CA–1014–EP.

United States District Court, W.D. Texas, San Antonio Division.

Feb. 4, 1998.

Steven N. Harkiewicz, San Antonio, TX, for George Cordova petitioner.

John Jacks, Office of the Attorney General, Asst. U.S. Attorney, Austin, TX, for Gary Johnson, Dan Morales, Atty. General, respondents.

## MEMORANDUM OPINION AND ORDER

PRADO, District Judge.

Petitioner George Cordova filed this action pursuant to Title 28 U.S.C. Section 2254 seeking federal habeas corpus review of his state conviction for capital murder and sentence of death. As grounds for relief, petitioner argues in his first amended petition that his trial counsel rendered ineffective assistance at both the guilt-innocence and punishment phases of petitioner's state capital murder trial, the state trial court erred in its jury instructions at both phases of trial, petitioner's death sentence violates the law of proportionality, the prosecution withheld exculpatory evidence, the evidence was legally insufficient to support the jury's verdict on the first special sentencing issue, and the cumulative effect of the foregoing alleged errors warrants federal habeas corpus relief. Because petitioner filed his federal habeas corpus petition *prior* to the effective date of the Antiterrorism and Effective Death Penal-

ty Act of 1996 ["AEDPA"],[1] this Court has been required to conduct a *de novo* review of each of petitioner's claims for relief herein.[2] For the reasons set forth at length hereinafter, this Court finds no merit to any of the petitioner's claims for relief and, therefore, denies petitioner's federal habeas corpus petition, and vacates the stay of execution issued in this cause on October 23, 1995.

## I. *Statement of the Case*

### A. *Factual Background*

During the early morning hours of August 4, 1979, petitioner George Cordova, Manuel Villanueva, and two other persons fatally assaulted and stabbed Jose M. "Joey" Hernandez, dragged Cynthia West from Hernandez's vehicle, sexually assaulted her, robbed both West and the body of Hernandez of jewelry and other items, and fled the scene with Hernandez's vehicle, which was later found abandoned.[3] A Bexar County grand jury indicted petitioner in 1980 on a charge of capital murder, to wit, having fatally stabbed Hernandez while committing and attempting to commit a robbery of Hernandez.[4] Petitioner was tried in 1982, and a Bexar County jury convicted and sentenced petitioner to death. Petitioner appealed but

the Texas Court of Criminal Appeals affirmed petitioner's 1982 conviction and sentence on September 25, 1985.[5] The United States Supreme Court denied petitioner's petition for writ of certiorari on May 5, 1986.[6] After petitioner unsuccessfully sought state habeas corpus relief, he filed a federal habeas petition which this Court denied. Petitioner appealed this Court's denial of his federal habeas corpus petition and the Fifth Circuit reversed petitioner's 1982 conviction on February 17, 1988.[7] The United States Supreme Court denied the State's certiorari petition on June 13, 1988.[8]

On February 1, 1989, a Bexar County grand jury re-indicted petitioner in cause no. 89–CR–557 on a single Count of capital murder which contained three separate paragraphs alleging that the petitioner had murdered Jose M. Hernandez while in the course of committing and attempting to commit the predicate offenses of (1) robbing Hernandez, (2) robbing Cynthia West, and (3) engaging in the aggravated sexual assault of West.[9] On June 6, 1989, the jury returned a verdict of guilty in petitioner's second capital murder trial.[10] On June 9, 1989, the same jury answered the two Texas special sentencing issues affirmatively and the state

---

1. Pub.L. No. 104–132, 110 Stat. 1214 (1996).

2. In *Lindh v. Murphy*, —— U.S. ——, ——, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997), the Supreme Court held that the new standard of review provisions of the AEDPA do *not* apply to federal habeas corpus petitions filed prior the effective date of the AEDPA, i.e., April 24, 1996.

3. The grisly facts of this cause will be discussed in greater detail hereinafter but are concisely summarized in the Fifth Circuit's published opinion reversing petitioner's original conviction. *See Cordova v. Lynaugh*, 838 F.2d 764, 765–66 (5th Cir.1988), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 932 (1988).

4. The original indictment against petitioner was *not* included among the many state court records furnished to this Court by the parties herein but charged petitioner with having murdered Hernandez in the course of committing and attempting to commit the predicate felony offense of robbing Hernandez. *See Cordova v. Lynaugh*, 838 F.2d at 766.

5. *See Cordova v. State*, 698 S.W.2d 107 (Tex. Crim.App.1985), *cert. denied*, 476 U.S. 1101, 106 S.Ct. 1942, 90 L.Ed.2d 352 (1986).

6. *See Cordova v. Texas*, 476 U.S. 1101, 106 S.Ct. 1942, 90 L.Ed.2d 352 (1986).

7. *See Cordova v. Lynaugh*, 838 F.2d 764 (5th Cir.1988), *cert. denied sub nom. Lynaugh v. Cordova*, 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 932 (1988).

8. *See Lynaugh v. Cordova*, 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 932 (1988).

9. Copies of the indictment under which petitioner was tried and convicted in 1989 appear at various places among the state court records submitted in this cause, including at page 2 of the first Volume of the Transcript from petitioner's 1989 state capital murder proceeding and at Volume I, pages 122 and 170, Volume II, page 335, and Volume III, page 641 of the state court records relating to petitioner's state habeas corpus proceeding challenging his 1989 conviction and sentence.

10. *See* Transcript of pleadings, motions, and other documents filed in petitioner's 1989 capital murder proceeding, at Volume II, p. 371; and Statement of Facts from petitioner's 1989 capital murder trial, at Volume XVI, p. 112.

trial court imposed a sentence of death by lethal injection.[11] Petitioner appealed but, in an unpublished opinion issued April 27, 1994, the Texas Court of Criminal Appeals affirmed petitioner's 1989 conviction and death sentence.[12] The United States Supreme Court denied certiorari on November 28, 1994.[13]

On November 29, 1994, petitioner filed his original state habeas corpus application, asserting some eight claims for relief.[14] On February 15, 1995, petitioner filed his first amended state habeas corpus application in which he asserted the same grounds for relief he had urged originally, and added two

new claims of error regarding the state trial court's guilt-innocence phase jury instructions.[15] On July 3, 1995, petitioner filed his second amended state habeas corpus application and asserted therein three additional claims for a total of thirteen claims for relief.[16] The state trial court held an evidentiary hearing on petitioner's state habeas claims on July 11 and 20, 1995, during which that court heard testimony from several members of petitioner's family regarding petitioner's deprived and abused childhood, heard extensive testimony from both of petitioner's trial counsel regarding their investigations into the case against petitioner and their strategic

**11.** *See* Transcript of pleadings, motions, and other documents filed in petitioner's 1989 capital murder proceeding [henceforth "Trial Transcript"], at Volume II, p. 375; and Statement of Facts from petitioner's 1989 capital murder trial, at Volume XVIII, pp. 71–73.

**12.** *See Cordova v. State*, Cause No. 70,926 (Tex. Crim.App. April 27, 1994). A copy of the Texas Court of Criminal Appeals' unpublished opinion affirming petitioner's 1989 conviction and death sentence appears at various among the state court records furnished to this Court by both parties herein, including at Volume I, pp. 61–75 and 206–22, Volume II, pp. 296–310, and Volume III, pp. 565–81 of the state court records relating to petitioner's state habeas corpus proceeding challenging his 1989 conviction and sentence.

**13.** *See Cordova v. Texas*, 513 U.S. 1020, 115 S.Ct. 585, 130 L.Ed.2d 499 (1994).

**14.** A copy of petitioner's initial state habeas corpus application challenging his 1989 conviction and death sentence appears at Volume I, pp. 1–55 of the state court records relating to petitioner's state habeas corpus proceeding challenging his 1989 capital murder conviction and sentence, i.e., Texas Court of Criminal Appeals App. No. 16,648–02, state trial court writ application no. 89–CR–557–W2 [henceforth "Petitioner's State Habeas Records"]. Those eight claims consisted or arguments that (1) the jury charge at the punishment phase of petitioner's trial had effectively precluded the jury from giving adequate consideration to petitioner's evidence regarding his deprived family background, history of child abuse and neglect, race, and other factors, (2) petitioner's trial counsel had rendered ineffective assistance by (a) failing to object to the alleged error in the punishment phase jury instructions, (b) effectively waiving petitioner's lesser-included offense pleas during closing argument at the guilt-innocence phase of trial, (c) making statements detrimental to petitioner's interests during closing argument at the punishment phase of

trial, (d) failing to object during voir dire to the prosecution's erroneous explanation of the effect of mitigating evidence of the petitioner's co-defendant's life sentence, (e) failing to voir dire members of the jury venire with regard to their views of the mitigating impact of evidence of the petitioner's co-defendant's life sentence, and (f) failing to investigate and present mitigating evidence regarding petitioner's deprived background and childhood abuse, and (3) the cumulative effect of the foregoing errors warranted state habeas relief.

**15.** *See* Petitioner's State Habeas Records, Volume II, pp. 227–89. More specifically, in addition to simply re-urging the same eight claims petitioner asserted in his initial state habeas corpus application, petitioner argued that the state trial court's jury instructions at the guilt-innocence phase of trial (1) failed to limit the definition of "knowingly" to the result of conduct and (2) gave undue prominence to the essential elements of the offense of capital murder by reiterating same in the context of each of the three separate theories of culpability contained in the indictment.

**16.** *See* Petitioner's State Habeas Records, Volume III, pp. 481–559. In addition to re-asserting the same ten claims petitioner had included in his first amended application, petitioner added three new claims to the effect that (1) his death sentence violated the law of proportionality, the common law doctrine of mandated consistency, and equal protection principles, (2) his trial counsel rendered ineffective assistance by failing to obtain discovery with regard to the documentary support for the prosecution's decision to allow petitioner's co-defendant Manuel Villanueva to enter a plea to the lesser offense of murder and receive a life sentence, and (3) the prosecution withheld potentially exculpatory evidence from the defense relating the reasons why and support for the decision to allow Manuel Villanueva to plead to a lesser offense and receive a life sentence.

decision-making before and during petitioner's 1989 trial, and heard testimony from Dr. John C. Sparks and received extensive documentary evidence regarding the mental and intellectual capacity of Manuel Villanueva.[17] In an Order issued August 22, 1995, the state trial court concluded that there was no merit to any of the claims contained in petitioner's second amended state habeas corpus application and recommended that state habeas relief be denied.[18] On October 18, 1995, the Texas Court of Criminal Appeals denied petitioner's state habeas corpus application without written order.[19]

### B. *Procedural History*

On October 23, 1995, petitioner filed his original petition for federal habeas corpus relief in this Court, together with separate motions requesting appointment of counsel, a stay of his then-impending execution, and leave to file an amended petition for federal habeas relief.[20] In an Order issued that same date, this Court granted petitioner's motion for stay of execution, appointed counsel to represent petitioner herein, and granted petitioner leave to file an amended federal habeas corpus petition.[21] On February 20, 1996, petitioner filed his first amended federal habeas corpus petition and asserted therein thirteen claims for relief similar but not identical to those he had included in his second amended state habeas corpus application discussed above.[22] On April 19, 1996, respondent filed his answer and motion for summary judgment in which he argued, among other things, that (1) nothing in the federal Constitution mandated that petitioner's jury be given the opportunity to consider the life sentence received by Manuel Villanueva as a mitigating factor which warranted a life sentence for petitioner, (2) the jury instructions at the punishment phase of petitioner's 1989 trial did not foreclose the jury from giving adequate consideration to petitioner's legitimate mitigating evidence, (3) several of petitioner's complaints of alleged errors in the jury instructions raised new rules of law foreclosed by the non-retroactivity doctrine of *Teague*, (4) there was more than ample evidence introduced during the petitioner's 1989 trial to support the jury's verdict at the punishment phase of that trial, and (5) petitioner's trial counsel did not render ineffective assistance.[23]

Subsequently, both parties filed supplemental pleadings and briefs addressing the applicability to this cause of the Antiterrorism and Effective Death Penalty Act of 1996 ["AEDPA"].[24]

### II. *Inapplicability of the AEDPA*

■ On April 24, 1996, the President signed into law the AEDPA,[25] which radically altered the standard of review by this Court in federal habeas corpus proceedings filed by

**17.** The Statement of Facts from the evidentiary hearing held July 11 and 20, 1995 in connection with petitioner's state habeas corpus proceeding challenging his 1989 conviction and sentence appears among the state court records furnished to this Court by respondent on April 16, 1996.

**18.** *See* Petitioner's State Habeas Records, Volume IV, at pp. 747–62.

**19.** *See Ex parte Cordova*, App. No. 16,148–02 (Tex.Crim.App. October 18, 1995).

**20.** *See* docket entry nos. 1–4.

**21.** *See* docket entry no. 5.

**22.** *See* docket entry no. 11. While petitioner included in his first amended federal habeas corpus petition all of the arguments that he had included in his second amended state habeas corpus application he did re-arrange the context of some of his arguments. For instance, petitioner's third claim for federal habeas corpus relief herein includes a contention that the jury instructions at the punishment phase of his 1989 trial did not permit the jury to give mitigating effect to his evidence regarding the life sentence which Manuel Villanueva received. Petitioner included that argument in his second amended state habeas corpus application but did so in the context *not* of his challenge to the state court's punishment phase jury instructions but, rather, in connection with his claim that his death sentence violated the law of proportionality.

**23.** *See* docket entry no. 12.

**24.** Pub.L. No. 104–132, 110 Stat. 1214 (1996).

**25.** *See* The AEDPA applies to all federal habeas petitions filed after its effective date, i.e., April 24, 1996—the date it was signed. *See Goodwin v. Johnson*, 132 F.3d 162, 169 n. 1 (5th Cir.1998); *Nobles v. Johnson*, 127 F.3d 409, 412–13 (5th Cir.1997); and *Green v. Johnson*, 116 F.3d 1115, 1120 (5th Cir.1997).

state prisoners pursuant to Title 28 U.S.C. Section 2254.[26] In the months thereafter, the Fifth Circuit held that the new standard of review provisions of the AEDPA governed federal court review of all federal habeas corpus petitions filed by state prisoners, including those petitions pending as of the effective date of that enactment.[27] However, in *Lindh v. Murphy*,[28] the Supreme Court held that the AEDPA does *not* apply to federal habeas corpus petitions filed prior to the effective date of that enactment. Thus the Fifth Circuit's opinions holding the AEDPA applicable to federal habeas petitions filed prior to April 24, 1996 are no longer controlling authority for this Court. Because petitioner's first amended habeas corpus petition in this cause was filed on February 20, 1996, *prior* to the effective date of the AEDPA, this Court must apply the pre–AEDPA standard of review to petitioner's federal habeas claims herein.[29]

**26.** *See Brown v. Cain*, 104 F.3d 744, 748–49 (5th Cir.1997), *cert. denied*, —— U.S. ——, 117 S.Ct. 1489, 137 L.Ed.2d 699 (1997); *Childress v. Johnson*, 103 F.3d 1221, 1224 (5th Cir.1997); *Mata v. Johnson*, 99 F.3d 1261, 1265–66 (5th Cir.1996), *vacated in part and modified on other grounds*, 105 F.3d 209 (5th Cir.1997); *Herman v. Johnson*, 98 F.3d 171, 173 (5th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1262, 137 L.Ed.2d 341 (1997) and *Drinkard v. Johnson*, 97 F.3d 751, 756 (5th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997).

**27.** *See Blankenship v. Johnson*, 106 F.3d 1202, 1204 (5th Cir.1997), *superseded by* 118 F.3d 312 (5th Cir.1997); *Brown v. Cain*, 104 F.3d at 748–49; *Lockhart v. Johnson*, 104 F.3d 54, 56–57 (5th Cir.1997), *cert. denied*, —— U.S. ——, 117 S.Ct. 2518, 138 L.Ed.2d 1019 (1997); *Childress v. Johnson*, 103 F.3d at 1224; *Mata v. Johnson*, 99 F.3d at 1266; and *Drinkard v.. Johnson*, 97 F.3d at 767.

**28.** —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

**29.** *See Goodwin v. Johnson*, 132 F.3d at 173 n. 7; *Ransom v. Johnson*, 126 F.3d 716, 720 (5th Cir. 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 361, 139 L.Ed.2d 281 (1997); *Williams v. Cain*, 125 F.3d 269, 273 (5th Cir.1997); and *Green v. Johnson*, 116 F.3d at 1120.

**30.** *Lawrence v. Lensing*, 42 F.3d 255, 258 (5th Cir.1994); *Gray v. Lynn*, 6 F.3d 265, 268 (5th Cir.1993); and *Lowery v. Collins*, 988 F.2d 1364, 1367 (5th Cir.1993).

## III. *State Law Claims*

A state prisoner seeking federal court review of his conviction pursuant to Title 28 U.S.C. Section 2254 must assert a violation of a federal constitutional right.[30] Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented.[31] In the course of reviewing state criminal convictions in federal habeas corpus proceedings, a federal court does *not* sit as a super-state appellate court.[32] The question before a federal habeas corpus court is *not* whether the state court correctly applied its own interpretation of state law; rather, the question is whether the petitioner's federal constitutional rights were violated.[33]

When a federal district court reviews a state prisoner's habeas petition pursuant to 28 U.S.C. § 2254 it must decide whether

**31.** *See Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606 (1990); *Pulley v. Harris*, 465 U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984); *Nobles v. Johnson*, 127 F.3d at 419 n. 21; *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1847, 137 L.Ed.2d 1050 (1997); *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993), *cert. denied* 510 U.S. 1025, 114 S.Ct. 637, 126 L.Ed.2d 596 (1993); *Lavernia v. Lynaugh*, 845 F.2d 493, 496 (5th Cir.1988); *Rault v. Butler*, 826 F.2d 299, 302 n. 1 (5th Cir.1987), *cert. denied*, 483 U.S. 1042, 108 S.Ct. 14, 97 L.Ed.2d 803 (1987); and *Neyland v. Blackburn*, 785 F.2d 1283, 1293 (5th Cir.1986), *cert. denied*, 479 U.S. 930, 107 S.Ct. 399, 93 L.Ed.2d 352 (1986).

**32.** "[F]ederal courts do not sit as courts of appeal and error for state court convictions." *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986). *Accord Bridge v. Lynaugh*, 838 F.2d 770, 772 (5th Cir.1988). This Court does *not* review a state prisoner's federal habeas corpus petition to determine whether the state appellate courts correctly construed and applied state law. Federal habeas corpus relief does not lie for errors of state law. *See Estelle v. McGuire*, 502 U.S. at 67–68, 112 S.Ct. at 480; *Lewis v. Jeffers*, 497 U.S. at 780, 110 S.Ct. at 3102; *Pulley v. Harris*, 465 U.S. at 41, 104 S.Ct. at 874; *Pemberton v. Collins*, 991 F.2d at 1223; *Lavernia v. Lynaugh*, 845 F.2d at 496; *Rault v. Butler*, 826 F.2d at 302 n. 1; and *Neyland v. Blackburn*, 785 F.2d at 1293.

**33.** *See Neyland v. Blackburn*, 785 F.2d at 1289.

the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." The court does not review a judgment, but the lawfulness of the petitioner's custody *simpliciter*.[34]

Thus, the issue before this Court is *not* whether the Texas courts properly applied state-law principles during petitioner's trial or when they affirmed petitioner's conviction and sentence or denied petitioner's state habeas corpus application; but whether petitioner's federal constitutional rights have been violated *in this case*.

## IV. *The Evidence at Trial*

Because so many of petitioner's claims for federal habeas relief are highly fact-intensive and address either the impact of the state trial court's jury instructions on the jury's deliberations or the strategic decisions of petitioner's trial counsel, a brief overview of the testimony and other evidence admitted during petitioner's 1989 capital murder trial is necessary to place petitioner's claims in proper context.

### A. *The Guilt–Innocence Phase of Trial*

Cynthia West testified that (1) on August 3, 1979, she was 19 years old, (2) the decedent Joey Hernandez picked her up in his car for a date that evening and they went to a drive-in movie and then drove various places before arriving in the well-lit parking lot at Espada Park in the early morning hours of August 4, 1979, (3) when they arrived, there was four or five other vehicles also parked in the lot, (4) shortly after they parked, another vehicle drove up behind Joey's car and parked, (5) the petitioner then knocked on Joey's window and asked for some oil for his car, (6) when Joey told the petitioner that he had none, the petitioner left and drove off, (7) shortly thereafter the other vehicles parked near Joey's car left the parking lot, (8) a short time later, four persons, consisting of the petitioner, Manuel Villanueva, and two younger Hispanic males, walked up to the driver's side of Joey's car and knocked on the window, (9) the windows of Joey's vehicle were rolled down about a quarter of the way and both doors were locked, (10) the petitioner asked Joey to take him to get some gas, (11) Cynthia noticed a knife in Villanueva's hand, (12) when Joey said that he was not going to take them anywhere because he had seen the knife in Villanueva's hand, Villanueva replied "What knife? I don't have a knife," (13) Joey started to place his hand on the ignition but someone stuck a hand through the window and struck Joey hard on the left side of his face, (14) the assailants then unlocked Joey's door and the petitioner struck Joey on the left side and the head with a tire tool, (15) the petitioner then repeatedly jabbed Joey with the tire tool while Villanueva stabbed Joey's head and left side with a pocket knife, (16) while the petitioner and Villanueva continued to assault Joey, the other two assailants came around to the passenger side of the car, unlocked the door, grabbed her arm, and pulled her to the rear of the car by the trunk, (17) when she got to the back of the car, the petitioner grabbed her left arm at the wrist and said to her "You better run, you bitch," (18) the petitioner then pulled her along at a brisk pace, (19) she was unable to match the petitioner's speed because of her high heels and attempted to tell the petitioner that she was asthmatic and pregnant, (20) the petitioner directed her to take off her shoes, threatened her with the tire tool which he still held in his hand, and told her "You better run, you bitch or *I'm going to do the same shit to you I just did to* [Joey]," (21) she was frightened and did not fight back, (22) they ran across the street and the petitioner shoved her down, (23) the petitioner placed his hand first on her stomach and then over her mouth, stuck the tire tool into the ground just inches from her head, and told her that she had better not scream, (24) she saw another vehicle that looked like Joey's vehicle drive over to where the petitioner's vehicle was parked, (25) the petitioner then pulled her up and dragged her through a brushy area while her other assailants pushed her from behind, (26) she fell on her stomach and the petitioner said to her "You better turn over, you fucking bitch," (27) when she refused to turn over, the petitioner physically turned her over, took off

---

**34.** *Coleman v. Thompson,* 501 U.S. 722, 730, 111 S.Ct. 2546, 2554, 115 L.Ed.2d 640 (1991).

her watch, necklace, and cross, and then undressed her, (28) the petitioner then unzipped his pants and, while others held her arms, the petitioner raped her, (29) at one point while he was raping her, the petitioner told her "you better start pumping," (30) she did not comply with that directive, (31) once the petitioner got off her, Villanueva raped her, (32) she could smell the "terrible" odor of paint on Villanueva's breath when he attempted to kiss her while he was raping her, (33) when Villanueva finished, a third assailant, the youngest one who had pulled her from Joey's car, raped her while Villanueva stood by and watched, (34) the petitioner then spoke in Spanish to the other assailants, saying something to the effect "Come on, let's go," (35) the four assailants then got into the two cars and drove off, (36) she dressed and went back to the parking lot, where she found Joey laying face down in a pool of blood, (37) she yelled at him but he did not answer, (38) she flagged down a uniformed police officer who was riding a motorcycle, (39) an EMS unit arrived at the scene but did not take Joey's body, (40) she described her assailants to the police officers who arrived shortly thereafter, (41) police officers brought three Hispanic youths to the crime scene but they were not her assailants, (42) a police officer took her to the hospital for a rape exam, (43) she gave a formal written statement to the police, (44) a few days later on August 7, 1979, she picked the petitioner and Manuel Villanueva out of separate lineups, (45) she recognized police photographs of herself taken shortly after the assault upon her which showed that she had suffered scratches to her neck, back, right hip, right side, right arm, and left arm, (46) she never agreed to have sexual relations with any of her assailants, (47) she never consented to give the petitioner any of the property he took from her, (48) at all times relevant to the sexual assault upon her and the assault upon Joey, she was in fear for her life, and (49) she got a clear look at the petitioner's face both of the times that he approached Joey's car and while the petitioner was dragging her through the bushes and raping her.[35]

Other testimony at the guilt-innocence phase of petitioner's 1989 trial revealed that (1) the police officers who responded to the call regarding the murder and rape found Cynthia West to be obviously upset but coherent,[36] (2) the night of the rape and murder, Cynthia took the police to the place where she had been raped and gave the police a very general description of her assailants,[37] (3) based on that description, the police stopped a group of young Hispanic males and took them to a show up at the crime scene but Cynthia was certain that none of that group were among her assailants,[38] (4) police found the knob from one of the door locks on Joey's car lying near Joey's body,[39] (5) the police also recovered a beer can containing spray enamel paint near Joey's body and a tire tool near the area where Cynthia West had been raped,[40] (6) on August 4, 1979, the police responded to a call about an abandoned vehicle located just a block and a half from Villanueva's residence and a short distance from the residence of the petitioner's family,[41] (7) the abandoned vehicle was Joey's, bore traces of blood and the distinctive odor of spray paint, and was missing its hub caps,[42] (8) Villanueva was a

**35.** See Statement of Facts from petitioner's 1989 state court trial [henceforth "S.F. Trial"], Testimony of Cynthia West, Volume XI, pp. 116–221; and Volume XII, pp. 10–84.

**36.** See S.F. Trial, Testimony of Adrian L. Miller, Volume XI, pp. 83–87; and Testimony of Robert Johnson, Volume XI, pp. 124–25.

**37.** Id., Testimony of Adrian L. Miller, Volume XI, pp. 87, 109–110, and 114; Testimony of Robert Johnson, Volume XI, p. 128.

**38.** Id., Testimony of Robert Johnson, Volume XI, p. 137; Testimony of Gary West, Volume XII, pp. 111–12; and Testimony of Preston Dick, Volume XII, pp. 119–24.

**39.** Id., Testimony of George Weaver, Volume XII, pp. 88–89; and Testimony of Alfred Hernandez, Volume XIII, pp. 160.

**40.** Id., Testimony of Gary West, Volume XI, pp. 108–110; and Testimony of George Weaver, Volume XII, pp. 88–92.

**41.** Id., Testimony of Danny Wayne Lewis, Volume XII, pp. 130–40.

**42.** Id., Testimony of Ronnie Reeves, Volume XI, pp. 68–70; Testimony of Danny Wayne Lewis, Volume XII, pp. 130–40; and Testimony of Alfred Hernandez, Volume XIII, pp. 157.

known abuser of spray paint,[43] (9) police later recovered Cynthia and Joey's watches from members of Villanueva's family,[44] (10) police recovered from members of Villanueva's family two cases of eight-track cassette tapes that had been in Joey's car prior his murder,[45] (11) police recovered Joey's wallet from one of Villanueva's neighbors who testified that Villanueva had given it to him and that he had seen Villanueva with the wallet and eight-track cassette boxes the date of the murder,[46] (12) when the police finally found Villanueva at home at his residence, Villanueva exited the residence, dropped a pocket knife, and made no effort to pick up the knife,[47] (13) Villanueva's mother picked up the knife and gave it to police when they requested it,[48] (14) the knife in question could have caused the fatal wound to Joey Hernandez,[49] (15) efforts to match the finger prints taken from Joey's vehicle proved fruitless when none of the 36 prints lifted from the vehicle proved to be sufficiently legible for that purpose,[50] and (16) the blood samples taken from Joey's vehicle, the blood on Villanueva's knife, and the semen samples taken during Cynthia West's rape exam each proved to be of insufficient quantity for purposes of typing and matching.[51]

The medical examiner who performed the autopsy of Joey Hernandez testified that (1) external examination of Joey's body revealed that Joey had suffered multiple lacerations to the head and multiple stab wounds, (2) Joey's lacerations were located below the left eye brow, on the left cheek bone below the eye, on the left middle jaw, and across the bridge of the nose, (3) the latter laceration involved a fracture to both the bone and cartilage tissue of the nose, (4) Joey's stab wounds included wounds to the back of the head behind the left ear, the muscles of the neck where they insert into the clavicle, the iliac crest on the left hip bone, and behind the left knee, (5) Joey also sustained a superficial bruise to the right cheek bone, (6) internal examination revealed that one of the stab wounds penetrated into Joey's trachea and another had cut three quarters of the way through Joey's spinal cord between the first and second cervical vertebrae, (7) the spinal cord injury was very similar to the type of injury inflicted at the end of a bull fight and had caused almost instantaneous death, (8) either of the blades on the pocket knife which Villanueva had dropped when confronted by police could have caused the penetrating stab wound that all but severed Joey's spinal cord, (9) the pain caused by the blow which broke and lacerated Joey's nose would have rendered him incapacitated even if it did not render him unconscious, (10) the lacerations to Joey's body were consistent with the type of injuries caused by blows from a blunt instrument like a tire tool, (11) Joey was *not* intoxicated at the time of his death, (12) the precise sequence of the blows and stab wounds to Joey's body could not be ascertained, (13) the injuries to Joey's face could have been caused by his face and head being forcibly shoved against the steering wheel of a motor vehicle, and (14) while there were no bruises or fractures to Joey's ribs, side, or thighs noted, he did suffer a small laceration to his left shoulder.[52]

43. *Id.*, Testimony of Danny Wayne Lewis, Volume XII, p. 136.

44. *Id.*, Testimony of Cynthia West, Volume XI, p. 70; Testimony of Eddie Wilbert Pinchback, Volume XII, p. 160; Testimony of James Herring, Volume XII, pp. 215–17; and Testimony of Jo An Watta, Volume XIII, pp. 12.

45. *Id.*, Testimony of Eddie Wilbert Pinchback, Volume XII, p. 160; Testimony of Leon Springs, Volume XII, pp. 191–94; Testimony of Joe Oosterveen, Volume XI, p. 223; and Testimony of Jo An Watta, Volume XIII, pp. 12–14.

46. *Id.*, Testimony of Ronnie Reeves, Volume XI, pp. 68–71; Testimony of Eddie Wilbert Pinchback, Volume XII, p. 161; and Testimony of Leon Springs, Volume XII, pp. 191–94.

47. *Id.*, Testimony of Eddie Wilbert Pinchback, Volume XII, pp. 153–55.

48. *Id.*, at pp. 155–56.

49. *Id.*, Testimony of Robert Swedarsky, Volume XIII, pp. 95–96.

50. *Id.*, Testimony of Cruz Morua, Volume XIII, p. 63.

51. *Id.*, Testimony of Jane Nellis, Volume XIII, pp. 132–37.

52. *Id.*, Testimony of Robert H. Swedarsky, Volume XIII, pp. 74–126.

The evidence at the guilt-innocence phase of petitioner's 1989 trial also established that (1) the petitioner was booked into the Bexar County Jail on August 6, 1979 on a charge of capital murder and (2) the petitioner escaped from the fourth floor of the Bexar County Jail on or about September 27, 1980 by climbing down a rope made from sheets and mattress covers.[53]

The defense offered the testimony of petitioner's three sisters, i.e., Aurelia Gomez, Maria Alma Herrera, and Nancy Cordova, that the petitioner had been baby-sitting for one of his sisters on the night in question.[54] Two of the petitioner's sisters admitted during cross-examination, however, that they had never previously testified regarding this new alibi evidence and the other sister admitted that, while she had testified at petitioner's first trial, she had not presented all aspects of her alibi testimony at petitioner's first trial.[55]

On June 6, 1989, after hearing closing arguments from both sides, the petitioner's jury retired to deliberate petitioner's guilt and returned its guilty verdict later that same date.

## B. *Punishment Phase of Trial*

The evidence admitted during the punishment phase of petitioner's 1989 capital murder trial included testimony regarding numerous instances of illegal and violent conduct by the petitioner, both inside and out of prison. More specifically, (1) two juvenile probation officers and three police officers each testified that petitioner's reputation in the community for being peaceful and law-abiding was bad,[56] (2) another police officer testified that, on May 25, 1979, he arrested the petitioner for unlawfully carrying a loaded handgun onto a licensed premises and the gun was later determined to have been stolen from Florida,[57] (3) a court bailiff testified that, on January 20, 1982, while the petitioner was in custody, he discovered a handcuff key in the petitioner's pants pocket during a routine search of petitioner's person at the Bexar County courthouse,[58] (4) a Texas Department of Corrections ["TDC"] officer testified that, during a routine shakedown of cells on December 18, 1984, the petitioner took a five-to-six inch homemade knife out of his pocket and attempted to pass the knife to another inmate,[59] (5) another TDC officer testified that, on November 13, 1985, he discovered eleven marijuana cigarettes during a shakedown of the petitioner's cell and that the petitioner later threatened him,[60] (6) another TDC officer testified that, on January 24, 1986, the petitioner had refused to comply with a routine strip search directive and had grabbed a belt and dared officers to search him until a lieutenant arrived on the scene,[61] (7) another TDC officer testified that, on November 22, 1988, the petitioner climbed a fence separating recreational areas at a TDC facility and received a packet of papers that

---

53. *Id.*, Testimony of Antonio Alvarado, Volume XIV, pp. 65–66; Testimony of Guadalupe Rodriguez, Volume XIV, pp. 73–76; Testimony of Richard Burch, Volume XIV, pp. 80–81; Testimony of Ruben C. Sandoval, Volume XIV, pp. 82–83; and Testimony of James Poore, Volume XIV, pp. 87–93.

54. *Id.*, Testimony of Aurelia Gomez, Volume XV, pp. 18–20; Testimony of Maria Alma Herrera, Volume XV, pp. 23–26; and Testimony of Nancy Cordova, Volume XV, pp. 52–55.

55. *Id.*, Testimony of Aurelia Gomez, Volume XV, p. 21; Testimony of Maria Alma Herrera, Volume XV, pp. 26–31 and 46; and Testimony of Nancy Cordova, Volume XV, pp. 55–57.

56. *Id.*, Volume XVII: Testimony of George R. Woodward, pp. 13–15; Testimony of Benny Reyes, pp. 16–20; Testimony of Danny Lewis, pp. 21–23; Testimony of Antonio Alvarado, pp. 23–24; and Testimony of Henry Alonzo, pp. 24–27.

57. *Id.*, Volume XVII, Testimony of Thomas F. Smith, Jr., pp. 30–32.

58. *Id.*, Testimony of Joe Losoya, Vol. XVII, pp. 46–48.

59. *Id.*, Testimony of Johnny James Carroll, Vol. XVII, pp. 63–69.

60. *Id.*, Testimony of Michael Cole, Vol. XVII, pp. 73–78.

61. *Id.*, Testimony of Adolph Thomas, Jr., Vol. XVII, pp. 56–58.

turned out to be illegal betting slips,[62] and (8) another TDC officer testified that, on December 18, 1988, the petitioner spat directly in his face and demanded to see a ranking officer.[63] The prosecution also introduced documents reflecting that the petitioner had been convicted (1) pursuant to a plea of nolo contendere in 1978 of the offense of "assault bodily injury," (2) pursuant to a guilty plea in April, 1982 of the felony offense of escape, and (3) pursuant to a guilty plea in April, 1982 of the felony offense of "robbery—bodily injury."[64]

The prosecution's strongest evidence at the punishment phase of petitioner's 1989 capital murder trial related to petitioner's convictions in Florida for offenses committed after the petitioner's escape from the Bexar County Jail, while the petitioner remained a fugitive from justice. A finger print examiner testified that the petitioner's finger prints matched those on a Florida pen packet indicating that the petitioner had been convicted in that state on two counts of aggravated assault and two counts of sexual battery.[65] A former deputy Sheriff from Florida testified that (1) when he and other law enforcement officials went to a labor camp to investigate a reported rape the evening before, the petitioner fled on foot and led them on a chase into a heavily wooded area, (2) they were forced to employ bloodhounds and helicopters to search for the petitioner, (3) when they finally apprehended the petitioner he pretended not to understand English, and (4) the petitioner later pleaded guilty to two counts of sexual battery and two counts of aggravated assault on April 9, 1981.[66] A Florida Sheriff testified that (1) the petitioner was booked into a count jail in Florida on January 27, 1981, (2) they moved the petitioner to a new cell by himself on January 29, 1981, (3) on February 15, 1981, they received a tip from another inmate, searched petitioner's cell, and found that the locking

mechanism on petitioner's cell door had been almost completely cut through, and (4) a subsequent search of the same cell disclosed hidden saw blades.[67]

The most chilling testimony at the punishment phase of petitioner's 1989 capital murder trial came from the victim of petitioner's sexual assaults, who testified that (1) on January 26, 1981 while she was driving home from a night class, she heard and felt two short bursts of gun fire from another car driven by the petitioner strike her vehicle, (2) the petitioner then twice rammed his vehicle into her car and forced her to pull over, (3) the petitioner then pointed a gun at her face and directed her to open her door, (4) the petitioner got in her car and forced her into the passenger seat, telling her that she should be still or he would kill her, (5) the petitioner waved off some other vehicles that slowed down, moved his car off the road, and returned to her car, (6) the petitioner then directed her to move into the back seat of her vehicle, removed her glasses, and directed her to fondle him while he asked her many personal questions, (7) the petitioner then drove to a secluded area, directed her to remove her pants and exit her car, (8) the petitioner led her to a grassy area and directed her to undress completely, (9) the petitioner then repeatedly raped her vaginally, raped her anally, and made her give him her jewelry, (10) throughout her ordeal, the petitioner continuously asked her questions, repeatedly called her a liar, told her not to look at his face, and threatened her, at one point telling her "No funny stuff or I'll blow your brains out," (11) at another point, the petitioner placed his gun against her head, asked her if she could tell him the license plate number of his car, and told her that his car was stolen, (12) she attempted to answer his questions in the hope that it would calm him down, (13) after he finished raping her, the petitioner cleaned himself with her shirt, threw her shirt at her, and told her to put it on, (14) the petitioner then took her back to

62. *Id.*, Testimony of Willie Lewis, Vol. XVII, pp. 80–85.

63. *Id.*, Testimony of Bobby Ennis, Vol. XVII, pp. 71–73.

64. *See* S.F. Trial, State's Exhibits 96 and 99.

65. *Id.*, Testimony of Cruz Morua, Vol. XVII, pp. 40–45.

66. *Id.*, Testimony of Bob Manson, Vol. XVII, pp. 86–110.

67. *Id.*, Testimony of O.L. Raulerson, Vol. XVII, pp. 110–15.

her car, forced her to lay on the floor board, and drove her back to the location of his car, (15) the petitioner wiped his prints off her car and told her to wait there until she heard him beep his horn, (16) the petitioner drove away but never beeped his horn, (17) she drove to a neighbor and called the police, (18) she was examined at a hospital and when that examination showed that the petitioner had infected her with gonorrhea, she had to return to the hospital to receive antibiotic treatment, (19) law enforcement authorities were able to lift the petitioner's finger prints off of her glasses, and (20) the petitioner pleaded guilty to two counts of sexual battery and two counts of aggravated assault arising from the incident in question.[68]

The defense offered the brief testimony of petitioner's accomplice Manuel Villanueva to the effect that he had been permitted to plead to the lesser offense of murder and to receive a life sentence [69] and introduced into evidence a juvenile case report prepared when the petitioner was still a youth which outlined the horrible, squalid, family conditions in which the petitioner had grown up.[70]

The prosecution then called as a rebuttal witness Sam Ponder, the assistant Bexar County District Attorney who had supervised Villanueva's prosecution, who testified that (1) he concluded after reviewing the evidence and conferring with his co-prosecutor that Villanueva was not intellectually capable of original thought, Villanueva was a follower, and that Villanueva had acted at the petitioner's direction in connection with the murder, (2) he believed that Villanueva was mentally retarded, and (3) while a jury had found Villanueva competent to stand trial, he did not personally believe the death penalty was appropriate for someone of Villanueva's diminished capacity.[71]

## V. *Punishment Phase Jury Instructions*

In his interrelated first and third claims for federal habeas relief, the petitioner ar-

---

**68.** *Id.*, Testimony of Vicki Meurville, Vol. XVII, pp. 116–34. Vicki Meurville testified that she was then living in Paris, France and that her maiden name had been Isenberg. *Id.*, at pp. 116 and 133–34. In his testimony at the evidentiary hearing held in connection with the petitioner's subsequent state habeas corpus proceeding, petitioner's veteran trial attorney and current state district judge Terry McDonald called Mrs. Meurville "the most devastating witness I've seen" and also testified that he believed the jury had imposed the death penalty on the petitioner because "of what in Florida" and that he was unsure that anything could have changed the jury's verdict at the punishment phase of trial. *See* Statement of Facts from Evidentiary Hearing Held July 11 and 20, 1995 in petitioner's state habeas corpus proceeding challenging his 1989 conviction and sentence [henceforth "S.F. State Habeas Hearing"], Testimony of Terrance ["Terry"] ["Terry"] McDonald, at pp. 233, 243, and 255.

**69.** *Id.*, Testimony of Manuel Villanueva, Vol. XVII, pp. 145–47.

**70.** The defense did not offer any testimony at petitioner's 1989 capital murder trial regarding petitioner's abused and deprived childhood but, instead, introduced into evidence a report apparently prepared in 1971 in connection with the petitioner's sentencing in a juvenile proceeding which outlined the extremely difficult circumstances under which the petitioner had grown up and emphasized that petitioner's parents all but abandoned him at an early age. *See* S.F. Trial, Exhibits Volume, Defendant's Exhibit 20. That report was prepared when the petitioner was only twelve years old but highlighted the fact that the petitioner (1) had done poorly in school, (2) had poor grades and even poorer attendance, (3) displayed a very bad attitude, (4) had made obscene gestures and exhibitions to younger boys in the rest room, (5) had taken money by force from other students, (6) had threatened younger children with physical harm, (7) did not participate in extracurricular activities, (8) had received no discipline or supervision at home, (9) was often left in filth and hunger with his siblings, (10) "takes what he can get and cares little whom he hurts," (11) "has already become hardened even as young as he is," and (12) did not participate in religious activities.

At the July, 1995 evidentiary hearing in petitioner's state habeas corpus proceeding, both of his 1989 trial attorneys testified that they had discussed the petitioner's childhood and background with various members of the petitioner's family but determined as a matter of trial strategy not to call petitioner's family members to testify at trial because either (1) the testimony these potential witnesses could furnish would *not* benefit the petitioner's chances of getting a negative answer to either of the two special sentencing issues or (2) the petitioner's family members would *not* corroborate the painful details of the petitioner's childhood. *See* S.F. State Habeas Hearing, Testimony of Raymund Fuchs, at pp. 129–33, 147–49, 152–54, 177–78, 182–83, 194–96; and Testimony of Terry McDonald, at pp. 240–43.

**71.** *See* S.F. Trial, Volume XVIII, Testimony of Sam Ponder, at pp. 6–20.

gues that the jury instructions at the punishment phase of his 1989 capital murder trial effectively prevented the jury from adequately considering and giving effect to the petitioner's mitigating evidence of his youth at the time of the offense, his troubled childhood, his traumatic family history, his minority race, his functional illiteracy, his "non-triggerman" status, and the life sentence received by Villanueva.[72]

On June 9, 1989, petitioner's jury heard the testimony of Sam Ponder, who had prosecuted Manuel Villanueva for his participation in petitioner's crime, heard closing arguments from both sides, retired to render its verdict, and returned its verdict at the punishment phase of trial later that same date.

### A. A Brief History of Mitigating Evidence

A summary of relevant Supreme Court and Fifth Circuit case law addressing the constitutional requirements regarding the consideration of mitigating evidence in capital sentencing proceedings may provide a proper context for analysis of petitioner's complaints about his punishment phase jury instructions.

#### 1. Supreme Court Precedent

In Woodson v. North Carolina,[73] a Supreme Court plurality struck down as unconstitutional a mandatory death penalty scheme, in part, because it did not allow the sentencing authority to consider the character and record of the individual offender and the circumstances of the particular offense.[74] However, the Supreme Court plurality opinion in Woodson did not identify those aspects of a defendant's character or offense that it deemed relevant as mitigating evidence. Acknowledging this omission, in Lockett v. Ohio,[75] a different plurality of the Supreme Court emphasized the importance of individualized sentencing in criminal cases and held that a state judge had violated a capital murder defendant's constitutional rights by refusing to consider evidence that the defendant (1) was only 21 at the time of the offense, (2) was successfully participating in a drug treatment program, (3) had a low-average or average intelligence and was not suffering from any mental deficiency, (4) had a prior criminal record that included a few minor offenses but no major crimes as a juvenile or adult, and (5) showed a favorable prognosis for rehabilitation.[76] The Supreme Court plurality in Lockett declared that the Eighth Amendment requires a capital sentencing authority be permitted to consider as mitigating factors, any evidence regarding the defendant's character or record or any of the circumstances of the offense that the defendant proffers as a basis for a sentence of less than death.[77]

In Eddings v. Oklahoma,[78] a Supreme Court majority adopted the holding in Lockett and overturned the death sentence of a defendant because the sentencing judge had expressly refused to consider mitigating evidence showing that the defendant (1) had been raised without proper guidance following his parents' divorce when he was only 5, (2) had lived with virtually no supervision from his alcoholic and promiscuous mother until he reached 14, when he was sent to live with his physically abusive father, (3) was emotionally disturbed and exhibited a mental and emotional development several years below his age, (4) was categorized by a psychologist as a sociopath and antisocial but given a thirty percent chance of growing out of that

---

72. See Petitioner's First Amended Petition for Writ of Habeas Corpus, filed February 20, 1996, docket entry no. 11 [henceforth "First Amended Petition"], at pp. 5–20 and 24–33; and Petitioner's Response to Respondent's Answer, filed May 13, 1996 [henceforth "Petitioner's Response"], docket entry no. 15, at pp. 3–8.

73. 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

74. See Woodson v. North Carolina, 428 U.S. at 304, 96 S.Ct. at 2991.

75. 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

76. See Lockett v. Ohio, 438 U.S. at 594, 98 S.Ct. at 2959.

77. Id., 438 U.S. at 605 & 607, 98 S.Ct. at 2964–65 & 2966.

78. 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

condition, (5) was identified as being a potential prospect for rehabilitation with proper therapy for 15–20 years, and (6) probably did not know what he was doing when he fired the fatal shot and, with proper therapy, would not be a threat to society.[79] The Supreme Court majority in *Eddings* expressly held that the foregoing evidence of the defendant's difficult family history and emotional disturbance was typical of the type of relevant mitigating evidence which the Eighth Amendment compels a capital sentencing authority to consider before imposing the death penalty.[80]

In *Skipper v. South Carolina*,[81] the Supreme Court overturned a death sentence because the state trial court had excluded what the Supreme Court held to be relevant, mitigating evidence that the defendant had been a well-behaved and disciplined prisoner, to wit, testimony establishing that the defendant (1) had conducted himself well while in jail awaiting trial, (2) had earned the equivalent of a high school diploma during a previous incarceration, (3) had made a good adjustment to prison life, and (4) planned to work while incarcerated to earn money for his family.[82]

In *Hitchcock v. Dugger*,[83] the Supreme Court struck down a death sentence after concluding that the defendant's sentencing jury had been precluded form considering the defendant's mitigating evidence that (1) as a child he had the habit of inhaling gasoline fumes, (2) he once passed out after doing so, (3) thereafter his mind tended to wander, (4) he had been one of seven children in a poor family that picked cotton for a living, (5) his father had died of cancer, (6) the defendant had been a fond and affectionate uncle to the children of his brother, (7) the defendant showed a potential for rehabilitation, and (8) he had voluntarily surrendered to authorities.[84]

In *Mills v. Maryland*,[85] the Supreme Court struck down a death sentence imposed by a jury that had been given both a confusing and ambiguous set of instructions and a verdict form which could have been construed to bar the jury's consideration of the defendant's mitigating evidence of his youth, mental infirmity, lack of future dangerousness, and State's failure to attempt to rehabilitate him during his prior incarceration unless the jury agreed unanimously on each mitigating factor.[86]

In *McKoy v. North Carolina*,[87] the Supreme Court struck down a state requirement that a jury unanimously agree before it could consider mitigating evidence, including the defendant's evidence that he (1) suffered from mental impairments that diminished his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, (2) had borderline intellectual functioning and an IQ of 74, (3) committed his crime while under the influence of mental or emotional disturbance, (4) was 65 at the time of the offense, (5) had for several decades exhibited signs of mental or emotional disturbance that went untreated, (6) suffered from a mental or emotions disturbance that was aggravated by his poor physical health, and (7) had an impaired ability to remember of the events of the day of his offense.[88]

---

**79.** The Supreme Court's summary of the extensive mitigating evidence introduced at trial in *Eddings* is found at 455 U.S. at 107–09, 102 S.Ct. at 872–73.

**80.** *See Eddings v. Oklahoma*, 455 U.S. at 115–16, 102 S.Ct. at 877–78.

**81.** 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986).

**82.** *See Skipper v. South Carolina*, 476 U.S. at 3–7, 106 S.Ct. at 1670–72.

**83.** 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

**84.** *See Hitchcock v. Dugger*, 481 U.S. at 397–99, 107 S.Ct. at 1823–24.

**85.** 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

**86.** *See Mills v. Maryland*, 486 U.S. at 376–83, 108 S.Ct. at 1866–70.

**87.** 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990).

**88.** *McKoy v. North Carolina*, 494 U.S. at 439–44, 110 S.Ct. at 1231–34.

In *Penry v. Lynaugh*,[89] decided June 26, 1989, less than three weeks after the petitioner's trial ended, the Supreme Court held the Texas capital sentencing scheme unconstitutional *as applied* to a defendant who had introduced evidence of his abusive childhood and mental retardation.[90] More specifically, Penry had introduced evidence during his trial which established that (1) he suffered from organic brain disorder and mental retardation, (2) these conditions made it impossible for him to appreciate the wrongfulness of his conduct or to conform his conduct to the law, and (3) when he was child, his mother frequently beat him over the head with a belt and routinely locked him in his room without access to the toilet for long periods of time.[91] The Supreme Court subsequently explained that it considered the foregoing evidence to be "mitigating" be-cause it indicated that the defendant suffered from a diminished ability to control his impulses or to evaluate the consequences of his conduct and therefore reduced his moral culpability.[92] The Supreme Court majority concluded in *Penry* that, in answering the three special issues submitted to it during the punishment phase of trial,[93] Penry's Texas jury had *not* been able to consider and give effect to all of Penry's mitigating evidence "without any jury instructions on mitigating evidence."[94] Therefore, the Supreme Court concluded that Penry was constitutionally entitled to further instructions informing the jury that it could consider and give effect to his evidence by declining to impose the death penalty.[95]

In several subsequent decisions, however, the Supreme Court has circumscribed its holding in *Penry*.[96] In *Graham v. Collins*,

**89.** 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

**90.** *See Penry v. Lynaugh*, 492 U.S. at 309, 109 S.Ct. at 2941.

**91.** *Id.*

**92.** *See Graham v. Collins*, 506 U.S. 461, 473, 113 S.Ct. 892, 901, 122 L.Ed.2d 260 (1993), *quoting Penry v. Lynaugh*, 492 U.S. at 322, 109 S.Ct. at 2948.

**93.** At the time of petitioner's capital murder trial in May and June, 1989, the Texas capital sentencing procedure called for a bifurcated trial in which the guilt or innocence phase of the trial occurred prior to any consideration of punishment by the jury. In the event the jury found the defendant guilty of capital murder, the same jury would remain empaneled and the punishment phase of the trial would proceed. *See* Texas Code of Criminal Procedure, Art. 37.071 (Vernon 1981). At that time, the Texas capital sentencing statute directed the trial court to submit the following issues to the jury at the punishment phase of the capital trial:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

Also at the time of the petitioner's trial, the Texas capital sentencing statute directed the trial court to instruct the jury that "(1) it may not answer any issue 'yes' unless it agrees unanimously; and (2) it may not answer any issue 'no' unless 10 or more jurors agree." *See* Texas Code or Criminal Procedure, Art. 37.071(d) (Vernon 1981). The Texas capital sentencing statute also provided as follows:

If the jury returns an affirmative finding on each special issue submitted under this article, the court shall sentence the defendant to death. If the jury returns a negative finding or is unable to answer any issue submitted under this article, the court shall sentence the defendant to confinement in the Texas Department of Corrections for life.

*See* Texas Code or Criminal Procedure, Art. 37.071(e) (Vernon 1981) (emphasis added).

**94.** *See Graham v. Collins*, 506 U.S. 461, 474–75, 113 S.Ct. 892, 901, 122 L.Ed.2d 260 (1993), *quoting Penry v. Lynaugh*, 492 U.S. at 322, 109 S.Ct. at 2948.

**95.** *See Graham v. Collins*, 506 U.S. at 474, 113 S.Ct. at 901, *quoting Penry v. Lynaugh*, 492 U.S. at 328, 109 S.Ct. at 2952.

For a discussion of the Supreme Court's holding in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and the relationship between that opinion and the holding in *Penry*, *see Adanandus v. Johnson*, 947 F.Supp. 1021, 1039–41 (W.D.Tex.1996), *affirmed*, 114 F.3d 1181, 1997 WL 256743 (5th Cir.1997) [Table].

**96.** *See Arave v. Creech*, 507 U.S. 463, 470–71, 113 S.Ct. 1534, 1540, 123 L.Ed.2d 188 (1993), (holding that to satisfy the Eighth and Fourteenth Amendments, a capital sentencing scheme must suitably direct and limit the sentencer's discre-

the Supreme Court held that its opinion in *Penry* should *not* be construed as broadly suggesting the invalidity of the Texas special issue framework and held that Graham's sentencing jury could give adequate consideration, without the necessity of a *Penry* instruction, to Graham's mitigating evidence of his youth, good character traits, efforts to be a responsible father, nonviolent and religious nature, and unstable family background.[97] In *Johnson v. Texas*,[98] the Supreme Court upheld a Texas prisoner's capital murder conviction and death sentence against a claim that the former Texas capital murder statute precluded the jury from considering and giving effect to mitigating evidence of the defendant's youth at the time of his offense.[99] Thus, while the Supreme Court has emphasized in its post–*Penry* opinions the broad scope of potentially mitigating evidence that a Texas capital sentencing jury may adequately consider without the necessity of a *Penry* instruction, that court has taken great pains *not* to require explicit consideration of all evidence that might arguably possess some potential mitigating value.[100]

Contrary to the suggestions implicit in petitioner's first and third claims for relief herein, neither before nor after *Penry* has the Supreme Court ever recognized any broad-ranging Eighth Amendment right to either (1) compel a capital sentencing authority to consider any and all manner of evidence which a capital murder defendant considers "relevant" in an abstract sense when deciding whether to impose the death penalty or (2) require the sentencing authority to consider an emotional appeal based on purportedly mitigating evidence. In *Lockett v. Ohio*, the Supreme Court plurality expressly acknowledged the "traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." [101] In *Skipper v. South Carolina*, the Supreme Court majority specifically disavowed the suggestion that "all facets of the defendant's ability to adjust to prison life must be treated as relevant and potentially mitigating." [102] In *California v. Brown*,[103] a Supreme Court plurality upheld as constitu-

tion so as to minimize the risk of wholly arbitrary and capricious action and that the limits on the sentencer's discretion must constitute clear and objective standards that provide "specific and detailed guidance" and make rationally reviewable the process for imposing the death penalty); *Saffle v. Parks*, 494 U.S. 484, 491–93, 110 S.Ct. 1257, 1262, 108 L.Ed.2d 415 (1990), (holding that within certain parameters, the State is free to channel or focus the jury's consideration of the defendant's mitigating evidence and emphasizing that "above all, capital sentencing must be reliable, accurate, and nonarbitrary"); and *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990), (holding that a defendant must show more than that a capital sentencing scheme *might* have resulted in the jury being prevented from considering mitigating evidence of the defendant's character and background; the petitioner must show a reasonable likelihood that such actually occurred).

**97.** See *Graham v. Collins*, 506 U.S. at 475–77, 113 S.Ct. at 902. Significantly, in *Graham*, the Supreme Court rejected the suggestion that a *Penry* instruction was constitutionally mandated whenever a capital murder defendant offered mitigating evidence that had some arguable relevance beyond the Texas special sentencing issues. *Id.*

**98.** 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993).

**99.** See *Johnson v. Texas*, 509 U.S. at 368–69, 113 S.Ct. at 2669. The Supreme Court emphasized

in *Johnson* that its previous opinions do *not* require that "a jury must be able to dispense mercy on the basis of a sympathetic response to the defendant." *Id.*, 509 U.S. at 371–72, 113 S.Ct. at 2671. However, the Supreme Court's opinion in *Johnson* includes a lengthy discussion regarding the inherently mitigating nature of evidence that the defendant was young or immature at the time of the capital offense. See *Johnson v. Texas*, 509 U.S. at 367–70, 113 S.Ct. at 2668–70.

**100.** See *Johnson v. Texas*, 509 U.S. at 371–72, 113 S.Ct. at 2671, (rejecting the contention that a *Penry* instruction is necessary in every case in which the defendant offers mitigating evidence that has *some* arguable relevance beyond the special issues and emphasizing that its previous opinions do *not* require that a jury be able to dispense mercy on the basis of a sympathetic response to the defendant); and *Graham v. Collins*, 506 U.S. at 476, 113 S.Ct. at 902, (rejecting the contention that a *Penry* instruction is necessary in every case in which the defendant offers mitigating evidence that has *some* arguable relevance beyond the special issues).

**101.** *Lockett v. Ohio*, 438 U.S. at 604 n. 12, 98 S.Ct. at 2965 n. 12.

**102.** *Skipper v. South Carolina*, 476 U.S. at 7 n. 2, 106 S.Ct. at 1672 n. 2.

tional a capital sentencing jury instruction which directed the jury *not* to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling.[104] In *Franklin v. Lynaugh*,[105] a majority of Supreme Court justices agreed that (1) a capital sentencing authority is *not* constitutionally required to give consideration to "residual doubts" about the defendant's innocence because such matters are relevant to neither the defendant's character or record nor the circumstances of the offense [106] and (2) the Texas capital sentencing special issue regarding future dangerousness affords the sentencing jury adequate opportunity to consider a capital murder defendant's evidence of his good behavior in prison.[107] In *Saffle v. Parks,* the Supreme Court upheld as consti-

tutional a jury instruction directing a capital sentencing jury to "avoid any influence of sympathy, sentiment, passion, prejudice, or other arbitrary factor when imposing sentence" [108] and held inconsistent with its prior opinions an argument that the Constitution requires the jury be allowed to consider and give effect to emotions that are based on mitigating evidence.[109] In *Tuilaepa v. California,*[110] the Supreme Court distinguished the two aspects of the capital decision-making process, i.e., the eligibility decision and the selection process, and emphasized that, while both inquiries necessarily involve resolution of issues that bear a factual nexus to the crime, the selection process must also focus on the character and record of the defendant.[111] In *Buchanan v. Angelone,*[112]

---

**103.** 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987).

**104.** *California v. Brown,* 479 U.S. at 542–43, 107 S.Ct. at 839–40.

**105.** 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).

**106.** *See Franklin v. Lynaugh,* 487 U.S. at 172–74, 108 S.Ct. at 2327 (plurality opinion of Justice White, joined by the Chief Justice and Justices Scalia and Kennedy); and *Franklin v. Lynaugh,* 487 U.S. at 188, 108 S.Ct. at 2335 (concurring opinion of Justices O'Connor and Blackmun concluding that "residual doubts" is neither relevant to the defendant's character nor the circumstances of the offense).

**107.** *Id.,* 487 U.S. at 177–80, 108 S.Ct. at 2329–30. The concurring Justices agreed with this treatment of Franklin's meager evidence regarding his good behavior in prison. *Id.,* 487 U.S. at 184–87, 108 S.Ct. at 2332–34, (O'Connor and Blackmun concurring).

**108.** *See Saffle v. Parks,* 494 U.S. at 489–94, 110 S.Ct. at 1260–63. "The State must not cut off full and fair consideration of mitigating evidence; but it need not grant the jury the choice to make the sentencing decision according to its own whims or caprice." *Id.,* 494 U.S. at 493, 110 S.Ct. at 1263.

**109.** *Id.,* 494 U.S. at 494, 110 S.Ct. at 1263.

**110.** 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994).

**111.** *See Tuilaepa v. California,* 512 U.S. at 971–73, 114 S.Ct. at 2634–35. *Tuilaepa* is significant to the jurisprudence of Eighth Amendment claims because it represents the first time that

the Supreme Court set forth a comprehensive analytical approach to Eighth Amendment claims. Equally significant is the fact that although there were several separate concurring opinions joining Justice Kennedy's opinion for the Court, six of the Justices appeared to agree on the propriety of the analytical framework set forth by Justice Kennedy. *Tuilaepa* holds that the Eighth Amendment address two different but related aspects of capital sentencing: the eligibility decision and the selection decision. 512 U.S. at 971, 114 S.Ct. at 2634. The Supreme Court's analysis of those aspects of capital sentencing provides the first clear insight into a comprehensive system for analyzing Eighth Amendment claims:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. The aggravated circumstance may be contained in the definition of the crime or in a separate sentencing factor (or both). As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to ever defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague. * * *

We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. "What is important at the selection state is an individualized determination on the basis of the character of the individual and the

the Supreme Court reaffirmed the vitality of the two-stage *Tuilaepa* analysis and rejected an argument that the Constitution mandates jury instructions at the selection stage of a capital sentencing proceeding regarding the nature of mitigating evidence or the manner in which the sentencing jury is to consider specific statutorily-defined mitigating factors, such as the defendant's age, lack of prior criminal activity, extreme emotional or mental disturbance, and significantly impaired capacity to appreciate the criminality of his conduct.[113]

The first part of the *Tuilaepa* analysis, i.e., the eligibility decision, was discussed by the Supreme Court in *Loving v. United States*[114]:

The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance

circumstances of the crime." That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.
512 U.S. at 971–73, 114 S.Ct. at 2634–35 (citations omitted).

**112.** —— U.S. ——, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998) [1998 WL 17109].

**113.** *See Buchanan v. Angelone,* 118 S.Ct. at 760–61.

The Supreme Court's opinion in *Buchanan* emphasizes that the issue of proportionality in capital sentencing is to be addressed in the eligibility phase of a capital sentencing proceeding, wherein that court has stressed the need for channeling and limiting the jury's discretion to ensure the death penalty is not arbitrarily or capriciously imposed. *Id.,* 118 S.Ct. at 761.

**114.** 517 U.S. 748, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996).

in addition is no part of the constitutionally required narrowing process."[115]

Under the Texas capital sentencing scheme, this constitutionally-mandated narrowing function is performed at the guilt-innocence phase of trial.[116] It is in the selection phase that a sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence.[117] Therefore, this Court's analysis of the petitioner's claims regarding mitigating evidence must focus on the second aspect of the *Tuilaepa* analysis.

### 2. Treatment of Penry Mitigating Evidence

■ In the wake of *Penry* and the other Supreme Court opinions summarized above, both the Supreme Court and the Fifth Circuit have addressed a wide range of constitutional challenges to individual applications of the Texas capital sentencing scheme. From those opinions, it is possible to discern a coherent approach to the subject of mitigating evidence. The Supreme Court and Fifth Circuit have each emphasized that a jury in a capital murder trial must be permitted to examine the defendant's character and record, as well as the circumstances of the particular offense in determining whether to impose the death penalty:

**115.** 517 U.S. 748, 116 S.Ct. 1737, 1742, 135 L.Ed.2d 36 (1996) (citations omitted). The Supreme Court's opinion in *Buchanan v. Angelone* includes a further elaboration on the distinction between the narrowing function or eligibility decision and the selection phase of a capital sentencing proceeding. *See Buchanan v. Angelone,* 118 S.Ct. at 761.

**116.** *See Johnson v. Texas,* 509 U.S. at 362, 113 S.Ct. at 2666: (holding that its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted five different classifications of murder for that purpose); *Lowenfield v. Phelps,* 484 U.S. 231, 243–47, 108 S.Ct. 546, 554–55, 98 L.Ed.2d 568 (1988); *Jurek v. Texas,* 428 U.S. at 268–75, 96 S.Ct. at 2955–57; *West v. Johnson,* 92 F.3d at 1406; and *Woods v. Johnson,* 75 F.3d 1017, 1033–34 (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996).

**117.** *See Buchanan v. Angelone,* 118 S.Ct. at 761.

[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.[118]

Therefore, a sentencing jury in a capital murder trial may not be prevented from considering any mitigating evidence presented by the defendant which relates to the defendant's character or record or the circumstances of the offense.[119] In other words, the jury at petitioner's trial must have been afforded adequate opportunity to give effect to petitioner's mitigating evidence of his character and background, as well as his evidence of the circumstances surrounding his offense. Probably because petitioner's trial was completed in the weeks prior to the Supreme Court's issuance of its opinion in

Penry, the state trial court did not give petitioner's jury any special instructions regarding mitigating evidence at the punishment phase of trial such as the one required in Penry.[120] The question before the Court is whether the absence of such an instruction in petitioner's case violated constitutional principles, i.e., effectively deprived petitioner's jury of the opportunity to consider his constitutionally relevant mitigating evidence.

■ The Fifth Circuit has held that a Penry instruction is only required in those instances in which the major mitigating thrust of the evidence is substantially beyond the scope of all the special issues under the Texas capital sentencing scheme.[121] The Fifth Circuit has recognized that a wide range of potentially mitigating evidence can be considered within the scope of the Texas capital sentencing special issues without the necessity for a Penry instruction.[122] The

**118.** *Lockett v. Ohio,* 438 U.S. at 604, 98 S.Ct. at 2964; and *Sawyers v. Collins,* 986 F.2d 1493, 1497 (5th Cir.1993), *cert. denied,* 508 U.S. 933, 113 S.Ct. 2405, 124 L.Ed.2d 300 (1993), *both quoting Woodson v. North Carolina,* 428 U.S. at 304, 96 S.Ct. at 2991.

**119.** *See Buchanan v. Angelone,* 118 S.Ct. at 761; *Eddings v. Oklahoma,* 455 U.S. at 113–17, 102 S.Ct. at 876–78; and *Sawyers v. Collins,* 986 F.2d at 1497. However, the Fifth Circuit's opinion in *Sawyers* must be read in conjunction with the Supreme Court's more recent opinions addressing the former Texas capital sentencing statute. *See Johnson v. Texas,* 509 U.S. at 372–73, 113 S.Ct. at 2671, (rejecting the contention that a *Penry* instruction is necessary in every case in which the defendant offers mitigating evidence that has *some* arguable relevance beyond the special issues and emphasizing that its previous opinions do *not* require that a jury be able to dispense mercy on the basis of a sympathetic response to the defendant); and *Graham v. Collins,* 506 U.S. at 476, 113 S.Ct. at 902, (rejecting the contention that a *Penry* instruction is necessary in every case in which the defendant offers mitigating evidence that has *some* arguable relevance beyond the special issues).

**120.** The jury charge at the punishment phase of petitioner's 1989 capital murder trial appears at pp. 372–74 of the Transcript from petitioner's 1989 state trial court proceeding.

**121.** *See Nethery v. Collins,* 993 F.2d 1154, 1161 (5th Cir.1993), *cert. denied,* 511 U.S. 1026, 114 S.Ct. 1416, 128 L.Ed.2d 87 (1994); *Bridge v. Collins,* 963 F.2d 767, 770 (5th Cir.1992), *cert. denied,* 509 U.S. 925, 113 S.Ct. 3044, 125

L.Ed.2d 729 (1993); *Holland v. Collins,* 962 F.2d 417, 419–20 (5th Cir.1992), *cert. denied,* 509 U.S. 925, 113 S.Ct. 3043, 125 L.Ed.2d 729 (1993); *White v. Collins,* 959 F.2d 1319, 1322 (5th Cir. 1992), *cert. denied,* 503 U.S. 1001, 112 S.Ct. 1714, 118 L.Ed.2d 419 (1992); *Barnard v. Collins,* 958 F.2d 634, 637 (5th Cir.1992), *cert. denied,* 506 U.S. 1057, 113 S.Ct. 990, 122 L.Ed.2d 142 (1993); and *Graham v. Collins,* 950 F.2d 1009, 1030–33 (5th Cir.1992), *(en banc),* *affirmed,* 506 U.S. 461, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993).

**122.** *See Tucker v. Johnson,* 115 F.3d 276, 281–82 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 605, 139 L.Ed.2d 492 (1997), (evidence of the defendant's youth, intoxication at the time of the offense, and chronic drug and alcohol abuse which resulted in arrested emotional development); *Turner v. Johnson,* 106 F.3d 1178, 1189 (5th Cir.1997), (evidence of the defendant's youth and good behavior during pretrial detention); *West v. Johnson,* 92 F.3d 1385, 1405 (5th Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1847, 137 L.Ed.2d 1050 (1997), (the defendant's testimony that he had been drinking and was intoxicated and his confession that he had "blown up" in response to his victim's verbal statements); *Nichols v. Scott,* 69 F.3d 1255, 1267–68 & 1278 (5th Cir.1995), *cert. denied,* 518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996), (evidence the defendant was not the triggerman and evidence showing the defendant's good character); *Briddle v. Scott,* 63 F.3d 364, 377 (5th Cir.1995), *cert. denied,* 516 U.S. 1033, 116 S.Ct. 687, 133 L.Ed.2d 531 (1995), (evidence of the defendant's remorse and voluntary intoxication); *Lackey v. Scott,* 28 F.3d 486, 489 (5th Cir.1994), *cert. de-*

Supreme Court and Fifth Circuit have each held that the Texas capital sentencing special issues allow adequate consideration of the mitigating effects of evidence of a defendant's youth so as to negate the necessity for a *Penry* instruction on such evidence.[123]

Likewise, the Fifth Circuit has repeatedly held that the Texas capital sentencing special issues are sufficiently broad to permit adequate consideration of evidence the accused was voluntarily intoxicated at the time of his offense.[124] The Fifth Circuit has also re-

*nied*, 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995), (evidence of the defendant's intoxication); *Crank v. Collins*, 19 F.3d 172, 175 (5th Cir.1994), *cert. denied*, 512 U.S. 1214, 114 S.Ct. 2699, 129 L.Ed.2d 825 (1994), (evidence of the defendant's good character); *Nethery v. Collins*, 993 F.2d at 1161, (evidence of the accused's voluntary intoxication); *James v. Collins*, 987 F.2d 1116, 1121–22 (5th Cir.1993), *cert. denied*, 509 U.S. 947, 114 S.Ct. 30, 125 L.Ed.2d 780 (1993), (evidence of the accused's voluntary intoxication, impoverished and abusive family history, redeeming character traits, including his remorse for his actions, his cooperation with law enforcement authorities, and his positive familial ties); *Jernigan v. Collins*, 980 F.2d 292, 295 (5th Cir.1992), *cert. denied*, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993), (evidence the defendant was a kind, gentle person who had rededicated his life to God); *Stewart v. Collins*, 978 F.2d 199, 201 (5th Cir.1992), *cert. denied*, 507 U.S. 1053, 113 S.Ct. 1951, 123 L.Ed.2d 656 (1993), (evidence that the defendant was *not* the triggerman); *Demouchette v. Collins*, 972 F.2d 651, 653–54 (5th Cir.1992), *cert. denied*, 505 U.S. 1246, 113 S.Ct. 27, 120 L.Ed.2d 952 (1992), (evidence the defendant suffered from antisocial personality disorder); *Cantu v. Collins*, 967 F.2d 1006, 1012–13 (5th Cir.1992), *cert. denied*, 509 U.S. 926, 113 S.Ct. 3045, 125 L.Ed.2d 730 (1993), (evidence of the defendant's youth); *Drew v. Collins*, 964 F.2d 411, 420–21 (5th Cir.1992), *cert. denied*, 509 U.S. 925, 113 S.Ct. 3044, 125 L.Ed.2d 730 (1993), (evidence the defendant had a troubled childhood, had a chronic drinking problem, was under the influence of alcohol and marijuana at the time he committed the crime, was only 23 years old at the time of the offense, and did *not* strike the fatal blow); *Bridge v. Collins*, 963 F.2d 767, 769–70 (5th Cir.1992), *cert. denied*, 509 U.S. 925, 113 S.Ct. 3044, 125 L.Ed.2d 729 (1993), (evidence of the defendant's accomplice actually shot the victim, the defendant was intoxicated at the time of the offense, the defendant did not plan the robbery, the defendant was operating under influence of others during the offense, the defendant expressed extreme remorse following the offense, the defendant was young and immature at the time of the offense, and had no previous history of violence); *Holland v. Collins*, 962 F.2d 417, 419–20 (5th Cir.1992), *cert. denied*, 509 U.S. 925, 113 S.Ct. 3043, 125 L.Ed.2d 729 (1993), (evidence of the defendant's positive personality traits); *Black v. Collins*, 962 F.2d 394, 404–05 (5th Cir.1992), *cert. denied*, 504 U.S. 992, 112 S.Ct. 2983, 119 L.Ed.2d 601 (1992), (evidence of defendant's good character, military service, and work with the Boy Scouts); *White v. Collins*, 959 F.2d 1319,

1324 (5th Cir.1992), *cert. denied*, 503 U.S. 1001, 112 S.Ct. 1714, 118 L.Ed.2d 419 (1992), (evidence of the defendant's youthful age at the time of his offense); *Lincecum v. Collins*, 958 F.2d 1271, 1282–84 (5th Cir.1992), *cert. denied* 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992), (evidence of the accused's troubled childhood and his emotional turmoil at the time of his offense); *Barnard v. Collins*, 958 F.2d 634, 638–39, (5th Cir.1992), *cert. denied*, 506 U.S. 1057, 113 S.Ct. 990, 122 L.Ed.2d 142 (1993), (defendant's evidence of his head injury, troubled childhood, drug and alcohol abuse, good character, work history, carpentry skills, and familial responsibility and support); *Cordova v. Collins*, 953 F.2d 167, 170 (5th Cir.1992), *cert. denied*, 502 U.S. 1067, 112 S.Ct. 959, 117 L.Ed.2d 125 (1992), (defendant's testimony of his voluntary intoxication at the time of his offense); *Graham v. Collins*, 950 F.2d 1009, 1032–33 (5th Cir. 1992), (*en banc*), *affirmed*, 506 U.S. 461, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993), (evidence that the defendant was of a normal or good character, respected his mother and stepfather, cared for and was close to his mother, was never violent, never had weapons, helped out around the house without being asked, went to school and church regularly, loved "The Lord", and worked and contributed to the support of his two children); and *Green v. Collins*, 947 F.2d 1230, 1232 (5th Cir.1991), *cert. denied*, 502 U.S. 954, 112 S.Ct. 412, 116 L.Ed.2d 433 (1991), (evidence the defendant was a good worker, had been a foreman, would have been re-employed by his former employer had he not been incarcerated, was highly intelligent, optimistic, and had the mental capacity to address small details).

**123.** *See Johnson v. Texas*, 509 U.S. at 365–70, 113 S.Ct. at 2668–70; *Tucker v. Johnson*, 115 F.3d at 281–82; *Turner v. Johnson*, 106 F.3d at 1189; *Drew v. Collins*, 964 F.2d at 420–21; *Barnard v. Collins*, 958 F.2d at 637–38; *Wilkerson v. Collins*, 950 F.2d 1054, 1060–61 (5th Cir.1992), *cert. denied*, 509 U.S. 921, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993); and *Graham v. Collins*, 950 F.2d at 1030–32.

**124.** *See Tucker v. Johnson*, 115 F.3d at 281–82; *West v. Johnson*, 92 F.3d at 1405; *Briddle v. Scott*, 63 F.3d at 377; *Lackey v. Scott*, 28 F.3d at 489; *Anderson v. Collins*, 18 F.3d 1208, 1215 n. 5 (5th Cir.1994); *Nethery v. Collins*, 993 F.2d at 1161; *James v. Collins*, 987 F.2d at 1121; *Sawyers v. Collins*, 986 F.2d at 1502 n. 14; *Drew v. Collins*, 964 F.2d at 420; *Bridge v. Collins*, 963 F.2d at 770; *Barnard v. Collins*, 958 F.2d at 639; *Cordova v. Collins*, 953 F.2d at 170; and *Graham*

peatedly held that a Texas capital sentencing jury may give adequate consideration to evidence showing a defendant neither fired the fatal shot nor delivered the fatal blow without the necessity of a *Penry* instruction.[125] Thus, evidence of such matters does not require any special jury instructions; Texas sentencing juries can adequately consider these types of evidence without the necessity of supplemental jury instructions like those mandated by *Penry*.

 Consistent with the Supreme Court opinions summarized above, the Fifth Circuit

v. *Collins*, 950 F.2d at 1029. In each of these opinions, the Fifth assumed without analysis that evidence of the defendant's voluntary intoxication at the time of his offense fell within the parameters of constitutionally relevant mitigating evidence.

**125.** See *Nichols v. Scott*, 69 F.3d at 1267–68; *Stewart v. Collins*, 978 F.2d at 201; *Drew v. Collins*, 964 F.2d at 420–21; and *Bridge v. Collins*, 963 F.2d at 769–70.

**126.** See *Turner v. Johnson*, 106 F.3d at 1189, (holding that "for evidence to have mitigating relevance, there must be a nexus between the mitigating evidence and the criminal act"); *Harris v. Johnson*, 81 F.3d 535, 539 (5th Cir.1996), *cert. denied*, 517 U.S. 1227, 116 S.Ct. 1863, 134 L.Ed.2d 961 (1996), (holding that no *Penry* instruction was necessary where there was no evidence showing that the defendant's borderline intelligence bore a nexus to his criminal actions); *Allridge v. Scott*, 41 F.3d 213, 223 (5th Cir.1994), *cert. denied*, 514 U.S. 1108, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995), (holding that no *Penry* instruction was necessary in the absence of evidence showing that the defendant's criminal conduct was attributable to the mental illness and abuse the had defendant suffered during a previous incarceration); *Lackey v. Scott*, 28 F.3d at 489, (holding that evidence of the defendant's low intelligence and history of childhood abuse was not relevant for *Penry* purposes where there was no evidence showing the defendant's criminal act was attributable to same); *Madden v. Collins*, 18 F.3d 304, 307–08 (5th Cir.1994), *cert. denied*, 513 U.S. 1156, 115 S.Ct. 1114, 130 L.Ed.2d 1078 (1995), (holding that evidence the defendant suffered from an antisocial personality, dyslexia, and a troubled childhood was not relevant for *Penry* purposes absent a showing that the defendant's criminal conduct was attributable to same); *Russell v. Collins*, 998 F.2d 1287, 1292–93 (5th Cir.1993), *cert. denied*, 510 U.S. 1185, 114 S.Ct. 1236, 127 L.Ed.2d 580 (1994), (holding that evidence of a single instance of physical abuse by the petitioner's stepfather did not constitute relevant mitigating evidence when unaccompanied by any

has held that, to constitute relevant mitigating evidence for *Penry* purposes, evidence of a defendant's background and character must relate to, and diminish the defendant's moral culpability for the offense with which he is charged.[126] Thus, the first inquiry in a *Penry* claim is whether the mitigating evidence is relevant, i.e., does the evidence implicate the basic concern of *Penry* that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable then defendants who have no such excuse.[127] In order to meet this rele-

other evidence showing that the incident left the petitioner mentally or emotionally impaired or more predisposed to commit murder); *Barnard v. Collins*, 958 F.2d at 638–39, (holding that, in order to warrant a *Penry* instruction, evidence that a defendant had a troubled childhood must be accompanied by evidence that the defendant's childhood experiences had a psychological effect on the defendant, i.e., that the defendant's criminal conduct was attributable to his disadvantaged background); and *Graham v. Collins*, 950 F.2d at 1033, (holding that "mitigating" evidence must be able to raise an inference "that the crime is attributable to the disability"). See also *Barnard v. Collins*, 958 F.2d at 639, (holding that evidence from lay witnesses that the defendant had a drinking problem and was intoxicated at the time of his offense was insufficient to permit the jury to conclude that the defendant therein suffered from alcoholism or drug addiction or some other "uniquely severe permanent handicap" through no fault of his own).

**127.** In both *Penry v. Lynaugh* and *Buchanan v. Angelone*, the Supreme Court addressed situations in which a capital murder defendant had presented evidence at trial that he had suffered extensive physical or emotional child abuse *and* expert testimony which directly linked the defendant's troubled childhood to the specific capital murder with which the defendant was charged. See *Penry v. Lynaugh*, 492 U.S. at 307–10, 109 S.Ct. at 2941–42; and *Buchanan v. Angelone*, 118 S.Ct. at 759. While a rational jury may infer that evidence of a long-standing, pattern of severe physical or emotional abuse inflicted upon a child of tender years renders that child less morally culpable for a violent crime, isolated episodes of violence or physical abuse inflicted upon a defendant do not, standing alone, constitute relevant mitigating evidence because there is no inherent nexus between such isolated episodes and the capital offense. See *Russell v. Collins*, 998 F.2d at 1292–93. Thus, absent evidence showing that extreme, severe, or sustained mental or physical abuse was inflicted upon a capital murder defendant during childhood, a defendant asserting a history of child abuse in mitigation at

vance standard, the evidence must show (1) a uniquely severe permanent handicap with which the defendant is burdened through no fault of his own and (2) that the criminal act was attributable to this severe permanent condition.[128] A properly preserved *Penry* claim will only prove meritorious if two requirements are met: first, the evidence proffered at trial must actually be "mitigating", i.e., it must relate to the defendant's character or background or to the circumstances of the offense and be sufficient to lead a reasonable juror to impose a penalty less than death; and second, the evidence proffered at trial must have been beyond the "effective reach" of the jury, i.e., there must be a reasonable likelihood that the jury applied the Texas special issues in a way that prevented consideration of the constitutionally relevant mitigating evidence.[129] A failure to satisfy either prong of this analysis renders a *Penry* claim meritless. Furthermore, *Penry* does not require that a sentencer be able to give effect to a defendant's mitigating evidence in whatever manner or to whatever extent the defendant desires.[130] A jury need only be provided one fair vehicle for considering mitigating evidence.[131] The State can

"structure" the jury's consideration of mitigating evidence, so long as it does not prevent the jury from giving effect to any constitutionally relevant mitigating evidence.[132]

### 3. Synthesis

From careful scrutiny of the foregoing Supreme Court and Fifth Circuit opinions, a coherent approach to the treatment of mitigating evidence in Texas capital sentencing proceedings emerges. In mathematical terms, the universe of evidence relevant at a capital murder trial includes a set of "constitutionally relevant mitigating evidence," i.e., evidence which relates to the defendant's character or background or to the circumstances of the offense and is sufficient to lead a reasonable juror to impose a penalty less than death. The Fifth Circuit has defined this type of evidence as that which establishes that (1) the defendant suffered from a uniquely severe permanent handicap with which the defendant is burdened through no fault of his own and (2) the defendant's criminal act was attributable to this severe permanent condition.[133] Within this set of constitutionally relevant mitigating

---

sentencing, the defendant must come forward with expert testimony or other evidence directly linking his or her capital offense to some form of physical, mental, or emotional abuse the defendant suffered as a child. *Id.*

128. *See Tucker v. Johnson*, 115 F.3d at 281; *Turner v. Johnson*, 106 F.3d at 1189; *Harris v. Johnson*, 81 F.3d at 539; *Davis v. Scott*, 51 F.3d 457, 460 (5th Cir.1995), *cert. denied*, 516 U.S. 992, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995); and *Russell v. Collins*, 998 F.2d at 1292–93.

129. *Turner v. Johnson*, 106 F.3d at 1189; *Madden v. Collins*, 18 F.3d at 308; and *Russell v. Collins*, 998 F.2d at 1292–93.

130. *Marquez v. Collins*, 11 F.3d 1241, 1248 (5th Cir.1994), *cert. denied*, 513 U.S. 881, 115 S.Ct. 215, 130 L.Ed.2d 143 (1994); and *White v. Collins*, 959 F.2d 1319, 1322 (5th Cir.1992), *cert. denied*, 503 U.S. 1001, 112 S.Ct. 1714, 118 L.Ed.2d 419 (1992).

131. *Harris v. Collins*, 990 F.2d 185, 189 (5th Cir.1993), *cert. denied*, 509 U.S. 933, 113 S.Ct. 3069, 125 L.Ed.2d 746 (1993); and *White v. Collins*, 959 F.2d at 1322–23.

132. *See Buchanan v. Angelone*, 118 S.Ct. at 761; *Johnson v. Texas*, 509 U.S. at 362, 113 S.Ct. at

2666; *Boyde v. California*, 494 U.S. at 377, 110 S.Ct. at 1196; and *Rogers v. Scott*, 70 F.3d 340, 343 (5th Cir.1995), *cert. denied*, 517 U.S. 1235, 116 S.Ct. 1881, 135 L.Ed.2d 176 (1996).

133. *See Tucker v. Johnson*, 115 F.3d at 281; *Turner v. Johnson*, 106 F.3d at 1189; *Harris v. Johnson*, 81 F.3d at 539; *Davis v. Scott*, 51 F.3d at 460; and *Russell v. Collins*, 998 F.2d at 1292–93. A defendant's "youth" is most certainly a constitutionally relevant mitigating factor, *see Johnson v. Texas*, 509 U.S. at 367, 113 S.Ct. at 2668–69, although it is *not* "permanent" in nature. However, the transitory nature of the defendant's "youth" in the abstract does not negate the mitigating relevance that factor brings to a capital sentencing decision. The focus on the defendant's "youth" in a capital sentencing proceeding is on the defendant's immaturity at the time of the offense and, therefore, is relevant as a "circumstance of the defendant's crime." The Fifth Circuit has taken a very narrow view of the extent to which purportedly mitigating evidence of a defendant's voluntary ingestion of drugs and alcohol can play in the capital sentencing process, specifically holding that "self-inflicted chronic drug and alcohol abuse and the resulting arrested emotional development do no constitute a unique handicap 'with which the defendant was burdened through no fault of his own.'" *Tucker v. Johnson*, 115 F.3d at 282.

evidence there exists of subset of *Penry* mitigating evidence, i.e., mitigating evidence that cannot be treated as "mitigating," i.e., as warranting a penalty less than death, without additional instructions or issues being submitted to the sentencing jury to explain how that evidence may be given mitigating effect. Essentially, what the Fifth Circuit has done in its many opinions discussing *Penry* mitigating evidence is to define such evidence as constitutionally relevant mitigating evidence which cannot be given adequate mitigating consideration by a Texas capital sentencing jury faced solely with the statutory Texas special sentencing issues.

Most of the Fifth Circuit opinions outlined above addressed unsuccessful arguments by capital murder defendants to the effect that a wide variety of evidence concerning their backgrounds or the circumstances of their crimes fell within this narrow subset of *Penry* evidence. Most significant for purposes of this Court's analysis of petitioner's claims relating to his punishment phase jury instructions is the narrow way in which the Fifth Circuit has defined "constitutionally relevant mitigating evidence." The Fifth Circuit has defined "constitutionally relevant mitigating evidence" as evidence which shows (1) the defendant suffers from a uniquely severe permanent handicap with which the defendant is burdened through no fault of his own *and* (2) the defendant's criminal act was attributable to this severe permanent condition.[134] With these principles in mind, this Court now turns to the petitioner's first and third claims for relief herein.

**B. Construing the 1989 Penalty Phase Jury Instructions**

**1. Quasi–Penry Claims**

**a. Petitioner's Youth and Family Background**

■ Petitioner contends that the "non-law-of-parties" instruction included in the punishment phase jury instructions at his 1989 capital murder trial effectively precluded the jury from considering his purportedly mitigating evidence regarding his troubled childhood, youth, race, family problems, and purported illiteracy because the instruction in question focused the jury's attention exclusively on the petitioner's conduct at the time of his offense and in the future.[135] However, none of this evidence required a *Penry* instruction. Thus, assuming arguendo that all of this evidence fell within the parameters of "constitutionally relevant mitigating evidence," none of this mitigating evidence was outside the reach of the petitioner's sentencing jury at the 1989 trial. Insofar as petitioner raises a *Penry* or quasi–*Penry* claim herein based upon the evidence of his troubled childhood, youth, race, family problems, and purported illiteracy, those claims do not warrant federal habeas relief. Petitioner's sentencing jury could have adequately considered all of that evidence without the necessity for a *Penry* instruction.[136]

Furthermore, while petitioner did introduce evidence regarding his youth, race, illiteracy, troubled childhood, and deprived family background at the punishment phase of his 1989 capital murder trial, petitioner did not introduce any evidence linking any of that

**134.** *See Tucker v. Johnson,* 115 F.3d at 281; *Turner v. Johnson,* 106 F.3d at 1189; *Harris v. Johnson,* 81 F.3d at 539; *Davis v. Scott,* 51 F.3d at 460; and *Russell v. Collins,* 998 F.2d at 1292–93.

**135.** This Court will refer to petitioner's "purported" illiteracy because there was no evidence introduced at petitioner's 1989 trial establishing that the petitioner was, in fact, illiterate at the time of his offense or at the time of either of his capital murder trials. The document outlining the petitioner's troubled childhood and deprived family background introduced into evidence by petitioner's trial counsel was prepared seven years before the petitioner's August 4, 1979 of-

fense, when the petitioner was only twelve years old. *See* S.F. Trial, Exhibits Volume, Defendant's Exhibit 20. Despite the statements contained therein indicating that the petitioner was then doing poorly in school, nothing in that document addressed the petitioner's literacy at the time of the petitioner's offense. *Id.* At the evidentiary hearing held July 11 and 20, 1995 in petitioner's most recent state habeas corpus proceeding, petitioner's sister testified that the petitioner could read and speak both English and Spanish. *See* S.F. State Habeas Hearing, Testimony of Maria Alma Herrera, at p. 98.

**136.** *See* cases summarized in notes 122–25, *supra.*

evidence to petitioner's criminal conduct on August 4, 1979. Petitioner failed to show a "nexus" between either his youth, race, illiteracy, deprived family background, or troubled childhood and his offense, i.e., that his criminal conduct was attributable to his troubled childhood and deprived family background.[137] Thus, this evidence did not rise to the level of constitutionally relevant mitigating evidence, much less *Penry* mitigating evidence.[138]

#### b. Petitioner's "Non–Triggerman" Status

Petitioner's complaint that his sentencing jury was unable to adequately consider his evidence that Villanueva actually delivered the fatal stab wound to Joey Hernandez's cervical vertebrae was also well within the reach of petitioner's 1989 capital sentencing jury.[139] A Texas capital sentencing jury may give adequate consideration to evidence showing a defendant neither fired the fatal shot nor delivered the fatal blow

137. See Tucker v. Johnson, 115 F.3d at 281; *Turner v. Johnson*, 106 F.3d at 1189; *Harris v. Johnson*, 81 F.3d at 539; *Davis v. Scott*, 51 F.3d at 460; and *Russell v. Collins*, 998 F.2d at 1292–93. .

Petitioner offered no expert testimony or other evidence at his 1989 trial linking or otherwise establishing a "nexus" between his deprived family background or troubled childhood and the petitioner's own criminal actions on August 4, 1979. Petitioner offered no evidence establishing that he had ever been the victim of physical violence or of sexual abuse. Petitioner offered no evidence that he had ever witnessed family violence or sexual violence during his youth. The sole evidence regarding petitioner's background introduced during his 1989 trial was a report prepared by an unidentified person, apparently in conjunction with petitioner's juvenile-justice sentencing for a burglary the petitioner committed when he was only twelve years old, reflecting a pattern of childhood neglect and abandonment of petitioner by his parents. In short, there was no evidence introduced during petitioner's 1989 trial which showed that his crime was "attributable" to his deprived background or troubled childhood.

138. See Turner v. Johnson, 106 F.3d at 1189, (holding that "for evidence to have mitigating relevance," there must be a nexus between the mitigating evidence and the criminal act); *Harris v. Johnson*, 81 F.3d at 539, (holding that no *Penry* instruction was necessary where there was no evidence showing that the defendant's borderline intelligence bore a nexus to his criminal actions); *Allridge v. Scott*, 41 F.3d at 223, (holding that no *Penry* instruction was necessary in the absence of evidence showing that the defendant's criminal conduct was attributable to the mental illness and abuse the had defendant suffered during a previous incarceration); *Lackey v. Scott*, 28 F.3d at 489, (holding that evidence of the defendant's low intelligence and history of childhood abuse was not relevant for *Penry* purposes where there was no evidence showing the defendant's criminal act was attributable to same); *Madden v. Collins*, 18 F.3d at 307–08, (holding that evidence the defendant suffered from an anti-social personality, dyslexia, and a troubled childhood was not relevant for *Penry* purposes absent a showing that the defendant's criminal conduct

was attributable to same); *Russell v. Collins*, 998 F.2d at 1292–93, (holding that evidence of a single instance of physical abuse by the petitioner's stepfather did not constitute relevant mitigating evidence when unaccompanied by any other evidence showing that the incident left the petitioner mentally or emotionally impaired or more predisposed to commit murder); *Barnard v. Collins*, 958 F.2d at 638–39, (holding that, in order to warrant a *Penry* instruction, evidence that a defendant had a troubled childhood must be accompanied by evidence that the defendant's childhood experiences had a psychological effect on the defendant, i.e., that the defendant's criminal conduct was attributable to his disadvantaged background); and *Graham v. Collins*, 950 F.2d at 1033, (holding that "mitigating" evidence must be able to raise an inference "that the crime is attributable to the disability").

139. Petitioner fails to recognize the potentially damaging nature of this same evidence in terms of the jury's consideration of whether the petitioner warranted a life sentence. It is well settled in federal sentencing practice that a criminal defendant's decision to involve minors or other persons of lesser maturity in a criminal offense can be a basis for enhancing or departing upward from the recommended sentencing range. *See United States v. Williams*, 937 F.2d 979, 983–84 (5th Cir.1991). As explained above, the evidence at petitioner's 1989 trial established that (1) the petitioner had first approached Joey Hernandez and Cynthia West by himself, (2) when rebuffed, left the scene and returned shortly thereafter with Villanueva and two other accomplices, (3) both Hernandez and West saw a knife in Villanueva's hand before the assault on Hernandez began, (4) the petitioner and Villanueva assaulted Hernandez simultaneously, and (5) throughout the entire incident the petitioner appeared to be in charge of the gang of thugs who killed Hernandez, robbed both Hernandez and West, and repeatedly sexually assaulted West. Petitioner's jury might easily have considered the petitioner's decision to involve Villanueva and the two other assailants described by West as "younger" than petitioner and Villanueva rendered the petitioner's role in the offense as more, rather than less, heinous.

without the necessity of a *Penry* instruction.[140]

### c. *Villanueva's Life Sentence*

 Petitioner's quasi-*Penry* complaint that the jury instructions at the punishment phase of his 1989 capital murder trial precluded the jury from considering and giving mitigating effect to his evidence regarding the life sentence which Manuel Villanueva received for his role in the same criminal offense fails for a slightly different reason. Petitioner's evidence regarding Villanueva's life sentence did *not* constitute "constitutionally relevant mitigating evidence," as defined by the Fifth Circuit. The parameters of constitutionally relevant mitigating evidence are limited to evidence that establishes (1) the defendant suffered from a

uniquely severe permanent handicap with which the defendant is burdened through no fault of his own and (2) the defendant's criminal act was *attributable* to this severe permanent condition.[141] The happenstance that a different sentencing authority, or in Villanueva's case a different prosecutor, chose to display mercy toward Villanueva based on the peculiarities of Villanueva's own character, background, record, and role in the offense, bears no relevance to the propriety of the petitioner's sentence.[142] Villanueva's life sentence does *not* establish or tend to establish either that (1) the petitioner suffered from a uniquely severe permanent handicap with which the petitioner was burdened through no fault of his own or (2) the petitioner's criminal acts were attributable to this severe permanent condition.[143] Villa-

---

**140.** See *Nichols v. Scott*, 69 F.3d at 1267–68; *Stewart v. Collins*, 978 F.2d at 201; *Drew v. Collins*, 964 F.2d at 420–21; and *Bridge v. Collins*, 963 F.2d at 769–70.

**141.** See *Tucker v. Johnson*, 115 F.3d at 281; *Turner v. Johnson*, 106 F.3d at 1189; *Harris v. Johnson*, 81 F.3d at 539; *Davis v. Scott*, 51 F.3d at 460; and *Russell v. Collins*, 998 F.2d at 1292–93.

**142.** The fact that Villanueva was the beneficiary of mercy dispensed by a different prosecutor or a different sentencing authority does not render the Texas capital sentencing scheme unconstitutional as applied to petitioner. See *McCleskey v. Kemp*, 481 U.S. 279, 307, 107 S.Ct. 1756, 1775, 95 L.Ed.2d 262 (1987), (holding that the existence of stages in a capital sentencing scheme which permit the exercise of discretionary leniency on an individualized basis does not violate the Constitution).

In *Frey v. Fulcomer*, 974 F.2d 348, 366 n. 22 (3rd Cir.1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993), the Third Circuit rejected petitioner's argument herein that the Supreme Court's opinion in *Parker v. Dugger*, 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991), held that evidence of a co-defendant's lesser sentence was relevant mitigating evidence. The Third Circuit noted that the Supreme Court's opinion in *Parker* merely mentioned in passing the evidence introduced and considered at Parker's trial without holding that the Constitution mandated consideration of all such evidence in mitigation of punishment. See *Parker v. Dugger*, 498 U.S. at 314–15, 111 S.Ct. at 736. As the Third Circuit noted, the State of Florida is not the only jurisdiction to have adopted such a rule. 974 F.2d at 366 n. 22. This Court notes that the federal capital sentencing scheme allows consideration of evidence of a codefendant's sentence

at the punishment phase of trial but only when the defendant and his co-defendant are "equally culpable." See 18 U.S.C. § 3592(a)(4).

**143.** The Supreme Court's discussion in *Johnson v. Texas*, of the mitigating nature of a capital murder defendant's youth provides a stark contrast to the evidence of Villanueva's life sentence which petitioner urges this Court to treat as constitutionally relevant mitigating evidence. In *Johnson*, the Supreme Court explained as follows:

"youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." A lack of maturity and underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions. A sentencer in a capital case must be allowed to consider the mitigating qualities of youth in the course of its deliberations over the appropriate sentence. *Johnson v. Texas*, 509 U.S. at 367, 113 S.Ct. at 2668–69 (citations omitted).

In sharp contrast, petitioner's evidence regarding Villanueva's life sentence bore no relevance whatsoever to petitioner's own character, record, or background or the petitioner's own role in the offense. Likewise, in *Eddings v. Oklahoma*, the Supreme Court suggested various categories of information that it deemed relevant to capital sentencing, i.e., the defendant's youth, the extent of the defendant's cooperation with police, the defendant's emotional state at the time of the crime. 455 U.S. at 111 n. 6, 102 S.Ct. at 875 n. 6. Later in that same opinion, the Supreme Court suggested factors in addition to the defendant's youth that were relevant to the capital sentencing equation, such as evidence of the defendant's

nueva's life sentence simply bears no relationship to the petitioner's character or background or the circumstances of the crime.[144] Likewise, it was a legal impossibility for petitioner's August, 1979 crime to have been "attributable" to an event, i.e., the decision to allow Villanueva to plead guilty to ordinary murder and receive a life sentence, which occurred years *after* the petitioner's offense. Evidence that does not bear on the defendant's character, record, or crime may properly be excluded at the sentencing phase of a capital murder trial.[145] The foregoing principles have long guided federal sentencing practice; a federal criminal defendant cannot rely upon the sentences imposed upon his co-defendants as a yardstick of his own.[146] Therefore, petitioner's evidence regarding Villanueva's sentence could not furnish the basis for a constitutional claim because, even if the jury could not give mitigating effect to same, that evidence did not constitute "constitutionally relevant mitigating evidence."

### 2. *Temporal Limiting Instructions*

■ However, petitioner's complaint goes beyond *Penry* or quasi–*Penry* issues. He also complains that his sentencing jury could have construed his 1989 punishment phase jury instructions as precluding consideration of legitimate, constitutionally relevant mitigating evidence. More specifically, petitioner complains about the following language included in his 1989 punishment phase jury instructions:

> You are instructed that the law of parties, on which you were instructed at the first phase of trial, has no applicability to this phase of trial. In answering these special issues, you will consider only such evidence, if any, as you might believe relevant to the conduct, if any, of the defendant at the time of the offense, and to his future conduct.[147]

Petitioner argues that the phrase "at the time of the offense, and to his future conduct" could have been construed by his jury as precluding them from considering the evidence of petitioner's youth, race, deprived family background, and troubled childhood when answering the special sentencing issues.

However, respondent points out that the state trial court included the following in-

---

difficult family history and of the defendant's emotional disturbance. 455 U.S. at 115, 102 S.Ct. at 877. The key element of all of the foregoing evidence was its obvious relevance to the issue of the defendant's moral culpability. Unlike such evidence, the fact that a codefendant received a life sentence does not, standing alone, diminish a capital murder defendant's own moral culpability for the offense.

**144.** *See Brogdon v. Blackburn*, 790 F.2d 1164, 1169–70 (5th Cir.1986), *cert. denied*, 481 U.S. 1042, 107 S.Ct. 1985, 95 L.Ed.2d 824 (1987), (holding that a state trial court had properly refused to permit a capital murder defendant to introduce evidence of a co-defendant's life sentence for participation in the same offense).

**145.** *See Allridge v. Scott*, 41 F.3d at 222–23, (holding that the state trial court properly refused to permit a capital murder defendant to introduce evidence at the punishment phase of trial regarding his likely ineligibility for release on parole); and *Granviel v. Lynaugh*, 881 F.2d 185, 189 (5th Cir.1989), *cert. denied*, 495 U.S. 963, 110 S.Ct. 2577, 109 L.Ed.2d 758 (1990), (holding that a state trial court properly excluded proffered testimony regarding the efficacy of Texas capital sentencing statutes as a deterrent to crime).

**146.** *See United States v. Arlen*, 947 F.2d 139, 146 (5th Cir.1991), *cert. denied*, 503 U.S. 939, 112 S.Ct. 1480, 117 L.Ed.2d 623 (1992); *United States v. Pierce*, 893 F.2d 669, 678 (5th Cir.1990); *United States v. Boyd*, 885 F.2d 246, 249 (5th Cir.1989); *United States v. Lindell*, 881 F.2d 1313, 1324 (5th Cir.1989), *cert. denied*, 496 U.S. 926, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990); *United States v. Juarez–Ortega*, 866 F.2d 747, 749 (5th Cir.1989); *United States v. Castillo–Roman*, 774 F.2d 1280, 1284 (5th Cir.1985); and *United States v. Lauga*, 762 F.2d 1288, 1291–92 (5th Cir.1985), *cert. denied*, 474 U.S. 860, 106 S.Ct. 173, 88 L.Ed.2d 143 (1985). A mere disparity of sentences among co-defendants does not, standing alone, constitute an abuse of discretion. *United States v.. Boyd*, 885 F.2d at 248; *United States v. Lindell*, 881 F.2d at 1324; *United States v. Castillo–Roman*, 774 F.2d at 1283. It is within the federal sentencing court's discretion to treat co-defendants differently. *United States v. Juarez–Ortega*, 866 F.2d at 749. A federal trial court is not obligated to consider co-defendants' sentences when imposing sentence on a defendant. *United States v. Boyd*, 885 F.2d at 249; *United States v. Castillo–Roman*, 774 F.2d at 1283–84; *United States v. Lauga*, 762 F.2d at 1291.

**147.** *See* Trial Transcript from Petitioner's 1989 State Court Trial, Volume II, p. 373.

struction on the next page of the punishment phase jury instructions:

> You are further instructed that in determining each of these special issues you may take into consideration all of the evidence submitted to you in the fill trial of the case, that is, all of the evidence submitted to you in the trial of the first part of this case wherein you were called upon to determine the guilt or innocence of the defendant, and all of the evidence, if any, admitted before you in the second part of the trial wherein you are called upon to determine the special issues hereby submitted to you.[148]

■■■■ The proper standard for reviewing a challenged jury instruction in the capital sentencing context is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." [149] This "reasonable likelihood" standard does not require the petitioner to prove that the jury "more likely than not" interpreted the challenged instruction in an impermissible way; however, the petitioner must demonstrate more than "only a possibility" of an impermissible interpretation.[150] This Court must analyze the challenged jury charge within the context of the overall jury charge.[151] "In evaluating the instructions, we do not engage in a technical parsing if this language of the instructions, but instead approach the instructions in the same way that the jury would—with a 'commonsense understanding of the instructions in the light of all that has taken place at the trial.' " [152]

Assuming arguendo that all of the petitioner's evidence regarding his youth, troubled childhood, minority race, family problems, purported illiteracy, co-defendant's life sentence, and "non-triggerman" status qualified as constitutionally relevant mitigating evidence, petitioner's construction of his punishment phase jury instructions does not satisfy this "reasonable likelihood" standard. It is *not* reasonably likely that the petitioner's 1989 jurors construed the language directing them to focus on the defendant's conduct as prohibiting them from considering the evidence of the petitioner's difficult childhood and deprived family background.

The Supreme Court recently emphasized that a state trial court's instruction that a sentencing jury consider "all the evidence" affords the jury an opportunity to consider mitigating evidence and that the Constitution does *not* require specific instructions guiding the jury at the selection stage of a capital murder trial on either the concept of mitigation or the nature of statutorily defined mitigating factors.[153]

In two recent opinions, the Fifth Circuit held that the giving of a jury instruction pursuant to Section 8.04(b) of the Texas Penal Code at the punishment phase of a capital murder trial did *not* deprive the defendant of his constitutional rights. In each of those cases, the Fifth Circuit addressed claims that a pair of Texas capital murder defendants' constitutional rights were violated when their state trial courts specifically instructed their juries at the punishment phase of trial, pursuant to Section 8.04(b) of the Texas Penal Code, that those juries could consider evidence of the defendants' voluntary intoxication *only* when it rose to the level of temporary insanity. The Fifth Cir-

**148.** *Id.*, p. 374.

**149.** *Buchanan v. Angelone,* 118 S.Ct. at 761; *Johnson v. Texas,* 509 U.S. at 367, 113 S.Ct. at 2669; *Boyde v. California,* 494 U.S. at 380, 110 S.Ct. at 1198; *Lauti v. Johnson,* 102 F.3d 166, 169 (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2525, 138 L.Ed.2d 1025 (1997); and *Drinkard v. Johnson,* 97 F.3d at 757.

**150.** *See Johnson v. Texas,* 509 U.S. at 367, 113 S.Ct. at 2669; *Boyde v. California,* 494 U.S. at 380, 110 S.Ct. at 1198; *Lauti v. Johnson,* 102 F.3d at 169; and *Drinkard v. Johnson,* 97 F.3d at 757.

**151.** *Drinkard v. Johnson,* 97 F.3d at 757, *citing Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

**152.** *Johnson v. Texas,* 509 U.S. at 368, 113 S.Ct. at 2669; *Boyde v. California,* 494 U.S. at 381, 110 S.Ct. at 1198; *Drinkard v. Johnson,* 97 F.3d at 757.

**153.** *See Buchanan v. Angelone,* 118 S.Ct. at 760–61.

cuit concluded in each case that the general instruction given at the punishment phase of trial directing the jury to consider "all of the evidence" introduced at trial effectively negated any inference from the Section 8.04(b) instruction that might have caused either jury to belief itself prohibited from considering evidence of voluntary intoxication that did not rise to the level of temporary insanity.[154] The Fifth Circuit's broad interpretation of a trial court instruction that a capital sentencing jury consider "all the evidence" introduced at trial is binding upon this Court.[155] Like the instructions directing the jury to consider "all the evidence" that cured the restrictive language in *Lauti* and *Drinkard* and satisfied the Supreme Court in *Buchanan*, similar language in petitioner's 1989 punishment phase jury instructions more than off set any restrictive inference that could have been read into the non-law-of-parties instruction given at the punishment phase of the petitioner's 1989 trial.

Moreover, unlike the specific restrictions on the jury's ability to consider evidence of voluntary intoxication in each of those cases, the petitioner's 1989 jury was *never* specifically directed that it could *not* consider any identifiable mitigating evidence. Nor is petitioner's suggested construction of his 1989 punishment phase jury instructions "reasonably likely." The context in which the state court advised the petitioner's 1989 jury that it should focus on the defendant's conduct "at the time of the offense, and to his future conduct" was an explanation that the law of parties, on which petitioner's 1989 jury had been properly instructed at the guilt-innocence phase of trial, was inapplicable at the

punishment phase of trial. The language in question properly instructed petitioner's jury that it had to focus exclusively on the defendant's conduct, rather the conduct of defendant's accomplices or others, in answering the special sentencing issues. The language in question focused the jury's attention primarily on the defendant's conduct, as opposed to the conduct of others, and cannot reasonably be construed as restricting the scope of mitigating evidence which the jury was free to consider at the punishment phase of the petitioner's 1989 trial. In their closing arguments at the punishment phase of petitioner's 1989 trial, petitioner's counsel emphasized the bleak, hopeless environment in which the petitioner had been raised and argued that the evidence regarding the horrific conditions in which the petitioner was raised warranted the dispensation of mercy toward petitioner.[156] Given the context in which the language in question was presented to the jury and the tenor and content of defense counsel's closing jury arguments at the punishment phase of petitioner's 1989 capital murder trial, no reasonable juror could have construed the instructions as forbidding jury consideration of any legitimate constitutionally relevant mitigating evidence. For the foregoing reasons neither the petitioner's first nor his third claims warrants federal habeas relief in this cause.

## VI. *Guilt–Innocence Phase Jury Instructions*

In his eighth ground for relief, petitioner argues that the state trial court erred in submitting the jury instructions at the guilt-innocence phase of petitioner's 1989 capital murder trial in such a way as to

**154.** *See Lauti v. Johnson,* 102 F.3d at 169–70; and *Drinkard v. Johnson,* 97 F.3d at 757–64.

**155.** The interpretations given the punishment phase jury instructions by the Fifth Circuit in both *Lauti* and *Drinkard,* are inconsistent with the natural tendency of juries to construe the specific as controlling over the general. However, this Court is not free to second-guess the Fifth Circuit's holdings in *Lauti* and *Drinkard.* On the contrary, this Court must apply the holdings in those cases in this cause regardless of whether the rulings in those cases comport with this Court's own interpretation of applicable constitutional principle. Nothing in this opinion should be construed as suggesting that the result which

the Fifth Circuit reached in either *Drinkard* or *Lauti* was erroneous. The Supreme Court recently held in *Buchanan v. Angelone, supra,* that a capital murder defendant possesses no constitutional right to a generic jury instruction regarding mitigating evidence and that an instruction directing a capital sentencing jury to base its decision on "all the evidence" suffices in most cases. *See Buchanan v. Angelone,* 118 S.Ct. at 760–61. Furthermore, the Fifth Circuit recently upheld the constitutionality of Section 8.04(a) as applied to the guilt-innocence phase of a Texas capital murder trial. *See Goodwin v. Johnson,* 132 F.3d at 190–91.

**156.** *See* S.F. Trial, Volume XVIII, at pp. 36–46.

suggest that the petitioner was on trial on three separate Counts of capital murder.[157] As explained above, petitioner's indictment charged him with committing the capital murder of Joey Hernandez while in the course of committing and attempting to commit (1) the robbery of Hernandez, (2) the robbery of Cynthia West, and (3) the sexual assault of West. Respondent argues that acceptance of the argument suggested by petitioner would violate the non-retroactivity doctrine recognized in *Teague v. Lane.*[158]

Before addressing respondent's *Teague* argument, this Court notes that a majority of the Supreme Court rejected the argument implicit in petitioner's eighth claims herein in *Schad v. Arizona.*[159] In *Schad*, the Supreme Court recognized the general rule that a single count may include allegations that the defendant committed the offense by one or more specified means and held that there is no constitutional requirement that the jury reach unanimity on the preliminary factual issues which underlie the verdict.[160] If, as the Supreme Court majority held in *Schad*, there is no constitutional requirement that a capital murder jury reach unanimity with regard to any of several specific means by which such a crime may be committed when

the indictment alleges multiple theories of the offense, then the premise underlying petitioner's eighth claim for relief vanishes. As explained in *Schad*, the prosecution properly indicted petitioner on a single count of capital murder and alleged and attempted to prove several different factual theories by which petitioner could have committed that single offense.[161] Hence, petitioner's complaint that the guilt-innocence phase jury charge gave "undue prominence" to the three separate theories of his offense is *non sequitur.*[162] It is not within the province of this Court to either disregard or overrule the Supreme Court majority's clear holding in *Schad.*

 Also of significance is the fact that petitioner's trial counsel did not raise a specific argument challenging the guilt-innocence phase jury instructions on this point.[163] "It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." [164] The fact that a jury instruction was incorrect under state law is not a basis for federal habeas relief.[165] Rather, the question is whether the allegedly ailing instruction by itself so infected the entire trial that the resulting conviction violates due process [166] "An omission, or an

157. *See* First Amended Petition, at pp. 65–71; and Petitioner's Response, at pp. 9–10.

158. 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989).

159. 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). For unknown reasons, neither party cited to the Supreme Court's opinion in *Schad* in the briefs filed in this Court.

160. *See Schad v. Arizona*, 501 U.S. at 631–32, 111 S.Ct. at 2496–97 (plurality opinion of Justice Souter, Chief Justice Rhenquist, and Justices O'Connor and Kennedy); and *Schad v. Arizona*, 501 U.S. at 649–50, 111 S.Ct. at 2506, (Justice Scalia wrote a separate concurring opinion in which he specifically agreed with the plurality's determination that the jury need not agree on the mode of commission of a single crime when that offense can be committed in various ways).

161. *Id.*

162. Insofar as petitioner suggests that the manner in which he was charged and tried on the three alternative theories of capital murder violated state procedural principles, for the reasons

discussed in Section III above, those claims do not warrant federal habeas relief.

163. While petitioner's trial counsel did raise an objection to the inclusion of the jury instructions regarding the robbery and sexual assault of Cynthia West in the guilt-innocence phase jury instructions, that objection was premised upon the fact that those theories had not been included in the indictment under which petitioner had been tried in 1982. *See* S.F. Trial, Volume XV, at p. 108. The entire charge conference at the guilt-innocence phase of petitioner's 1989 trial appears in S.F. trial, Volume XV, at pp. 94–116.

164. *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977).

165. *See Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991); and *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6, 103 S.Ct. 843, 853 n. 6, 74 L.Ed.2d 646 (1983).

166. *See Estelle v. McGuire*, 502 U.S. at 72, 112 S.Ct. at 482; *Henderson v. Kibbe*, 431 U.S. at 154, 97 S.Ct. at 1737; and *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973).

incomplete instruction, is less likely to be prejudicial than a misstatement of law." [167] A federal court may reverse a state court criminal conviction based upon erroneous jury instructions only when the instructions in question render the entire trial fundamentally unfair.[168]

Having reviewed the entire transcript and Statement of Facts from the petitioner's 1989 capital murder trial, this Court concludes that nothing in the guilt-innocence phase jury instructions rendered petitioner's entire trial fundamentally unfair. Petitioner was charged with a single Count of capital murder in an indictment that alleged three separate theories regarding how that offense was committed. The prosecution introduced evidence supporting each of those factual theories. Thus, it was incumbent upon the state trial court to properly instruct the jury on the law applicable to each of those factual theories. That is exactly what petitioner's state trial court's jury instructions did at the guilt-innocence phase of petitioner's 1989 capital murder trial.

 Moreover, respondent's contention that petitioner's eighth claim is foreclosed by the non-retroactivity doctrine of *Teague* is correct. Federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review.[169] Under *Teague*, a "new rule" is one which was not dictated by precedent existing at the time the defendant's conviction became final.[170] Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review.[171] This non-retroactivity doctrine applies equally to a novel application of an old rule.[172] On the date petitioner's second capital murder conviction became final, i.e., on November 28, 1994,[173] *Schad* was the law of the land. Petitioner has not identified any case law in existence as of that date which mandates a result different from the one clearly mandated by *Schad*. Thus, the petitioner's eighth claim is barred by *Teague*, foreclosed by the long-recognized principles discussed in *Schad*, and without merit from a constitutional perspective.

For each of the foregoing reasons, the petitioner's eighth claim does not warrant federal habeas relief.

## VII. *The Law of Proportionality and Equal Protection Claims*

In his ninth claim, petitioner argues that his sentence violates the law of proportionality, the Eighth Amendment, the Fourteenth Amendment's Equal Protection Clause, and the common law Doctrine of Mandated Consistency because Villanueva received only a life sentence despite evidence showing that Villanueva, rather than the petitioner, actual-

---

**167.** *Henderson v. Kibbe*, 431 U.S. at 155, 97 S.Ct. at 1737.

**168.** *See Henderson v. Kibbe*, 431 U.S. at 154, 97 S.Ct. at 1736; and *Cupp v. Naughten*, 414 U.S. at 147, 94 S.Ct. at 400–01.

**169.** *See Teague v. Lane*, 489 U.S. at 310, 109 S.Ct. at 1075; *Johnson v. Scott*, 68 F.3d 106, 111 n. 10 (5th Cir.1995), *cert. denied*, 517 U.S. 1122, 116 S.Ct. 1358, 134 L.Ed.2d 525 (1996); *Lackey v. Scott*, 52 F.3d 98, 100 (5th Cir.1995), *stay granted and cert. dism'd*, 514 U.S. 1093, 115 S.Ct. 1818, 131 L.Ed.2d 741 (1995); *Davis v. Scott*, 51 F.3d at 466–67; *Mann v. Scott*, 41 F.3d 968, 976 (5th Cir.1994), *cert. denied*, 514 U.S. 1117, 115 S.Ct. 1977, 131 L.Ed.2d 865 (1995); *Crank v. Collins*, 19 F.3d at 175; *Motley v. Collins*, 18 F.3d 1223, 1230 (5th Cir.1994), *cert. denied*, 513 U.S. 960, 115 S.Ct. 418, 130 L.Ed.2d 333 (1994); *Webb v. Collins*, 2 F.3d 93, 95 (5th Cir.1993); *Nethery v. Collins*, 993 F.2d at 1162; and *Cordo-*

va v. *Collins*, 953 F.2d 167, 173 (5th Cir.1992), *cert. denied*, 502 U.S. 1067, 112 S.Ct. 959, 117 L.Ed.2d 125 (1992).

**170.** *See Davis v. Scott*, 51 F.3d at 459–60; *Mann v. Scott*, 41 F.3d at 976; *Crank v. Collins*, 19 F.3d at 175; and *Motley v. Collins*, 18 F.3d at 1230.

**171.** *Id.*

**172.** *See Stringer v. Black*, 503 U.S. 222, 227–29, 112 S.Ct. 1130, 1135, 117 L.Ed.2d 367 (1992); *Butler v. McKellar*, 494 U.S. 407, 414–15, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990); and *Lackey v. Scott*, 52 F.3d at 100.

**173.** *See Vuong v. Scott*, 62 F.3d 673, 680 (5th Cir.1995), *cert. denied*, 516 U.S. 1005, 116 S.Ct. 557, 133 L.Ed.2d 458 (1995), (recognizing that a criminal conviction becomes final for *Teague* purposes on the date the Supreme Court denies certiorari on the defendant's direct appeal).

ly delivered the fatal blow to Joey Hernandez.[174]

## A. Proportionality Claims

 For various reasons, these arguments do not warrant federal habeas relief. First, the Supreme Court and Fifth Circuit have each held that there is no constitutional requirement for review of the proportionality of sentences in a State's capital murder cases.[175] Second, the Supreme Court has repeatedly emphasized that capital sentencing must be a highly individualized process.[176] Petitioner's proposed rule would stand the principle of individualized sentencing on its head. Third, a co-defendant's life sentence is not relevant in a capital sentencing proceeding.[177] Fourth, "[i]n order to assess a death penalty under the Constitution, the state is only required to demonstrate 'major participation in the felony committed, combined with a reckless indifference to human life.'"[178] The prosecution proved much more than petitioner's mere "major participation" in the murder of Joey Hernandez and petitioner's "reckless indifference" to the life of Joey during petitioner's 1989 capital murder trial.[179] In view of the foregoing

---

**174.** *See* First Amended Petition, at pp. 71–77; and Petitioner's Response, at pp. 10–11.

**175.** *See Pulley v. Harris*, 465 U.S. 37, 48–51, 104 S.Ct. 871, 878–79, 79 L.Ed.2d 29 (1984); *United States v. Jones*, 132 F.3d 232, 240 (5th Cir.1998); *Brogdon v. Blackburn*, 790 F.2d at 1170; and *Williams v. Maggio*, 679 F.2d 381, 394 (5th Cir. 1982), *cert. denied*, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983). In *Pulley*, the Supreme Court once again reaffirmed its conclusion in *Jurek* that the Texas capital sentencing scheme included provisions which eliminated any necessity for state appellate court review of the proportionality of death sentences imposed in Texas. *See* 465 U.S. at 48–49, 104 S.Ct. at 878. The Fifth Circuit has likewise rejected global challenges to the Texas capital sentencing scheme on the basis that it disproportionately impacts minorities. *See Andrade v. McCotter*, 805 F.2d 1190, 1193 (5th Cir.1986); and *Milton v. Procunier*, 744 F.2d 1091, 1102 (5th Cir.1984), *cert. denied*, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).

**176.** *See Buchanan v. Angelone*, 118 S.Ct. at 761 (emphasizing that in the selection phase of a capital sentencing proceeding there is a need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination); *Tuilaepa v. California*, 512 U.S. at 972, 114 S.Ct. at 2635, ("What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime."); *Boyde v. California*, 494 U.S. at 377, 110 S.Ct. at 1196, (discussing the "requirement of individualized sentencing in capital cases"); *Blystone v. Pennsylvania*, 494 U.S. 299, 307, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990), (the same); *South Carolina v. Gathers*, 490 U.S. 805, 810, 109 S.Ct. 2207, 2210, 104 L.Ed.2d 876 (1989), (holding that for purposes of imposing the death penalty, the defendant's punishment must be tailored to his personal responsibility and moral guilt); *Sumner v. Shuman*, 483 U.S. 66, 74–82, 107 S.Ct. 2716, 2722–26, 97 L.Ed.2d 56 (1987), (striking down as unconstitutional an automatic death penalty statute for persons who committed murder while serving a life sentence because that statute departed from the individualized capital sentencing doctrine); *McCleskey v. Kemp*, 481 U.S. at 279, 107 S.Ct. at 1777, (holding that the capital sentencing decision requires that jurors focus their collective judgment on the unique characteristics of a particular criminal defendant and that the lack of predictability of such jury decisions does not render them unconstitutional); and *Lockett v. Ohio*, 438 U.S. at 602, 98 S.Ct. at 2963.

The Fifth Circuit has likewise recognized that each capital defendant is entitled to an individualized assessment of the appropriateness of the death penalty based on the jury's reasoned moral response to the defendant's background, character, and crime. *See United States v. Jones*, 132 F.3d at 241, (emphasizing that a capital sentencing jury must be provided "the fullest possible information about the defendant"); and *Johnson v. Collins*, 964 F.2d 1527, 1533 (5th Cir.1992), *cert. denied*, 505 U.S. 1235, 113 S.Ct. 4, 120 L.Ed.2d 933 (1992).

**177.** *See Brogdon v. Blackburn*, 790 F.2d at 1169–70, (holding that a state trial court had properly refused to permit a capital murder defendant to introduce evidence of a co-defendant's life sentence for participation in the same offense).

**178.** *Westley v. Johnson*, 83 F.3d 714, 719 (5th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 773, 136 L.Ed.2d 718 (1997), *quoting, Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987); and *Belyeu v. Scott*, 67 F.3d 535, 540 (5th Cir.1995), *cert. denied*, 517 U.S. 1144, 116 S.Ct. 1438, 134 L.Ed.2d 559 (1996).

**179.** When viewed in the light most favorable to the jury's verdict, the evidence at petitioner's 1989 trial established that (1) the petitioner approached Joey Hernandez and Cynthia West and, when reproached, left and soon returned with three accomplices, one of whom was armed with a deadly weapon, i.e., a knife, (2) the petitioner again approached Joey's vehicle, this time himself armed with a tire tool, and made a verbal

authorities, application of the law of proportionality in capital sentencing in the manner advocated by petitioner herein would necessarily require the adoption of a new rule and, therefore, is barred by the non-retroactivity doctrine of *Teague*.[180]

■ Insofar as proportionality analysis is constitutionally necessary with regard to the Texas capital sentencing scheme, that analysis is incorporated in the "eligibility decision" described in the *Tuilaepa* and *Buchanan* and is accomplished in the Texas capital sentencing scheme at the guilt-innocence phase of a trial because the Texas capital murder statute itself performs the constitutionally-mandated narrowing function.[181] Therefore, no independent proportionality review of Texas capital murder sentences is constitutionally mandated.[182]

■ Furthermore, even if this Court disregards the *Teague* barrier and the other precedents outlined above, application of constitutional proportionality principles to petitioner's case does not warrant federal habeas relief in this cause. Proportionality analysis involves an examination of (1) the gravity of the offense and the harshness of the penalty, including the harm caused or threatened to the victim or society and the culpability of the offender, (2) the sentence imposed on other criminals in the same jurisdiction, and (3) the sentence imposed for the commission of the same crime in other jurisdictions.[183] Applying these principles, the Supreme Court has upheld the constitutionality of a life sentence without parole imposed upon a first-time drug offender.[184] The Fifth Circuit has upheld similar sentences under the Mississippi habitual offender statute for burglary defendants whose criminal records included previous armed robbery convictions.[185] The Fifth Circuit has also upheld the imposition of a life sentence without parole for conspiracy to possess with intent to distribute more

request which Joey again refused, (3) the petitioner and Villanueva then jointly beat and stabbed Joey repeatedly, (4) throughout the assault upon him, Joey offered no resistance to the brutal attack upon him, (5) the petitioner then dragged Cynthia West into a wooded area, repeatedly threatened her, including making a statement to the effect that if she resisted, he would do to her what he had just done to Joey, (6) the petitioner then robbed Cynthia West and sexually assaulted her, and (7) when the petitioner returned after to the scene where his accomplices were continuing the sexual assault upon West, the petitioner directed the gang to leave and his accomplices immediately complied with that directive. *See* S.F. Trial, Testimony of Cynthia West, Volume XI, pp. 116–221; and Volume XII, pp. 10–84.

**180.** No case law in existence on the date petitioner's conviction became final mandated a life sentence for a capital murder defendant whenever one of the defendant's co-defendants or accomplices was the beneficiary of mercy in the form of a life sentence dispensed by a prosecutor, sentencing judge, or a single hold-out juror at the punishment phase of a Texas capital sentencing proceeding. Nor has this Court been able to locate any authority to support such a proposition.

**181.** *See Johnson v. Texas*, 509 U.S. at 362, 113 S.Ct. at 2666: (holding that its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted five different classifications of murder for that purpose); *Lowenfield v. Phelps*, 484 U.S. at 243–47, 108 S.Ct. at 554–55, (recognizing that the Texas statute itself performs the narrowing function by the way it defines capital murder); *McCleskey v. Kemp*, 481 U.S. at 279, 107 S.Ct. at 1775, (recognizing that when statutory procedures adequately channel the sentencer's discretion, proportionality review is not constitutionally required); *Jurek v. Texas*, 428 U.S. at 268–75, 96 S.Ct. at 2955–57 (holding same as *Lowenfield*); *Woods v. Johnson*, 75 F.3d at 1033–34; and *West v. Johnson*, 92 F.3d at 1406.

**182.** The Constitution does not require comparative proportionality review of every capital case, but only that the death penalty not be imposed arbitrarily or capriciously. *See Pulley v. Harris*, 465 U.S. at 49–50, 104 S.Ct. at 878–79; and *United States v. Jones*, 132 F.3d at 240–41.

**183.** *Solem v. Helm*, 463 U.S. 277, 291–92, 103 S.Ct. 3001, 3010–11, 77 L.Ed.2d 637 (1983); and *United States v. Lemons*, 941 F.2d 309, 319–20 (5th Cir.1991).

**184.** *See Harmelin v. Michigan*, 501 U.S. 957, 994–95, 111 S.Ct. 2680, 2701, 115 L.Ed.2d 836 (1991).

**185.** *See Sones v. Hargett*, 61 F.3d 410, 415 n. 7 (5th Cir.1995); and *McGruder v. Puckett*, 954 F.2d 313, 316–17 (5th Cir.1992), *cert. denied sub nom. McGruder v. Puckett*, 506 U.S. 849, 113 S.Ct. 146, 121 L.Ed.2d 98 (1992).

than five kilograms of cocaine.[186] More to the point, the Fifth Circuit has upheld a 50-year sentence under the Texas habitual offender statute for a person convicted of theft of $27.64 worth of meat who had two prior misdemeanor theft convictions.[187]

Petitioner has not alleged any facts showing that any Texas capital murderers equally culpable to himself have received sentences less than death. Petitioner has also failed to allege any specific facts showing that the sentences routinely imposed in other jurisdictions for the commission of offenses identical or similar to his own are less than the sentence imposed in his case. In this case, the petitioner (1) acted as the ring leader of a gang that murdered and robbed Joey Hernandez and that robbed and repeatedly raped Cynthia West, (2) personally initiated and orchestrated the fatal assault upon Hernandez, and (3) personally committed the robbery and sexual assault of West. The jury specifically found that the petitioner had personally acted "deliberately" with regard the murder of Joey Hernandez and that the petitioner posed a continuing threat of violence to society. Under such circumstances, the imposition of a death sentence upon the petitioner does not violate proportionality principles even though petitioner's mentally impaired minion Villanueva received a life sentence despite evidence that Villanueva may have actually delivered the fatal blow to Hernandez.[188]

### B. Equal Protection Claims

#### 1. Facial Challenge

■■■ An equal protection challenge to the Texas capital sentencing scheme on its face must include proof of a discriminatory legislative purpose in either the adoption or continuation of a capital sentencing scheme, i.e., proof that the state legislature selected or reaffirmed a particular capital sentencing scheme at least in part because, not merely in spite, of its adverse effect upon an identifiable group.[189] Petitioner has alleged no specific facts which such a discriminatory animus on the part of the Texas Legislature.[190] In short, an equal protection challenge to a capital sentencing scheme requires proof of the existence of purposeful discrimination.[191] Petitioner simply has not presented any fact-specific allegations establishing such purposeful discrimination.[192] Thus, insofar as his ninth claim can be construed as a facial challenge to the Texas capital sentencing scheme, that claim is without merit.[193]

**186.** See United States v. Davis, 61 F.3d 291, 305 (5th Cir.1995), cert. denied, 516 U.S. 1135, 116 S.Ct. 961, 133 L.Ed.2d 883 (1996).

**187.** See Smallwood v. Johnson, 73 F.3d 1343, 1346–48 (5th Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 212, 136 L.Ed.2d 146 (1996).

**188.** See Tison v. Arizona, 481 U.S. at 158, 107 S.Ct. at 1688; Westley v. Johnson, 83 F.3d at 719; and Belyeu v. Scott, 67 F.3d at 540.

**189.** See McCleskey v. Kemp, 481 U.S. at 298, 107 S.Ct. at 1770, (holding that a capital murder defendant sentenced to death who asserts an equal protection claim must prove both purposeful discrimination and a discriminatory effect upon himself). See also Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991), (applying the same definition of discriminatory intent in the context of a Batson claim).

**190.** For an overview of the Texas capital sentencing scheme in the post–Jurek era, see Adanandus v. Johnson, 947 F.Supp. at 1039–41. The Fifth Circuit has noted that there has been no significant substantive change to the Texas capital sentencing scheme since the Supreme Court approved same in Jurek. See In re West, 119 F.3d 295, 296 (5th Cir.1997), (holding that the Texas capital sentencing scheme does not violate equal protection or substantive due process rights).

**191.** See McCleskey v. Kemp, 481 U.S. at 292, 107 S.Ct. at 1767.

**192.** While the petitioner does list his race among the "mitigating" evidence that he introduced at his 1989 trial, petitioner did not present any evidence to the state trial court or in his most recent state habeas corpus proceeding suggesting that his race bore any relationship to the jury's verdict at that trial. Petitioner has also alleged no specific facts before this Court showing that his race was in any way relevant to the jury's verdict at his 1989 trial. Petitioner and Joey Hernandez were both Hispanic.

**193.** See Arave v. Creech, 507 U.S. at 470–71, 113 S.Ct. at 1540, (holding that to satisfy the Eighth and Fourteenth Amendments, a capital sentencing scheme must suitably direct and limit the sentencer's discretion so as to minimize the risk of wholly arbitrary and capricious action and that the limits on the sentencer's discretion must constitute clear and objective standards that pro-

### 2. *"As Applied" Challenge*

Insofar as petitioner argues that he is entitled a life sentence by virtue of Villanueva's receipt of such a sentence, petitioner's "as applied" equal protection claim is barred by *Teague*.[194] It is also wholly without merit. At its core, the Equal Protection Clause requires similar treatment of persons similarly situated.[195] The simple fact is that the petitioner and Villanueva were *not* similarly situated for equal protection purposes. Any individualized sentencing decision regarding the petitioner and Villanueva would necessarily have required consideration of the fact that Villanueva suffered from severe and permanent mental impairments that rendered him significantly less capable than the petitioner of understanding the nature and significance of his own actions and of conforming his behavior to that mandated by the law.[196] In addition, the evidence at petitioner's 1989 trial established the petitioner as the primary instigator and leader of the confrontation with Joey Hernandez, the fatal

assault upon Hernandez, and the robberies of both Hernandez and West, as well as the sexual assault upon West. Cynthia West testified that the petitioner initiated and orchestrated the fatal confrontation with Hernandez, initially scouting the scene, leaving to get Villanueva and two other accomplices, and then returning to the scene himself armed with a tire tool and alongside Villanueva, who was armed with an equally deadly knife. West also testified that when the petitioner spoke or directed, the other assailants followed his lead and there was no evidence introduced at the 1989 trial suggesting that anyone other than the petitioner gave any orders or directives to the four assailants.[197] Even more significantly, there is no suggestion anywhere in the record now before this Court that Villanueva's conduct while awaiting trial on this same charge or following his conviction even begins to match the list of violent felonies committed by the petitioner following his 1979 arrest for capital murder and subsequent escape from jus-

vide "specific and detailed guidance" and make rationally reviewable the process for imposing the death penalty); and *Saffle v. Parks*, 494 U.S. at 491–93, 110 S.Ct. at 1262, (holding that within certain parameters, the State is free to channel or focus the jury's consideration of the defendant's mitigating evidence and emphasizing that "above all, capital sentencing must be reliable, accurate, and nonarbitrary"). Subsequent to its opinions in *Arave* and *Saffle,* the Supreme Court once again affirmed the vitality of the Texas capital sentencing scheme. *See Johnson v. Texas*, 509 U.S. at 368–69, 113 S.Ct. at 2669–70.

194. Just as petitioner's reliance on the law of proportionality is barred by the non-retroactivity doctrine of *Teague,* so too are petitioner's equal protection claims. On the date petitioner's 1989 conviction became final, no federal court had ever held that the Equal Protection Clause forbade a death sentence for one participant in a capital murder if any other participant in that same capital murder received a lesser sentence. That is essentially the rule petitioner would have this Court adopt in response to his nebulous equal protection claims herein.

195. *See City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); and *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir.1996).

196. The clinical diagnoses and reports prepared in connection with the prosecution of Manuel

Villanueva were matters of public record long before the petitioner's 1989 trial and were explained at length by Dr. John C. Sparks during the evidentiary hearing held July 11, 1995 in petitioner's most recent state habeas corpus proceeding. *See* S.F. Evidentiary Hearing held July 11, 1995, Testimony of Dr. John C. Sparks, at pp. 16–67. The reports on Manuel Villanueva themselves appear among the state court records from petitioner's most recent state habeas corpus proceeding as defendant's exhibits one through ten introduced during that same hearing on July 11, 1995. Another complete set of those same exhibits, bearing file-stamp marks indicating they were filed as matters of public record in Villanueva's state criminal proceeding, also appears as state's exhibits one and two introduced at the same hearing on July 20, 1995.

197. The federal Sentencing Guidelines have long recognized that the leaders and organizers of concerted criminal activity warrant more severe sentences than those whose roles in the concerted criminal activities are more subservient. *See* § 3B1.1, Federal Sentencing Guidelines. It should also be noted that West testified that two of the accomplices whom the petitioner brought to the crime scene appeared to be a lot younger than either the 19–year–old petitioner or the 18–year–old Villanueva and that federal sentencing principles also recognize that a defendant's involvement of minors in criminal activity is also an aggravating factor for sentencing purposes. *Id.*, § 3B1.4.

tice.[198] Thus, despite the evidence suggesting that Villanueva delivered the fatal blow to Joey Hernandez, there were compelling reasons for treating petitioner and Villanueva differently for sentencing purposes. Under such circumstances, Villanueva's receipt of a life sentence does not render the petitioner's death sentence a violation of equal protection principles.[199] For the foregoing reasons, none of the petitioner's arguments contained in his ninth claim warrant federal habeas relief.

## VIII. *Brady Violation*

In his eleventh claim for relief, petitioner argues that his constitutional rights were violated when the prosecution withheld from the defense at his 1989 trial evidence which might have been used to impeach the prosecution's rebuttal witness Sam Ponder.[200]

### A. *The Claim*

As explained above, at the punishment phase of petitioner's 1989 trial, the defense called Villanueva, who testified briefly that he had been permitted to enter a guilty plea to a reduced charge of ordinary murder and had received a life sentence.[201] The prosecution then called as a rebuttal witness Sam Ponder, the assistant Bexar County District Attorney who had supervised Villanueva's prosecution. Ponder testified that (1) he concluded after reviewing the evidence and conferring with his co-prosecutor that Villanueva was mentally-impaired, not intellectually capable of original thought, and a follower, and (2) he believed that Villanueva had acted at the petitioner's direction in connection with the murder, and (3) while a jury had found Villanueva competent to stand trial, he did not personally believe the death penalty was appropriate for someone of Villanueva's diminished mental capacity.[202] Petitioner now argues that the prosecution withheld from the defense evidence showing that Villanueva was not as severely mentally-impaired as Ponder indicated during his testimony at petitioner's 1989 trial and that such evidence would have enabled his trial counsel to impeach Ponder on the rationale for his reason *not* to seek the death penalty in Villanueva's case.

More specifically, at the punishment phase of petitioner's 1989 trial, Sam Ponder testified that (1) he recalled that Villanueva had denied participating in the sexually assault on West, (2) he reviewed the mental health records concerning Villanueva and believed that Villanueva had the intellectual capacity of a seven-year-old, (3) he did not believe that Villanueva was capable of original

198. As explained above, the petitioner's penchant for violent confrontations and illegal activities was not diminished by his incarceration. Various TDCJ officials testified at the punishment phase of petitioner's 1989 trial that the petitioner had engaged in many violent and illegal acts during his incarceration. *See* S.F. Trial, Volume XVII, at pp. 56–58, 65–69, 72–73, and 77. Several other jailers testified regarding numerous instances in which petitioner had been found in possession of contraband, including marijuana and a handcuff key. *Id.*, at pp. 48, 75–76, and 81–84. The jury also heard testimony regarding petitioner's efforts to escape from a Florida jail as well. *Id.*, at 111–15. In addition, petitioner's capital sentencing jury was also faced with the evidence regarding the petitioner's escape from the fourth floor of the Bexar County Jail while awaiting trial for capital murder and the details of the petitioner's violent, sordid, assault, kidnaping, and sexual assaults upon Vicki Isenberg following his escape and flight to Florida. Flight can be considered by the jury as a factor from which it can infer guilty knowledge. *See United States v. Quiroz–Hernandez*, 48 F.3d 858, 865 (5th Cir.1995); *United States v. Sanchez–Sotelo*, 8 F.3d 202, 210 (5th Cir.1993), *cert. denied*, 511 U.S. 1023, 114 S.Ct. 1410, 128 L.Ed.2d 82 (1994); and *United States v. Williams*, 775 F.2d 1295, 1300 (5th Cir.1985), *cert. denied*, 475 U.S. 1089, 106 S.Ct. 1477, 89 L.Ed.2d 732 (1986). Petitioner does not suggest or imply that any similar evidence regarding any potential tendency toward violence by Villanueva has ever existed or should have been considered by a sentencing authority faced with both their fates.

199. *See Russell v. Collins*, 998 F.2d at 1294, (rejecting equal protection challenge based on alleged disparity between death sentence imposed upon petitioner and given life sentence for capital murder and sixty year term imposed upon co-defendant who pleaded guilty to the same offense).

200. *See* First Amended Petition, at pp. 81–87; and Petitioner's Response, at pp. 11–13.

201. *See* S.F. Trial, Testimony of Manuel Villanueva, Vol. XVII, pp. 145–47.

202. *Id.*, Testimony of Sam Ponder, Vol. XVIII, pp. 6–20.

thought, (4) he believed from his review of all relevant materials that Villanueva had merely been a follower of the petitioner during the crime and had acted at the petitioner's direction, (5) he believed that Villanueva was mentally retarded, (6) while Villanueva had been found mentally competent to stand trial, he believed that finding reflected only that Villanueva possessed a very meager level of mental capacity, stating that "you don't have to be very smart to be competent to stand trial," and (7) he believed that Villanueva was a street kid who lived by the code of the street and that Villanueva would not "rat" on others.[203]

Dr. John C. Sparks testified extensively at the evidentiary hearing held in July, 1995 in petitioner's most recent state habeas corpus proceeding regarding Villanueva's mental health records and his own examination of Villanueva. Dr. Sparks testified that (1) over the course of several years, Villanueva had been evaluated by nine different mental health professionals, most of whom were concerned primarily with the issue of whether Villanueva was competent to stand trial, (2) he had examined Villanueva in September, 1982 and had concluded that Villanueva was competent to stand trial, (3) he diagnosed Villanueva as displaying antisocial personality pattern, having used opiates in an episodic manner prior to arrest, and having borderline intellectual functioning, (4) Villanueva had repeatedly tested just above the mentally retarded level on IQ tests, (5) in 1979, Villanueva was diagnosed as exhibiting dissocial behavior, suffering from mild mental retardation with psycho-social deprivation, and possessing borderline intellectual func-

tioning, (6) in July, 1980, Villanueva was diagnosed as mildly retarded, (7) in August, 1980, Villanueva was examined and found to have below average intelligence but to be fully capable of consulting with counsel, (8) in several different examinations undertaken in the late-1970's Villanueva was diagnosed as displaying borderline mental retardation, being a severe sociopath and very dangerous, but still competent to stand trial, (9) Dr. Sparks believed that Villanueva was functioning intellectually within a range of from ages eight or nine to ages twelve or thirteen, (10) on tests involving reading and on written examinations, Villanueva had tested at the age of seven years and ten months, and (11) Villanueva was essentially illiterate.[204]

Petitioner now argues that (1) had his trial counsel been able to review Villanueva's mental health records, they could have impeached Ponder's trial testimony by showing that Villanueva was actually functioning at an intellectual level ranging from ages eight to thirteen, rather than at age seven, and (2) this would have cast doubt as to the legitimacy of Ponder's decision not to seek the death penalty for Villanueva. For the reasons discussed below, however, those arguments are wholly bereft of merit.

### B. *The Constitutional Standard*

 The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution.[205] Impeachment evidence also falls within the *Brady* rule.[206] Even

---

**203.** *See* S.F. Trial, Volume XVIII, Testimony of Sam Ponder, at pp. 7–20. This Court notes that Ponder's recollection regarding Villanueva's involvement in the sexual assault upon West was inconsistent with West's testimony at petitioner's 1989 trial during which she identified Villanueva as the second of the three persons who sexually assaulted her on August 4, 1979. *See* S.F. Trial, Volume XI, at pp. 185–86. However, Ponder's trial testimony on this point reflected what Villanueva had told investigators. *See* S.F. Trial, Volume XVIII, Testimony of Sam Ponder, at p. 9.

**204.** *See* S.F. State Habeas Hearing, Testimony of Dr. John C. Sparks, at pp. 19–42.

**205.** *Brady v. State of Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963);

*Goodwin v. Johnson*, 132 F.3d at 185; *Kopycinski v. Scott* 64 F.3d 223, 225 (5th Cir.1995); *Allridge v. Scott*, 41 F.3d at 217; and *Williams v. Scott*, 35 F.3d 159, 163 (5th Cir.1994), *cert. denied*, 513 U.S. 1137, 115 S.Ct. 959, 130 L.Ed.2d 901 (1995).

**206.** *See United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *Goodwin v. Johnson*, 132 F.3d at 185; *Boyle v. Johnson*, 93 F.3d 180, 186 (5th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 968, 136 L.Ed.2d 853 (1997); *Kopycinski v. Scott*, 64 F.3d at 225; and *East v. Scott*, 55 F.3d 996, 1002 (5th Cir.1995).

inadmissible evidence may be material for *Brady* purposes.[207] There are three elements to a valid *Brady* claim: (1) the prosecution must suppress or withhold evidence, (2) which is favorable, and (3) material to the defense.[208] Evidence is *not* "suppressed" if the defendant either knew, should have known, or with the exercise of due diligence could have learned, of the essential facts permitting him to take advantage of the exculpatory evidence.[209] Undisclosed evidence is "material" if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.[210] A reasonable probability of a different result is shown when non-disclosure puts the case in a different light so as to undermine confidence in the jury verdict.[211] If materiality is established, no harmless error analysis is employed.[212]

## C. Analysis

The problems with petitioner's *Brady* claim are two-fold.

### 1. No Concealment of Public Records

■ First, the testimony during the evidentiary hearing held in petitioner's most recent state habeas corpus proceeding unequivocally established that all of the records relating to Villanueva's mental condition that petitioner now claims were "withheld" prior to his 1989 trial had, in fact, been filed as matters of public record in Villanueva's state criminal case years prior to petitioner's 1989

**207.** See *Spence v. Johnson*, 80 F.3d 989, 1005 n. 14 (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 519, 136 L.Ed.2d 407 (1996).

**208.** See *East v. Johnson*, 123 F.3d 235, 237 (5th Cir.1997); *United States v. Fisher*, 106 F.3d 622, 634 (5th Cir.1997); *Jimenez v. Trominski*, 91 F.3d 767, 768 (5th Cir.1996); *Westley v. Johnson*, 83 F.3d at 725; *Spence v. Johnson*, 80 F.3d at 994; *East v. Scott*, 55 F.3d at 1002; *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir.1994); *Wilson v. Whitley*, 28 F.3d 433, 435 (5th Cir.1994), *cert. denied*, 513 U.S. 1091, 115 S.Ct. 754, 130 L.Ed.2d 653 (1995); *Blackmon v. Scott*, 22 F.3d 560, 564 (5th Cir.1994), *cert. denied*, 513 U.S. 1060, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994); and *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir.1992), *cert. denied*, 509 U.S. 925, 113 S.Ct. 3044, 125 L.Ed.2d 730 (1993).

**209.** See *East v. Johnson*, 123 F.3d at 239, (holding that the materiality prong of this test is *not a* sufficiency of the evidence test); *United States v. Mmahat*, 106 F.3d 89, 94 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 136, 139 L.Ed.2d 84 (1997), (holding that a defendant must show that the information allegedly withheld was unavailable to him through due diligence); *United States v. Aubin*, 87 F.3d 141, 148–49 (5th Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 965, 136 L.Ed.2d 850 (1997), (holding that due diligence on the part of the defendant is a necessary element in a successful *Brady* claim); *Lawrence v. Lensing*, 42 F.3d at 257; *Williams v. Scott*, 35 F.3d at 163, (holding that a *Brady* violation does not arise if the defendant, using reasonable diligence, could have obtained the information); and *Blackmon v. Scott*, 22 F.3d at 564–65, (holding that the state is not required to furnish the defendant with exculpatory evidence that is fully available to the defendant or that could be obtained through reasonable diligence).

**210.** See *Wood v. Bartholomew*, 516 U.S. 1, 116 S.Ct. 7, 10, 133 L.Ed.2d 1 (1995); *Kyles v. Whitley*, 514 U.S. 419, 434–35, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995); *United States v. Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383; *Goodwin v. Johnson*, 132 F.3d at 185; *East v. Johnson*, 123 F.3d at 237–39 (holding that the petitioner carries his burden to show materiality by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict); *United States v. Fisher*, 106 F.3d at 634; *Jimenez v. Trominski*, 91 F.3d at 768; *Westley v. Johnson*, 83 F.3d at 725; *Kopycinski v. Scott*, 64 F.3d at 225; *East v. Scott*, 55 F.3d at 1002; *Allridge v. Scott*, 41 F.3d at 217; *Williams v. Scott*, 35 F.3d at 159; and *Blackmon v. Scott*, 22 F.3d at 564. In recent opinions, both the Supreme Court and Fifth Circuit have analogized the "materiality" standard under *Brady* to the "prejudice" standard under *Strickland*. See *Kyles v. Whitley*, 514 U.S. at 434–35, 115 S.Ct. at 1566; and *Johnson v. Scott*, 68 F.3d 106, 109 n. 5 (5th Cir.1995).

**211.** *Kyles v. Whitley*, 514 U.S. at 434–35, 115 S.Ct. at 1566; *East v. Johnson*, 123 F.3d at 239–40, (holding material evidence that would have revealed that a key prosecution witness had a criminal record and history of mental problems); *United States v. Gonzales*, 121 F.3d 928, 946 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 726, 139 L.Ed.2d 664 (1998); *Spence v. Johnson*, 80 F.3d at 994; and *Kopycinski v. Scott*, 64 F.3d at 226. See also *United States v. Gonzales*, 121 F.3d at 946, and *Spence v. Johnson*, 80 F.3d at 995, (both holding that there is no *Brady* violation where the undisclosed evidence is merely cumulative).

**212.** See *Kyles v. Whitley*, 514 U.S. at 434–38, 115 S.Ct. at 1566–67; *Goodwin v. Johnson*, 132 F.3d at 185; and *Kopycinski v. Scott*, 64 F.3d at 226.

trial.[213] Additionally, both of petitioner's trial counsel testified that they had access to the reports concerning Villanueva's mental health from Villanueva's court case file.[214] Information such as that relating to Villanueva's mental condition that was both a matter of public record long before a defendant's 1989 trial and actually reviewed by defense counsel prior to trial could hardly have been "withheld" by the prosecution within the meaning of *Brady*.[215] Furthermore, petitioner offered no evidence during that hearing showing that prosecutors ever withheld or concealed evidence regarding Villanueva's mental health condition from petitioner's 1989 trial counsel and petitioner has alleged no specific facts in this Court supporting such a contention or refuting the uncontroverted testimony to the contrary from his most recent state habeas corpus proceeding. One cannot withhold or conceal what has already been made a matter of public record.

### 2. Nothing "Material" in the Records Anyway

■ Second, for the compelling reasons discussed in the testimony of petitioner's trial counsel at the evidentiary hearing held July 11 and 20, 1995 during petitioner's most recent state habeas corpus proceeding, the purported impeachment evidence identified by petitioner herein, i.e., the mental health records of Villanueva, was *not* material within the meaning of *Brady*.

Petitioner's trial counsel testified extensively during that state court hearing that they introduced evidence regarding Villanueva's life sentence for the purpose of allowing them to argue at sentencing that it was unfair for the petitioner to receive a death sentence while the individual who actually delivered the fatal blow to Hernandez had received a lesser sentence.[216] Their strategy at the punishment phase of petitioner's trial was to convince the jury that the petitioner deserved a life sentence because of the *fact* that Villanueva had received such a sentence, *not* because of the reasons Villanueva had received such a sentence.[217] Petitioner's trial counsel did not believe that impeaching Sam Ponder with regard to the reasons why he chose not to seek the death penalty for Villanueva would have been helpful to petitioner.[218] Both of petitioner's 1989 trial counsel emphasized in their testimony at the July, 1995, state habeas hearing that information showing that Sam Ponder had erroneously chosen not to seek the death penalty for Villanueva would *not* have aided their efforts to obtain a similar sentence for the petitioner because the thrust of their argument was the unfairness imposing different sentences on petitioner and Villanueva, *not* the reasons

213. An employee of the Bexar County District Clerk's office testified at the evidentiary hearing in petitioner's most recent state habeas corpus proceeding that all of Villanueva's mental; health records had been filed as matters of public record many years prior to petitioner's 1989 trial. *See* S.F. State Habeas Hearing, Testimony of Mary White, at pp. 330–35. Copies of the actual documents filed as a matter of public record in Villanueva's state criminal case were introduced during that hearing as State's Exhibits 1 and 2. Dr. John C. Sparks testified during that same hearing that his evaluations of Villanueva and those of some eight other mental health professionals had all been made public records when they were filed with the state trial court. *See* S.F. State Habeas Hearing, Testimony of Dr. John C. Sparks, at pp. 45–47.

214. *See* S.F. State Habeas Hearing, Testimony of Raymund Fuchs, at p. 160; and Testimony of Terry McDonald, at pp. 267–68.

215. *See United States v. Mmahat*, 106 F.3d at 94, (holding that a defendant must show that the

information allegedly withheld was unavailable to him through due diligence); *United States v. Aubin*, 87 F.3d at 148–49, (holding that due diligence on the part of the defendant is a necessary element in a successful *Brady* claim); *Lawrence v. Lensing*, 42 F.3d at 257; *Williams v. Scott*, 35 F.3d at 163, (holding that a *Brady* violation does not arise if the defendant, using reasonable diligence, could have obtained the information); and *Blackmon v. Scott*, 22 F.3d at 564–65, (holding that the state is not required to furnish the defendant with exculpatory evidence that is fully available to the defendant or that could be obtained through reasonable diligence).

216. *See* S.F. State Habeas Hearing, Testimony of Raymund Fuchs, at pp. 151 & 153–54; and Testimony of Terry McDonald, at pp. 248, 252–56, and 261–62.

217. *Id.*

218. *Id.*, Testimony of Raymund Fuchs, at pp. 163–68; and Testimony of Terry McDonald, at pp. 252–53 and 255–56.

why Villanueva had received a life sentence.[219] Petitioner's 1989 trial counsel testified that the reasons *why* Ponder had chosen to be merciful toward Villanueva were irrelevant to their strategy.[220] It simply did not matter to petitioner's 1989 trial counsel whether Ponder's decision to be merciful toward Villanueva had been based upon Ponder's erroneous understanding of the scope of Villanueva's involvement in the rape of West, Ponder's erroneous belief as to the degree of Villanueva's diminished mental capacity, or simply Ponder's personal moral feelings about the propriety of the death penalty; what mattered was that Villanueva had received a life sentence.[221]

The evidence before the jury at the punishment phase of petitioner's 1989 trial included testimony detailing (1) the petitioner's leadership role in the fatal assault upon Joey Hernandez and his personal commission of both the robbery and rape of Cynthia West, (2) the petitioner's escape from the Bexar County Jail while awaiting trial on this same capital murder charge, (3) the petitioner's numerous instances of violent and illegal conduct during his years of incarceration, and (4) the petitioner's brutal assault, rape, and sodomization of another young women in Florida following petitioner's escape from the Bexar County Jail. The issues before the jury at the punishment phase of petitioner's 198 trial were whether the petitioner had personally acted "deliberately" with regard to the murder of Joey Hernandez and whether there was a probability the petitioner would continue to pose a continuing threat to society.[222] Faced with compelling evidence regarding the petitioner's leadership role in the fatal assault upon Joey Hernandez and the petitioner's demonstrated propensity for future violence, petitioner's trial counsel were reduced to making an appeal for jury nullification at the punishment phase of petitioner's 1989 trial based upon the purported "unfairness" of Villanueva receiving only a life sentence while the petitioner received death. Therefore, the impeachment of Sam Ponder with regard to his reasons for not seeking the death penalty for Villanueva would not only have been irrelevant to the "unfairness" argument advanced by petitioner's 1989 trial counsel at the punishment phase of trial but might actually have undermined that argument.[223] Under such circumstances, there is simply no reasonable probability that, but for the alleged non-disclosure of evidence of Villanueva's mental condition to petitioner's counsel and the suggestion that Ponder's testimony could have been impeached thereby, the result of the punishment phase of petitioner's 1989 trial would have been different.

For the foregoing reasons, petitioner's *Brady* claim does not warrant federal habeas relief.

### IX. *Insufficient Evidence re "Deliberately"*

In his twelfth ground for relief, petitioner argues that there was legally insufficient evidence supporting the jury's affirmative answer to the first special sentencing issue; which inquired whether the petitioner had personally acted "deliberately" with regard to the murder of Joey Hernandez.[224]

---

**219.** *Id.*, Testimony of Raymund Fuchs, at pp. 163 and 166–68; testimony of Terry McDonald, at pp. 254–56.

**220.** *Id.*

**221.** *Id.*

**222.** *See* Trial Transcript, Volume II, at p. 372. As explained above and discussed in greater detail below in connection with petitioner's claims of ineffective assistance by his trial counsel, petitioner was tried *prior* to the issuance of the Supreme Court's *Penry* opinion.

**223.** Had petitioner's 1989 trial counsel undermined the rationale for Sam Ponder's decision not to seek the death penalty for Villanueva, a sophisticated prosecutor could have argued to the jury that the petitioner should not escape the death penalty simply because Ponder had made a mistake and that someone should have to pay for having caused Joey Hernandez's death. There is no reasonable probability that a showing that Ponder's decision to be merciful toward Villanueva was a mistake would have helped petitioner receive a life sentence. If Ponder's decision for leniency in Villanueva's case had been a clear mistake, then the defense strategy of pointing out the unfairness of the difference between a life sentence for Villanueva and a death sentence for petitioner would have been reduced to that of asking the jury to make a second "mistake" in favor of the petitioner.

**224.** *See* First Amended Petition, at pp. 87–95; and Petitioner's Response, at pp. 13–14.

## A. *The Claim*

The first special sentencing issue submitted to petitioner's 1989 jury inquired as follows:

> "Was the conduct of the defendant that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of Jose M. Hernandez would result?" [225]

In addition, the state trial court defined the term "deliberately" and instructed petitioner's jury that, in answering the special sentencing issues, the jury should focus its attention on the conduct of the petitioner alone and disregard the trial court's previous instruction at the guilt-innocence phase of trial on "law of the parties." [226] Petitioner argues that the evidence was legally insufficient to establish that he acted deliberately with regard to the murder of Joey Hernandez because (1) Cynthia West's testimony established that Villanueva, and not petitioner, had a knife, (2) the fatal blow to Hernandez was applied by a knife, not the tire tool petitioner used to beat Hernandez, and (3) petitioner had the opportunity to kill West but did not do so.[227]

## B. *The Constitutional Standard*

The standard for testing the sufficiency of evidence in a federal habeas review of a state court conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[228] The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.[229] To determine whether the evidence is sufficient to support a state criminal conviction, the federal habeas court must look to state law for the substantive elements of the relevant criminal offense.[230] Either direct or circumstantial

**225.** *See* Trial Transcript, Volume II, at p. 372.

**226.** *See Id.*, at p. 373:

> You are instructed that the law of parties, on which you were instructed at the first phase of trial, has no applicability to this phase of trial. In answering these special issues, you will consider only such evidence, if any, as you may believe relevant to the conduct, if any, of the defendant at the time of the offense, and to his future conduct.
>
> As used in the first Special Issue, the word "deliberately" has a meaning different and distinct from the word "intentionally" as that word was previously defined in the charge of guilt. The word "deliberately" as used in the first Special Issue means a manner of doing an act characterized by or resulting from a careful consideration "a conscious decision involving a thought process which embraces more than a mere will to engage in the conduct."

**227.** *See* First Amended Petition, at pp. 94–95.

**228.** *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *West v. Johnson*, 92 F.3d at 1393; *Gilley v. Collins*, 968 F.2d 465, 467 (5th Cir.1992); *Johnson v. Collins*, 964 F.2d at 1531; *Gibson v. Collins*, 947 F.2d 780, 781–82 (5th Cir.1991), *cert. denied*, 506 U.S. 833, 113 S.Ct. 102, 121 L.Ed.2d 61 (1992); *Brown v. Collins*, 937 F.2d 175, 180 (5th Cir. 1991); *Guzman v. Lensing*, 934 F.2d 80, 82 (5th Cir.1991); *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir.1990), *cert. denied*, 498 U.S. 903, 111 S.Ct. 265, 112 L.Ed.2d 221 (1990); and *Marler v. Blackburn*, 777 F.2d 1007, 1011 (5th Cir.1985).

This same standard of review applies to a federal defendant's challenge to the sufficiency of the evidence supporting a federal criminal conviction. *See United States v. Leahy*, 82 F.3d 624, 633 (5th Cir.1996); *United States v. Salazar*, 66 F.3d 723, 728 (5th Cir.1995); *United States v. Crawford*, 52 F.3d 1303, 1309 (5th Cir.1995); and *United States v. Harris*, 932 F.2d 1529, 1533 (5th Cir.1991), *cert. denied*, 502 U.S. 897, 112 S.Ct. 270, 116 L.Ed.2d 223 (1991).

**229.** *United States v. Stevenson*, 126 F.3d 662, 664 (5th Cir.1997); *United States v. Burton*, 126 F.3d 666, 677 (5th Cir.1997), (holding that the issue is *not* whether each piece of evidence, viewed independently, may have been susceptible of innocent interpretation but whether the jury could reasonably have concluded that when examined in the aggregate, the evidence sufficed to establish guilt); *United States v. Ismoila*, 100 F.3d 380, 386 (5th Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 1712, 137 L.Ed.2d 836 (1997); *United States v. Leahy*, 82 F.3d at 633; *United States v. Salazar*, 66 F.3d at 728; *United States v. Crawford*, 52 F.3d at 1309; *United States v. Faulkner*, 17 F.3d 745, 768 (5th Cir.1994), *cert. denied*, 513 U.S. 1056, 115 S.Ct. 663, 130 L.Ed.2d 598 (1994); and *United States v. Pigrum*, 922 F.2d 249, 254 (5th Cir.1991), *cert. denied*, 500 U.S. 936, 111 S.Ct. 2064, 114 L.Ed.2d 468 (1991).

**230.** *See Jackson v. Virginia*, 443 U.S. at 324 n. 16, 99 S.Ct. at 2792 n. 16; *Johnson v. Collins*, 964 F.2d at 1531; *Brown v. Collins*, 937 F.2d at 181; *Isham v. Collins*, 905 F.2d 67, 69 (5th

evidence can contribute to the sufficiency of the evidence underlying the conviction.[231] A federal court may not substitute its own judgment regarding the credibility of witnesses for that of the state courts.[232] All credibility choices must be resolved in favor of the jury's verdict.[233]

## C. *Analysis*

To carry its burden of proving the defendant acted "deliberately," the prosecution in a Texas capital sentencing proceeding "does not have to show that the defendant 'carefully weighed or considered or carefully studied the situation immediately prior to killing the deceased'"; rather, the circumstances of the crime may be sufficient to support a finding of deliberateness.[234] "To find the act of deliberateness, there must be the moment of deliberation and the determination on the part of the actor to kill. Such determination must necessarily be found from the totality of the circumstances of the individual case."[235] In this regard, petitioner's reliance on the fact that he did not kill West goes

astray; for the question before petitioner's jury was solely whether petitioner had acted deliberately in connection with the killing of Joey Hernandez.[236]

As explained at length in Section IV above, when viewed in the light most favorable to the jury's verdict, Cynthia West's testimony established that (1) the petitioner initially approached Joey Hernandez's window alone and asked for some oil for his car,[237] (2) when Joey told the petitioner that he had none, the petitioner left and drove off,[238] (3) a short time later, the petitioner, this time accompanied by Manuel Villanueva and two younger Hispanic males, drove back to the park, parked their vehicle, walked up to the driver's side of Joey's car, and again knocked on the window,[239] (4) the petitioner was armed with a tire tool and Villanueva was armed with a pocket knife,[240] (5) the petitioner asked Joey to take him to get some gas,[241] (6) Cynthia West and Joey each noticed the knife in Villanueva's hand,[242] (7) when Joey said that he was not going to take them anywhere because he had seen the knife in

Cir.1990); *Alexander v. McCotter,* 775 F.2d 595, 598 (5th Cir.1985); and *Turner v. McKaskle,* 721 F.2d 999, 1001 (5th Cir.1983).

231. *Schrader v. Whitley,* 904 F.2d at 287; *Pate v. Wainwright,* 607 F.2d 669, 670 (5th Cir.1979); *see also Jackson v. Virginia,* 443 U.S. at 324–26, 99 S.Ct. at 2792–93, (holding that circumstantial evidence can alone support a finding as to an essential element of an offense). *See also Gibson v. Collins,* 947 F.2d at 783–86; and *United States v. Harris,* 932 F.2d at 1533, (both holding that it is not necessary that the evidence exclude every hypothesis of innocence and that a jury is free to choose among reasonable constructions of the evidence).

232. *See Marler v. Blackburn,* 777 F.2d at 1012; and *Dunn v. Maggio,* 712 F.2d 998, 1001 (5th Cir.1983), *cert. denied,* 465 U.S. 1031, 104 S.Ct. 1297, 79 L.Ed.2d 697 (1984). *See also United States v. Payne,* 99 F.3d 1273, 1278 (5th Cir. 1996), (holding that the non-credibility of witnesses is not a sound basis for challenging the sufficiency of evidence); *United States v. Polk,* 56 F.3d 613, 620 (5th Cir.1995), (holding that non-credibility is generally not a sound basis for alleging insufficiency of the evidence; it is the jury's function to determine credibility), *citing United States v. Bermea,* 30 F.3d 1539, 1552 (5th Cir.1994), *cert. denied sub nom. Garza v. United States,* 514 U.S. 1097, 115 S.Ct. 1825, 131 L.Ed.2d 746 (1995); *United States v. Harris,* 932 F.2d at 1533, (holding that all inferences and credibility choices must be made in the light

most favorable to the Government); and *United States v. Salazar,* 66 F.3d at 728, (holding that the jury is free to chose among reasonable constructions of the evidence).

233. *United States v. Nguyen,* 28 F.3d 477, 480 (5th Cir.1994). Credibility issues are for the finder of fact and do not undermine the sufficiency of the evidence. *United States v. Morgan,* 117 F.3d 849, 854 n. 2 (5th Cir.1997), *cert. denied, sub nom. Wright v. United States,* —— U.S. ——, 118 S.Ct. 641, 139 L.Ed.2d 619 (1997); and *United States v. Davis,* 61 F.3d at 297.

234. *Johnson v. Collins,* 964 F.2d at 1531.

235. *Id.*

236. *Id.*

237. *See* S.F. Trial, Volume XI, Testimony of Cynthia West, at pp. 162–63.

238. *Id.,* at p. 164.

239. *Id.,* at pp. 165–66.

240. *Id.,* at pp. 169–171.

241. *Id.,* at p. 169.

242. *Id.,* at pp. 169–70.

Villanueva's hand, Villanueva replied "What knife? I don't have a knife,"[243] (8) Joey started to place his hand on the ignition but someone stuck a hand through the window and struck Joey hard on the left side of his face,[244] (9) the assailants then unlocked Joey's door and the petitioner struck Joey on the left side and the head with a tire tool,[245] (10) the petitioner repeatedly struck Joey with the tire tool while Villanueva stabbed Joey's head and left side with a pocket knife,[246] (11) while the petitioner and Villanueva continued to assault Joey, the other two assailants came around to the passenger side of the car, unlocked the door, grabbed West by her arm, and pulled her to the rear of the car by the trunk,[247] (12) when West got to the back of the car, the petitioner grabbed her left arm at the wrist and said to her "You better run, you bitch,"[248] (13) the petitioner then pulled her along at a brisk pace,[249] (14) when West was unable to match the petitioner's speed because of her high heels and attempted to tell the petitioner that she was asthmatic and pregnant, the petitioner directed her to take off her shoes, threatened her with the tire tool which he still held in his hand, and told her "You better run, you bitch or *I'm going to do the same shit to you I just did to* [Joey],"[250] (15) at one point, the petitioner shoved West down, placed his hand first on her stomach and then over her mouth, stuck the tire tool into the ground just inches from her head, and told her she better not scream,[251] (16) the petitioner then robbed and raped her, telling her at one point during the sexual assault "you better

start pumping,"[252] (17) once the petitioner got off her, Villanueva raped her,[253] (18) when Villanueva finished raping her, a third assailant raped her while Villanueva stood by and watched,[254] (19) the petitioner then spoke in Spanish to the other assailants, saying something to the effect "Come on, let's go,"[255] (20) the four assailants then ran over to where they had moved the petitioner's car and Joey's car and drove off,[256] and (21) West got a good look at the petitioner's face both of the times he approached Joey's car.[257]

The testimony of the medical examiner, when viewed in the light most favorable to the jury's verdict, established that (1) Joey had been beaten several times about the face and head, including one blow that had fractured both the bone and cartilage in his nose,[258] (2) the blow to Joey's nose injury would have caused enough pain to incapacitate Joey even if it did not render him unconscious,[259] (3) Joey had been stabbed several times in the neck, head, left hip, and left knee and one of those stab wounds had cut three quarters of the way through his spinal cord between the first and second cervical vertebrae,[260] and (4) the spinal cord injury was the cause of Joey's death.[261]

From the foregoing evidence, petitioner's 1989 jury could reasonably have inferred that (1) after he was rebuffed by Joey, the petitioner went and deliberately obtained the assistance of three accomplices, including one who was armed with a deadly weapon, and returned to the park, (2) the petitioner approached Joey's car a second time while

243. *Id.*

244. *Id.,* at p. 171.

245. *Id.*

246. *Id.,* at pp. 171–73.

247. *Id.,* at pp. 173–74.

248. *Id.,* at p. 174.

249. *Id.,* at pp. 175–76.

250. *Id.*

251. *Id.,* at pp. 177–78.

252. *Id.,* at pp. 181–83.

253. *Id.,* at p. 185.

254. *Id.,* at p. 186.

255. *Id.,* at pp. 196–87.

256. *Id.,* at pp. 178–79 & 187.

257. *Id.,* Volume XII, at p. 80.

258. *See* S.F. Trial, Volume XIII, Testimony of Robert H. Swedarsky, at pp. 79–81 & 83.

259. *Id.,* at pp. 97–100, 102, & 106–07.

260. *Id.,* at pp. 82–92.

261. *Id.,* at pp. 93–94.

deliberately carrying a tire tool that was capable of causing serious bodily injury and incapacitating a person, (3) the petitioner was aware that Villanueva was armed with a knife before any blows were delivered to Joey but deliberately instigated another confrontation with Joey, (4) while the petitioner deliberately assaulted Joey with the tire tool, Villanueva stabbed Joey, (5) immediately after the fatal assault on Joey took place, the petitioner threatened to do to West what, in his own words, *he* had just done to Joey, (6) when the petitioner and his accomplices not only stole Joey's vehicle but also robbed both Joey and West of all their money and left West naked and alone late at night, they thereby prevented West from immediately calling for help or getting Joey to a hospital quickly for treatment of his injuries, and (7) throughout the fatal assault upon Joey and the robbery and sexual assault on West, the petitioner acted as the leader of the four assailants.

Based on the narrative concerning the petitioner's troubled and deprived childhood contained in the juvenile justice report prepared when the petitioner was only twelve years old,[262] petitioner's 1989 jury could also have inferred that the petitioner's conduct on August 4, 1979 was a *deliberate* series of actions by a person accustomed to taking what he could get and caring little whom he hurt. Petitioner offered no evidence indicating that the he ever made any effort to limit or restrict the scope of his joint attack with Villanueva upon Joey or that he ever made any effort to seek or render aid to Joey after completing that assault. On the contrary, by robbing West himself and robbing or allowing the robbery of Joey and the theft of Joey's automobile, the petitioner, as leader of the pack, thereby deprived West of any practical means of quickly getting Joey to a hospital or getting immediate help for Joey's injuries. Given the obvious seriousness of Joey's injuries, depriving West of the ability to quickly get help for Joey was itself an act of deliberate indifference to Joey's life. The sordid details of West's testimony made clear that immediately after the fatal assault upon

Joey, while Joey lay incapacitated and bleeding from his injuries, the petitioner led his gang on a series of sexual assaults on West. Significant as well is the fact that the petitioner's 1989 jury had before it absolutely no expression of remorse for Joey's death from the petitioner.

The evidence summarized above, when viewed in the light most favorable to the jury's 1989 verdict established that the petitioner (1) *deliberately* returned to the park with three accomplices, one of whom carried a deadly weapon, for the specific purposes of killing Joey, stealing Joey's car, robbing both Joey and West, and sexually assaulting West, (2) *deliberately* instigated and another confrontation with Joey while himself armed with a tire tool and with full knowledge that Villanueva was armed with a knife, (3) *deliberately* initiated and participated in the fatal assault upon Joey, (4) *deliberately* made no effort to limit the scope of the assault upon Joey, (5) *deliberately* made no effort to render aid to Joey after the assault, (6) *deliberately* prevented West from immediately getting assistance for Joey's obvious injuries, and (7) did so because the petitioner personally possessed the specific intent to kill Joey. The evidence introduced at petitioner's 1989 trial was more than sufficient to support the jury's affirmative answer to the first special sentencing issue.

For the foregoing reasons, petitioner's twelfth claim does not warrant federal habeas corpus relief.

## X. *Ineffective Assistance Claims*

In his second, fourth, fifth, sixth, seventh, and tenth claims for relief, herein, petitioner argues that his trial counsel rendered ineffective assistance by committing a wide variety of professionally deficient acts and omissions.[263]

### A. *The Claims*

Petitioner argues that his trial counsel rendered ineffective assistance by (1) failing to object to the failure of the punishment phase jury instructions to afford petitioner's 1989

---

**262.** *See* S.F. Trial, Defendant's Exhibit 20.

**263.** *See* First Amended Petition, at pp. 21–23, 33–65, and 77–81; and Petitioner's Response, at pp. 14–21.

jury an adequate opportunity to consider petitioner's mitigating evidence, (2) failing to adequately voir dire members of the jury venire concerning their views on petitioner's mitigating evidence, (3) failing to object during voir dire to the prosecutor's statement to one member of the venire to the effect that the jury could not consider evidence of the petitioner's co-defendant's life sentence when answering the special sentencing issues, (4) making closing arguments at the guilt-innocence phase of trial which effectively waived the lesser-included offense instructions, (5) making disparaging admissions and uncomplimentary comments about petitioner during closing arguments at the punishment phase of trial, and (6) failing to request and obtain discovery into documents relating to Villanueva's mental health that could have been used to impeach the testimony of Sam Ponder regarding his reasons for not seeking a death sentence for Villanueva.

## B. *The Constitutional Standard*

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in the case of *Strickland v. Washington:*

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing .that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.[264]

In order to establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness."[265] In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance.[266] The courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight.[267] It is strongly presumed that counsel has rendered adequate assistance and made all significant

**264.** 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

**265.** *Darden v. Wainwright,* 477 U.S. 168, 184, 106 S.Ct. 2464, 2473, 91 L.Ed.2d 144 (1986); *Strickland v. Washington,* 466 U.S. at 687–88, 104 S.Ct. at 2064; *Lackey v. Johnson,* 116 F.3d 149, 152 (5th Cir.1997); *Andrews v. Collins,* 21 F.3d 612, 621 (5th Cir.1994), *cert. denied,* 513 U.S. 1114, 115 S.Ct. 908, 130 L.Ed.2d 790 (1995); *Duff–Smith v. Collins,* 973 F.2d 1175, 1182 (5th Cir.1992), *cert. denied,* 507 U.S. 1056, 113 S.Ct. 1958, 123 L.Ed.2d 661 (1993); and *Black v. Collins,* 962 F.2d 394, 401 (5th Cir. 1992), *cert. denied,* 504 U.S. 992, 112 S.Ct. 2983, 119 L.Ed.2d 601 (1992).

**266.** *See Strickland v. Washington,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66; *Carter v. Johnson,* 131 F.3d 452, 463 (5th Cir.1997); *Belyeu v. Scott,* 67 F.3d at 538; *Duff–Smith v. Collins,* 973 F.2d at 1182. A federal habeas petitioner must carry the burden of demonstrating both counsel's deficient performance and resultant prejudice. *Burnett v. Collins,* 982 F.2d 922, 928 (5th Cir.1993); and *Martin v. Maggio,* 711 F.2d 1273, 1279 (5th Cir.1983), *cert. denied,* 469 U.S. 1028, 105 S.Ct. 447, 83 L.Ed.2d 373 (1984).

**267.** *See Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993); *Burger v. Kemp,* 483 U.S. 776, 789, 107 S.Ct. 3114, 3123, 97 L.Ed.2d 638 (1987); *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065– 66; *Carter v. Johnson,* 131 F.3d at 463; *Williams v. Cain,* 125 F.3d 269, 276 (5th Cir.1997), (holding that review of the first prong of *Strickland* requires consideration of the facts and resources available to defense counsel at the time of trial); *Green v. Johnson,* 116 F.3d 1115, 1122 (5th Cir. 1997); *United States v. Gaudet,* 81 F.3d 585, 592 (5th Cir.1996); and *Belyeu v. Scott,* 67 F.3d at .538. The deficiency prong of *Strickland* is judged by counsel's conduct under the law existing at the time of the conduct, *see Lockhart v. Fretwell,* 506 U.S. at 371–72, 113 S.Ct. at 844, *Lucas v. Johnson,* 132 F.3d 1069 (5th Cir.1998), and *Westley v. Johnson,* 83 F.3d at 723, and in view of the facts and resources available at the time of trial, *see Williams v. Cain,* 125 F.3d at 276, *citing Motley v. Collins,* 18 F.3d 1223, 1226 (5th Cir.1994), *cert. denied,* 513 U.S. 960, 115 S.Ct. 418, 130 L.Ed.2d 333 (1994).

decisions in the exercise of reasonable professional judgment.[268] An attorney's strategic choices, usually based on information supplied by the defendant and from a thorough investigation of relevant facts and law are virtually unchallengeable.[269] Counsel is required neither to advance every non-frivolous argument nor to investigate every conceivable matter inquiry into which could be classified as non-frivolous.[270] A criminal defense counsel is not required to exercise clairvoyance during the course of a criminal trial.[271]

The proper standard for evaluating counsel's performance under the Sixth Amendment is "reasonably effective assistance."[272] "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."[273] "Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution."[274] In order to establish that he has sustained prejudice, the convicted defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."[275] In addition, analysis of the second or "prejudice" prong of the *Strickland* test must include examination of whether counsel's deficient performance caused the outcome to be unreliable or the proceeding to be fundamentally unfair.[276] "Unreliability or

**268.** *See Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066; and *Duff–Smith v. Collins,* 973 F.2d at 1182.

**269.** *See Ransom v. Johnson,* 126 F.3d 716, 721 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 361, 139 L.Ed.2d 281 (1997); *Boyle v. Johnson,* 93 F.3d at 187–88, (holding that an attorney's decision not to pursue a mental health defense or to present mitigating evidence concerning the defendant's possible mental illness was reasonable where counsel was concerned that such testimony would not be viewed as mitigating by the jury and that the prosecution might respond to such testimony by putting on its own psychiatric testimony regarding the defendant's violent tendencies); *West v. Johnson,* 92 F.3d at 1406–09, (holding that a trial counsel's failure to conduct further investigation into the defendant's head injury and psychological problems was reasonable where interviews with the defendant and the defendant's family failed to produce any helpful information); and *Bryant v. Scott,* 28 F.3d 1411, 1415 (5th Cir.1994), *citing Strickland v. Washington,* 466 U.S. at 691, 104 S.Ct. at 2066; and *Andrews v. Collins,* 21 F.3d at 623, (holding that counsel acted reasonably in failing to further pursue the defendant's mental capacity or background where counsel had no reason to believe that further investigation would be useful).

**270.** *See Sones v. Hargett,* 61 F.3d 410, 415 n. 5 (5th Cir.1995): "Counsel cannot be deficient for failing to press a frivolous point."; *United States v. Gibson,* 55 F.3d 173, 179 (5th Cir.1995): "Counsel is not required by the Sixth Amendment to file meritless motions."; *Smith v. Collins,* 977 F.2d 951, 960 (5th Cir.1992), *cert. denied,* 510 U.S. 829, 114 S.Ct. 97, 126 L.Ed.2d 64 (1993): "The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources.";

*Koch v. Puckett,* 907 F.2d 524, 527 (5th Cir. 1990): "counsel is not required to make futile motions or objections."; *Schwander v. Blackburn,* 750 F.2d 494, 500 (5th Cir.1985), (holding that defense counsel is not required to investigate everyone whose name is mentioned by the defendant); and *Murray v. Maggio,* 736 F.2d 279, 283 (5th Cir.1984): "Counsel is not required to engage in the filing of futile motions."

**271.** *See Sharp v. Johnson,* 107 F.3d 282, 290 n. 28 (5th Cir.1997), *citing Garland v. Maggio,* 717 F.2d 199, 207 (5th Cir.1983), (holding that clairvoyance is not a required attribute of effective representation). *See also Lackey v. Johnson,* 116 F.3d at 152, (holding that trial counsel was not ineffective for failing to discover evidence about which the defendant knew but withheld from his counsel).

**272.** *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. at 2064; *Bullock v. Whitley,* 53 F.3d 697, 700 (5th Cir.1995).

**273.** *Strickland v. Washington,* 466 U.S. at 691, 104 S.Ct. at 2067.

**274.** *Strickland v. Washington,* 466 U.S. at 692, 104 S.Ct. at 2067.

**275.** 466 U.S. at 694, 104 S.Ct. at 2068.

**276.** *See Lockhart v. Fretwell,* 506 U.S. 364, 368–73, 113 S.Ct. 838, 842–44, 122 L.Ed.2d 180 (1993); *Carter v. Johnson,* 131 F.3d at 463; *Ransom v. Johnson,* 126 F.3d at 721; *Lackey v. Johnson,* 116 F.3d at 152; *Vuong v. Scott,* 62 F.3d at 685; and *Armstead v. Scott,* 37 F.3d 202, 207 (5th Cir.1994), *cert. denied,* 514 U.S. 1071, 115 S.Ct. 1709, 131 L.Ed.2d 570 (1995). "[T]he right to effective assistance of counsel, both at the trial and appellate level, 'is recognized not

unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." [277]

In summary then, in order to prevail on a claim of ineffective assistance of counsel, a convicted defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[278]

The two-part test of *Strickland*, has been applied by the Supreme Court and the Fifth Circuit in a wide variety of contextual challenges to the effectiveness of counsel's performance. Given the language of *Strickland* itself, the test applies to the conduct of counsel both in preparation for and at trial.[279] An attorney's failure to investigate the case against the defendant and to interview witnesses can support a finding of ineffective assistance.[280] However, in order to establish that counsel was rendered ineffective by virtue of a failure to investigate the case against a defendant or to discover and present evidence, a convicted defendant must do more than merely allege a failure to investigate; he must state with specificity what the investigation would have revealed, what evidence would have resulted from that investigation, and how such would have altered the outcome of the case.[281] Furthermore, when a trial counsel's decision not to pursue further investigation into a potential defense or into an area of potential mitigating evidence is based on investigation and consultation with the defendant which leads the attorney to believe that further investigation would be fruitless, that decision may not be challenged as unreasonable.[282] The extent of an attorney's investigation into an area must be viewed in the context of the defendant's cooperation with the attorney's investigation and with a heavy measure of deference to counsel's judgments.[283]

for its own sake, but because of the effect that it has on the ability of the accused to receive a fair trial.' " *Earhart v. Johnson*, 132 F.3d 1062 (5th Cir.1998), and *Goodwin v. Johnson*, 132 F.3d at 174, *both citing Lockhart v. Fretwell*, 506 U.S. at 369, 113 S.Ct. at 842.

**277.** *Lockhart v. Fretwell*, 506 U.S. at 372, 113 S.Ct. at 844. Thus, prejudice is measured by current law and not by the law as it existed at the time of the alleged error. *See Lockhart v. Fretwell*, 506 U.S. at 369–73, 113 S.Ct. at 843–44; *Lucas v. Johnson*, 132 F.3d at 1077–78; and *Westley v. Johnson*, 83 F.3d at 723.

**278.** *See Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S.Ct. 2574, 2582–83, 91 L.Ed.2d 305 (1986); *Darden v. Wainwright*, 477 U.S. at 184, 106 S.Ct. at 2473; and *Williams v. Collins*, 16 F.3d 626, 631 (5th Cir.1994), *cert. denied*, 512 U.S. 1289, 115 S.Ct. 42, 129 L.Ed.2d 937 (1994). In the course of the latter portion of this inquiry, the Court must consider not merely whether the outcome of the defendant's case would have been different but also whether counsel's deficient performance caused the outcome to be unreliable or the proceeding to be fundamentally unfair. *See Lockhart v. Fretwell*, 506 U.S. at 368–73, 113 S.Ct. at 842–44; *Goodwin v. Johnson*, 132 F.3d at 174, (holding that the presence or absence of prejudice, both at trial and on appeal, hinges upon the fairness of the trial and the reliability of the judgment of conviction resulting therefrom); *Carter v. Johnson*, 131 F.3d at 463; *Ransom v. Johnson*, 126 F.3d at 721; and *Armstead v. Scott*, 37 F.3d at 207.

**279.** *See, e.g., Martin v. McCotter*, 796 F.2d 813, 816–17 (5th Cir.1986), *cert. denied*, 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d 985 (1987) (holding that the *Strickland* test applied to both the trial and sentencing phases of a criminal proceeding); and *Nealy v. Cabana*, 764 F.2d 1173, 1178–80 (5th Cir.1985).

**280.** *Bryant v. Scott*, 28 F.3d at 1415.

**281.** *See Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir.1994); *Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir.1993); *United States v. Green*, 882 F.2d 999, 1003 (5th Cir.1989); *Lockhart v. McCotter*, 782 F.2d 1275, 1282–83 (5th Cir.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 827 (1987); *Alexander v. McCotter*, 775 F.2d 595, 603 (5th Cir.1985); *Schwander v. Blackburn*, 750 F.2d 494, 499–500 (5th Cir.1985); and *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir.1983).

**282.** *See Carter v. Johnson*, 131 F.3d at 465; *Boyle v. Johnson*, 93 F.3d at 187–88; *West v. Johnson*, 92 F.3d at 1406–09; and *Andrews v. Collins*, 21 F.3d at 623.

**283.** *See Carter v. Johnson*, 131 F.3d at 463; and *Randle v. Scott*, 43 F.3d 221, 225 (5th Cir.1995), *cert. denied*, 515 U.S. 1108, 115 S.Ct. 2259, 132 L.Ed.2d 265 (1995), (holding that trial counsel was not ineffective for failing to investigate the validity of the defendant's prior conviction where the defendant was aware that the prior conviction had been reversed but failed to disclose

524

Because the *Strickland* opinion itself dealt with a sentencing proceeding, the two-part test applies to sentencing proceedings.[284] To satisfy the prejudice prong of the *Strickland* test in the context of a non-capital sentencing proceeding, a defendant must establish a reasonable probability that, but for the deficient performance of counsel, his sentence would have been significantly less harsh.[285] In a capital sentencing proceeding, the prejudice analysis focuses on whether there is a reasonable probability that, absent counsel's errors, a life sentence would have been imposed.[286] The failure to present mitigating evidence during the sentencing phase of a capital trial is *not, per se,* deficient performance.[287] Counsel does, however, have a duty to make a reasonable investigation into available mitigating evidence or to make a reasonable decision that makes particular investigations unnecessary.[288] Coun-

sel is also obligated to investigate beyond merely communicating with his client once counsel becomes aware of the possible existence of potentially mitigating evidence.[289]

Because a convicted defendant must satisfy *both* prongs of the *Strickland* test, a failure to establish either deficient performance or prejudice under that test makes it unnecessary to examine the other prong.[290] Therefore, a failure to establish that counsel's performance fell below an objective standard of reasonableness avoids the need to consider the issue of prejudice.[291] It is also unnecessary to consider whether counsel's performance was deficient where there is an insufficient showing of prejudice.[292] Mere conclusory allegations in support of claims of ineffective assistance of counsel are insufficient, as a matter of law, to raise a constitutional issue.[293]

same to his counsel and, instead, instructed his counsel to cease investigation into the matter so as to expedite the defendant's entry of a guilty plea). However, an attorney who is aware of potential mitigating evidence is obligated to investigate the existence of such evidence beyond merely communicating with the defendant. *Ransom v. Johnson,* 126 F.3d at 723.

284. *See Burger v. Kemp,* 483 U.S. 776, 788–96, 107 S.Ct. 3114, 3122–26, 97 L.Ed.2d 638 (1987); *Green v. Johnson,* 116 F.3d at 1122; *Belyeu v. Scott,* 67 F.3d at 540–42, (applying both prongs of the *Strickland* test to ineffective assistance claims regarding the sentencing phase of a capital murder trial); *Andrews v. Collins,* 21 F.3d at 623–25; and *Spriggs v. Collins,* 993 F.2d 85, 88 (5th Cir.1993).

285. *See United States v. Acklen,* 47 F.3d 739, 742 (5th Cir.1995); *United States v. Segler,* 37 F.3d 1131, 1136 (5th Cir.1994); and *Spriggs v. Collins,* 993 F.2d at 87–88.

286. *See Strickland v. Washington,* 466 U.S. at 695, 104 S.Ct. at 2069; *Carter v. Johnson,* 131 F.3d at 463; *Ransom v. Johnson,* 126 F.3d at 723; *Green v. Johnson,* 116 F.3d at 1122, (holding that the proper inquiry is whether the defendant has demonstrated a reasonable probability that the jury would not have imposed the death sentence in the absence of errors by counsel); and *Belyeu v. Scott,* 67 F.3d at 538.

287. *See Ransom v. Johnson,* 126 F.3d at 723; *Williams v. Cain,* 125 F.3d at 277; and *West v. Johnson,* 92 F.3d at 1408.

288. *See Williams v. Cain,* 125 F.3d at 277, *citing Strickland v. Washington,* 466 U.S. at 691, 104 S.Ct. at 2066.

289. *Ransom v. Johnson,* 126 F.3d at 723.

290. *See Strickland v. Washington,* 466 U.S. at 700, 104 S.Ct. at 2071; *Ransom v. Johnson,* 126 F.3d at 721; *Green v. Johnson,* 116 F.3d at 1122; *United States v. Seyfert,* 67 F.3d 544, 547 (5th Cir.1995); and *Armstead v. Scott,* 37 F.3d at 210. *See also Burnett v. Collins,* 982 F.2d at 928, (holding that the defendant bears the burden of proof on *both* prongs of the *Strickland* test).

291. *See United States v. Hoskins,* 910 F.2d 309, 311 (5th Cir.1990); and *Thomas v. Lynaugh,* 812 F.2d 225, 229–30 (5th Cir.1987), *cert. denied,* 484 U.S. 842, 108 S.Ct. 132, 98 L.Ed.2d 89 (1987).

292. *See Black v. Collins,* 962 F.2d at 401; *Bates v. Blackburn,* 805 F.2d 569, 578 (5th Cir.1986), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987); and *Martin v. McCotter,* 796 F.2d 813, 821 (5th Cir.1986), *cert. denied,* 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d 985 (1987).

293. *See Kinnamon v. Scott,* 40 F.3d 731, 735 (5th Cir.1994), *cert. denied,* 513 U.S. 1054, 115 S.Ct. 660, 130 L.Ed.2d 595 (1994), (holding that a petitioner's speculative complaints of ineffective assistance by appellate counsel did not warrant federal habeas relief); *Anderson v. Collins,* 18 F.3d 1208, 1221 (5th Cir.1994), (holding that, without a specific, affirmative showing of precisely what evidence or testimony was rendered unavailable due to a trial counsel's failure to investigate, develop, and present same, i.e., a showing of exactly what the missing evidence or testimony would have been, a court cannot even begin to apply the *Strickland* analysis because it is very difficult to determine whether the defendant was prejudiced by any such deficiencies in

## C. Analysis

### 1. Failure to Object to Punishment Phase Jury Instructions

 Petitioner argues that hist trial counsel should have objected to the punishment phase jury instructions because, as petitioner argued in his first and third claims for relief discussed in detail in Section V above, those instructions precluded his 1989 jury from giving effect to petitioner's mitigating evidence.[294]

#### a. No Deficient Performance

The deficiency prong of *Strickland* is judged by counsel's conduct under the law existing at the time of the conduct[295] and in view of the facts and resources available at the time of trial.[296] In essence, petitioner criticizes his 1989 trial counsel for failing to anticipate the Supreme Court's subsequent *Penry* decision regarding the need for supplemental jury instructions on mitigating evidence and failing to either request or object to the absence of something akin to a *Penry* instruction. However, the failure of petitioner's trial counsel to anticipate the Supreme Court ruling in *Penry* did not cause the performance of said counsel to fall below an objective level of reasonableness. "In cases tried prior to *Penry*, counsel is not defective for failing to anticipate that decision."[297] As explained at greater length below, petitioner's trial counsel had compelling strategic reasons for choosing not to rely upon petitioner's troubled childhood and deprived family background as the sine qua non of their defense at the punishment phase of trial.[298]

#### b. No Prejudice

Moreover, neither the petitioner's "mitigating" evidence regarding his youth, race, purported illiteracy, troubled childhood, deprived family background, and his non-triggerman status, nor his evidence regarding Villanueva's life sentence would have warranted a *Penry* instruction even if petitioner's trial counsel had requested one. To warrant a *Penry* instruction, evidence must both (1) relate to the defendant's character or background or to the circumstances of the offense *and* be sufficient to lead a reasonable juror to impose a penalty less than death and (2) have been beyond the "effective reach" of the jury.[299] A Texas capital sentencing jury can give adequate consideration to evidence showing a defendant neither fired the fatal shot nor delivered the fatal blow without the necessity of a *Penry* instruction.[300] The mitigating effects of a defendant's youth can also be adequately considered by a Texas jury without the necessity of a *Penry* instruction.[301] Petitioner's evidence regarding his minority race, purportedly illiteracy, troubled childhood, and deprived family background was not accompanied by any evidence showing a "nexus" or causal relationship between those factors and his criminal

counsel's performance); *United States v. Pineda,* 988 F.2d 22, 23 (5th Cir.1993); *Koch v. Puckett,* 907 F.2d 524, 530 (5th Cir.1990); *Russell v. Lynaugh,* 892 F.2d 1205, 1213 (5th Cir.1989), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2909, 115 L.Ed.2d 1073 (1991); *United States v. Woods,* 870 F.2d 285, 288 n. 5 (5th Cir.1989); and *Ross v. Estelle,* 694 F.2d 1008, 1011–12 & n. 2 (5th Cir.1983).

294. *See* First Amended Petition, at pp. 21–23; and Petitioner's Response, at pp. 15–16.

295. *See Lockhart v. Fretwell,* 506 U.S. at 372, 113 S.Ct. at 844; and *Westley v. Johnson,* 83 F.3d at 723.

296. *See Williams v. Cain,* 125 F.3d at 276; and *Motley v. Collins,* 18 F.3d at 1226.

297. *See West v. Johnson,* 92 F.3d at 1409 n. 45; and *Woods v. Johnson,* 75 F.3d at 1034–35.

298. *See* notes 299–303, *infra,* and accompanying test.

299. *Turner v. Johnson,* 106 F.3d at 1189; *Madden v. Collins,* 18 F.3d at 308; and *Russell v. Collins,* 998 F.2d at 1292.

300. *See Nichols v. Scott,* 69 F.3d at 1267–68; *Stewart v. Collins,* 978 F.2d at 201; *Drew v. Collins,* 964 F.2d at 420–21; and *Bridge v. Collins,* 963 F.2d at 769–70.

301. *See Johnson v. Texas,* 509 U.S. at 365–70, 113 S.Ct. at 2668–70; *Tucker v. Johnson,* 115 F.3d at 281–82; *Turner v. Johnson,* 106 F.3d at 1189; *Drew v. Collins,* 964 F.2d at 420–21; *Barnard v. Collins,* 958 F.2d at 637–38; *Wilkerson v. Collins,* 950 F.2d at 1060–61; and *Graham v. Collins,* 950 F.2d at 1030–32.

conduct on August 4, 1979.[302] Therefore, petitioner would not have been entitled to a *Penry* instruction with regard to any of that evidence.[303] Finally, petitioner's evidence regarding Villanueva's life sentence did not relate to petitioner's own character or background or the circumstances of petitioner's crime and, therefore, also would not have warranted a *Penry* instruction had his counsel requested one.[304]

302. Petitioner offered no evidence at his 1989 trial establishing that his criminal conduct on August 4, 1979 was caused by, the result of, or bore a "nexus" to petitioner's troubled childhood, deprived family background, purported illiteracy, or minority race. The sole evidence on petitioner's background introduced into evidence at his 1989 trial was a juvenile justice report which had been prepared almost eight years before petitioner's crime. *See* S.F. Trial, Defendant's Exhibit 20. Nothing in that report reflected that the then-twelve-year-old boy who was the subject of that report was capable of capital murder or sexual assault. Nothing in that report indicated any history of physical or sexual abuse. Admittedly, that report reflected a history of neglect and non-supervision by petitioner's parents that bordered on abandonment and recounted several incidents in which the petitioner had used threats of violence to "shake down" his school mates for their money. However, nothing in that report indicated or suggested that, as of the date the report was prepared, the petitioner had ever been the victim of physical violence or sexual assault.

As explained above, petitioner's only "mitigating" evidence of his own illiteracy consisted of that same juvenile justice sentencing recommendation, which had been prepared when petitioner was only twelve and merely noted that the petitioner had poor grades and poor attendance in school. *See* S.F. Trial, Defendant's Exhibit 20. Nothing in that report indicated that the petitioner was "illiterate" at that time, much less seven years later when he orchestrated the murder of Joey Hernandez.

Likewise, petitioner's assertion of his minority race was unaccompanied by any evidence of a nexus between that fact and his crime. Both the petitioner and Joey Hernandez were Hispanic. Petitioner never introduced any evidence at his 1989 trial linking Joey's murder with any sort of racial discord or race-related issue. Insofar as petitioner implies that the mere fact a criminal defendant is a member of a minority race is somehow automatically "mitigating," that contention is not only utterly without support in this nation's jurisprudence but also contrary to the Fifth Circuit's definition of "constitutionally relevant mitigating evidence" discussed in Section V above, i.e., evidence which shows (1) a uniquely severe permanent handicap with which the defendant is burdened through no fault of his own and (2) that the criminal act was attributable to this severe permanent condition. *See Tucker v. Johnson*, 115 F.3d at 281; *Turner v. Johnson*, 106 F.3d at 1189; *Harris v. Johnson*, 81 F.3d at 539; *Davis v. Scott*, 51 F.3d at 460; and *Russell v. Collins*, 998 F.2d at 1292–93. Petitioner presented no expert testimony or other evidence at his 1989 trial showing that his criminal conduct on August 4, 1979 was related to, or the product of, his deprived family background, troubled childhood, minority race, or purported illiteracy.

303. *See Turner v. Johnson*, 106 F.3d at 1189, (holding that "for evidence to have mitigating relevance, there must be a nexus between the mitigating evidence and the criminal act"); *Harris v. Johnson*, 81 F.3d at 539, (holding that no *Penry* instruction was necessary where there was no evidence showing that the defendant's borderline intelligence bore a nexus to his criminal actions); *Allridge v. Scott*, 41 F.3d at 223, (holding that no *Penry* instruction was necessary in the absence of evidence showing that the defendant's criminal conduct was attributable to the mental illness and abuse the defendant had suffered during a previous incarceration); *Lackey v. Scott*, 28 F.3d at 489, (holding that evidence of the defendant's low intelligence and history of childhood abuse was not relevant for *Penry* purposes where there was no evidence showing the defendant's criminal act was attributable to same); *Madden v. Collins*, 18 F.3d at 307–08, (holding that evidence the defendant suffered from an anti-social personality, dyslexia, and a troubled childhood did not warrant a *Penry* instruction absent a showing that the defendant's criminal conduct was attributable to same); *Russell v. Collins*, 998 F.2d at 1292–93, (holding that evidence of a single instance of physical abuse by the petitioner's stepfather did not constitute relevant mitigating evidence when unaccompanied by any other evidence showing that the incident left the petitioner mentally or emotionally impaired or more predisposed to commit murder); *Barnard v. Collins*, 958 F.2d at 638–39, (holding that, in order to warrant a *Penry* instruction, evidence that a defendant had a troubled childhood must be accompanied by evidence that the defendant's childhood experiences had a psychological effect on the defendant, i.e., that the defendant's criminal conduct was attributable to his disadvantaged background); and *Graham v. Collins*, 950 F.2d at 1033, (holding that "mitigating" evidence must be able to raise an inference "that the crime is attributable to the disability").

304. *See Brogdon v. Blackburn*, 790 F.2d at 1169–70. As explained above in Section V.B.1.c., the happenstance that a different sentencing authority, or in Villanueva's case a different prosecutor, chose to display mercy toward Villanueva based on the peculiarities of Villanueva's own character, background, record, and role in the offense, bears no relevance to the propriety of the petitioner's sentence. *Accord Russell v. Collins*, 998 F.2d at 1294.

The evidence supporting the jury's affirmative findings on the two special sentencing issues was more than merely sufficient; it was compelling.[305] In addition to the facts of the crime, the prosecution introduced evidence of the petitioner's numerous acts of violence and illegal activity during his incarceration, the petitioner's escape from the Bexar County Jail, and the graphic details of petitioner's assault, robbery, and petitioner's brutal rape of a young woman in Florida following his escape. In a capital sentencing proceeding, the prejudice analysis focuses on whether there is a reasonable probability that, absent counsel's errors, a life sentence would have been imposed.[306] There is no reasonable probability that, but for the failure of petitioner's trial counsel to request a *Penry* instruction or to object to the absence of such an instruction in petitioner's 1989 punishment phase jury instructions, the outcome of that phase of petitioner's trial would have been different.

In fact, given the overwhelming evidence regarding the petitioner's leadership role in the murder of Joey Hernandez and the compelling testimony of the petitioner's propensity for extreme and outrageous violence toward women, there is no reasonable probability that, even had the state trial court given a *Penry* instruction at the punishment phase of petitioner's 1989 trial, the outcome of that phase of petitioner's trial would have been any different. Likewise, because of the lack of any clearcut nexus between petitioner's proffered mitigating evidence and the petitioner's crime, not to mention the overall lack of substance to petitioner's proffered mitigating evidence, the absence of a *Penry* instruction did not render the punishment phase of petitioner's 1989 trial fundamentally unfair or unreliable. Petitioner was not entitled to a generic jury instruction regarding mitigating evidence.[307]

Therefore, petitioner's second claim herein, and his first assertion of ineffective assistance, does not satisfy either prong of *Strickland* and does not warrant federal habeas relief.

## 2. *Failing to Adequately Voir Dire the Jury Venire*

■ Petitioner argues that his trial counsel should have more thoroughly questioned members of the jury venire at voir dire concerning their views on petitioner's mitigating evidence, i.e., petitioner's evidence regarding his youth, purported illiteracy, minority race, troubled childhood, deprived family background, non-triggerman status, and his evi-

---

**305.** Both of petitioner's 1989 trial counsel later testified at the evidentiary hearing held July, 1995 in petitioner's most recent state habeas corpus proceeding and indicated their belief that the testimony of petitioner's Florida rape victim had generated an almost irresistible force favoring a death sentence. Attorney Raymund Fuchs testified that he and co-counsel Terry McDonald had engaged in extensive research and preparation prior to petitioner's 1989 trial, including reviewing the entire trial transcript from petitioner's 1982 trial and the transcript from petitioner's prior state habeas corpus hearing, talking with petitioner's prior attorneys and numerous witnesses, including petitioner's family members, reviewing relevant documents, including petitioner's Department of Human Services records and Villanueva's mental health records, and analyzing and rejecting potential affirmative defenses, and that they were not surprised by anything that came out at trial *except* for the impact of the graphic testimony of Vicki Isenberg Meurville. *See* S.F. State Habeas Hearing, Testimony of Raymund Fuchs, at pp. 127–33 & 178–201. Petitioner's other 1989 trial counsel, attorney Terry McDonald, testified that

(1) Mrs. Meurville was "the most devastating witness I've seen," (2) he believed the jury had imposed the death penalty on the petitioner because "of what happened in Florida," and (3) because of the compelling nature her testimony, he was unsure that anything could have been done to change the jury's verdict at the punishment phase of trial. *See* S.F. State Habeas Hearing, at pp. 233, 243, and 255. Having independently reviewed the testimony of Mrs. Meurville, this Court agrees with petitioner's 1989 trial counsel that petitioner's fate was, for all intents and purposes, settled when Vicki Isenberg Meurville left the stand.

**306.** *See Strickland v. Washington,* 466 U.S. at 695, 104 S.Ct. at 2069; *Carter v. Johnson,* 131 F.3d at 463; *Ransom v. Johnson,* 126 F.3d at 723; *Green v. Johnson,* 116 F.3d at 1122, (holding that the proper inquiry is whether the defendant has demonstrated a reasonable probability that the jury would not have imposed the death sentence in the absence of errors by counsel); and *Belyeu v. Scott,* 67 F.3d at 538.

**307.** *See Buchanan v. Angelone,* 118 S.Ct. at 761.

dence regarding Villanueva's life sentence.[308]

### a. *No Deficient Performance*

An attorney's actions during voir dire are considered to be a matter of trial strategy and cannot form the basis for an ineffective assistance claim unless counsel's tactical decisions are so ill chosen that they "permeate the entire trial with obvious unfairness."[309] The petitioner's two 1989 trial counsel testified extensively concerning their voir dire and trial strategy at the evidentiary hearing held July, 1995 in petitioner's most recent state habeas corpus proceeding and explained that (1) at the time of petitioner's trial, there was no vehicle available through which the petitioner's jury could have given mitigating effect to evidence of the petitioner's troubled childhood and deprived background,[310] (2) they considered the possibility of presenting live testimony from the petitioner's family members regarding petitioner's troubled and deprived childhood but decided as a matter of trial strategy not to do so because they found that petitioner's family members were unwilling to either admit just how bad the petitioner's childhood family situation had been or corroborate most of the ugly facts contained in the documents regarding petitioner's deprived background that petitioner's trial counsel had obtained,[311] (3) they decided that petitioner would *not*

testify at trial because the petitioner's testimony at his previous state habeas hearing would have subjected petitioner to possible impeachment on cross-examination at trial and because of the petitioner's refusal to admit he was even present when the murder was committed,[312] (4) they believed that evidence regarding the petitioner's troubled childhood and deprived background might actually hurt their chances of getting a negative answer to the second special sentencing issue regarding future dangerousness,[313] (5) they decided not to focus their defense at the punishment phase of trial on the introduction of mitigating evidence regarding petitioner's troubled childhood and deprived family background but, instead, to make the jury aware of that information and then urge a life sentence for petitioner because the petitioner was not the triggerman and Villanueva had received such a sentence,[314] (6) they did question the members of the venire at voir dire concerning their feelings on the non-triggerman issue,[315] but (7) they did not voir dire the venire members as to their opinions on defense's other mitigating evidence because they believed that (a) asking voir dire questions inquiring how individual members of the venire would react to specific mitigating evidence would probably have resulted in an objection by the prosecutor which the trial court would have sustained,[316] (b) asking

**308.** See First Amended Petition, at pp. 33–47; and Petitioner's Response, at pp. 16–18.

**309.** *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir.1995); and *Garland v. Maggio*, 717 F.2d at 206.

**310.** *See* S.F. State Habeas Hearing, Testimony of Raymund Fuchs, at p. 149; and Testimony of Terry McDonald, at pp. 242, 247–49. As explained above, the failure of petitioner's 1989 trial counsel to anticipate the Supreme Court's narrow holding in *Penry* did not render their performance professionally deficient or objectively unreasonable. *See West v. Johnson*, 92 F.3d at 1409 n. 45; and *Woods v. Johnson*, 75 F.3d at 1034–35. Trial counsel are not required to exercise clairvoyance in the performance of their professional duties. *See Sharp v. Johnson*, 107 F.3d at 290 n. 28; and *Garland v. Maggio*, 717 F.2d at 207. The deficiency prong of *Strickland* is judged by counsel's conduct under the law existing at the time of the conduct, *see Westley v. Johnson*, 83 F.3d at 723, *citing Lockhart v. Fretwell*, 506 U.S. at 372, 113 S.Ct. at 844, and in view of the facts and resources available at the

time of trial, *see Williams v. Cain*, 125 F.3d at 276, *citing Motley v. Collins*, 18 F.3d at 1226.

**311.** *See* S.F. State Habeas Hearing, Testimony of Raymund Fuchs, at pp. 127–33, 147–48, and 193–96.

**312.** *Id.*, Testimony of Raymund Fuchs, at pp. 136–40, 188–89, 198–99, and 201–03.

**313.** *Id.*, Testimony of Raymund Fuchs, at pp. 147–49; and Testimony of Terry McDonald, at pp. 246–49.

**314.** *Id.*, Testimony of Raymund Fuchs, at pp. 147–59, 151–54, 164, 167–68, 181–86, and 193–96; and Testimony of Terry McDonald, at pp. 244–49.

**315.** *Id.*, Testimony of Raymund Fuchs, at p. 176; and Testimony of Terry McDonald, at pp. 234–35, and 244.

**316.** *Id.*, Testimony of Raymund Fuchs, at p. 175. This belief was far from unreasonable. *See*

such questions and receiving answers indicating a predisposition in favor of the defense would probably have resulted in the prosecutor using peremptory strikes against those members of the venire favorably disposed to the defense,[317] (c) it was better to evaluate the potential jurors based on how they related to the prosecutor rather than how they answered defense counsel's questions,[318] and (d) the ultimate goal of voir is to select a jury as favorable to the defense as possible and educating individual jurors on the law can be dangerous.[319] Thus, petitioner's trial counsel had well-reasoned, compelling, strategic reasons for not using voir dire to inquire into the reactions of the individual members of petitioner's jury venire as to potential mitigating evidence.[320]

This Court has independently reviewed the entire voir dire examination of each of the twelve venire members who later sat on petitioner's 1989 petit jury. It is true, as petitioner now complains, his trial counsel did *not* make any inquiries regarding those individual venire members' opinions on the efficacy of mitigating evidence of a criminal defendant's family background, deprived childhood, other personal characteristics, or co-defendant's lesser sentence. However, as explained above, petitioner's trial counsel had compelling strategic reasons for not delving into those areas at voir dire.

Petitioner's suggestion that his trial counsel was professionally deficient in failing to adequately voir dire the venire on the issue of petitioner's "non-triggerman" status is simply inane. The prosecution questioned each of the twelve persons who eventually served as petit jurors extensively during voir dire concerning (1) the law of parties as it applied to the guilt-innocence phase of trial, (2) the inapplicability of the law of parties at the punishment phase of trial, and (3) the propriety of imposing the death penalty upon a defendant who, although a participant in a murder, had *neither* fired the fatal shot nor delivered the fatal blow.[321] Petitioner's trial counsel had the benefit of witnessing those venire members' responses to those voir dire inquiries before undertaking their own examinations of the same venire members and chose to discuss the law of parties and the issue of the propriety of imposing the death penalty on a "non-triggerman" murder defendant with only six of the twelve members of the jury venire who later served as petit

---

*Rhoades v. State*, 934 S.W.2d 113, 123 (Tex.Crim. App.1996), (holding that it was improper for defense counsel to ask a venire member whether he thought good conduct in prison would be an aggravating or mitigating factor, as opposed to simply asking whether the venire member *could* consider good conduct in prison as a mitigating factor). This distinction is the subtle yet significant difference between a question inquiring whether a venire member *could* consider certain evidence to be mitigating and a question inquiring whether the venire member *would*, in fact, consider the same evidence to be mitigating. Under Texas law, the former is proper while the latter is improper. *Id.*

**317.** *Id.*, Testimony of Terry McDonald, at pp. 270–71.

**318.** *Id.*, Testimony of Terry McDonald, at pp. 269–70.

**319.** *Id.*, Testimony of Terry McDonald, at pp. 271–72.

**320.** While not specifically addressed by petitioner's 1989 trial counsel during their testimony at the July, 1995, state habeas hearing, an obvious tactical problem with revealing at voir dire that one of the participants in the murder of Joey Hernandez had already been sentenced to a term of life imprisonment is that, by so doing, defense counsel would necessarily have also revealed that at least one of the participants in the assault upon Joey Hernandez had already been convicted in connection with that incident. The potential that such information might prejudice petitioner's own position at the guilt-innocence phase of his trial is readily apparent.

**321.** *See* S.F. Trial, Voir Dire Examinations of Leonard Benitez, Volume II, at pp. 47–50 and 65–73; Linda Holloway Davis, Volume II, at pp. 181–82 and 201–04; Venoy Jones, Volume II, at pp. 266–70 and 282–91; Paul L. Wilson, Volume IV, at pp. 122–24 and 135–37; Avelardo Salazar, Volume VI, at pp. 32–35 and 45–47; William Frank Wiatrek, Volume VI, at pp. 85–93, 126–28, and 134–36; Linda K. Lynd, Volume VI, at pp. 156–59 and 169–71; Todd Lawrence Ellison, Volume VII, at pp. 151–53 and 166–67; Reginald Earl Williams, Sr., Volume VIII, at pp. 111–14 and 126–27; Elizabeth Barrett Garza, Volume VIII, at pp. 154–59 and 169–70; Kathleen Frytz Stein, Volume IX, at pp. 105–07, 117–18, and 120–21; and William Curtis Hanzal, Volume IX, at pp. 156–58 and 167–70.

jurors at petitioner's 1989 trial.[322] In addition, both the prosecution and petitioner's trial counsel had access at the time of voir dire to the venire members' answers to extensive questionnaires soliciting a wide variety of information on the venire members' backgrounds and political views.[323] Petitioner has not alleged any specific facts establishing the necessity for any further voir dire on those same subjects by his trial counsel.[324]

"Selecting a jury is 'more art than science.'"[325] There is nothing unreasonable or professionally deficient in a defense counsel's informed decision to rely upon his own reading of venire members' verbal answers, body language, and overall demeanor during the prosecution's voir dire examination.[326] In view of the extensive voir dire by the prosecution regarding the venire members' views on the law of parties and the petitioner's "non-triggerman" status, the decision by petitioner's trial counsel not to re-hash the same issues with every member of the venire during said counsel's own voir dire did *not* cause the performance of said counsel to fall below an objective level of reasonableness. Petitioner has not alleged any specific facts showing that his 1989 trial counsels' strategic decision-making process outlined above fell outside the broad range of professionally acceptable trial strategy to which this Court must give great deference.

#### b. *No Prejudice*

Petitioner has not alleged any facts showing that any of the twelve persons who served as petit jurors during his 1989 trial were either biased against him or otherwise unqualified to serve in that capacity. Petitioner has not alleged any facts showing that any of these same twelve petit jurors could have been disqualified from service at that trial had his trial counsel conducted a through more vigorous or extensive voir dire examination. Petitioner has also alleged no facts suggesting or implying that more extensive voir dire questioning by his trial counsel would have revealed any information which would have caused his counsel to exercise a peremptory strike against any of those twelve venire persons.[327] Petitioner does not

322. See S.F. Trial, Voir Dire Examinations of Leonard Benitez, Volume II, at pp. 82–84; Venoy Jones, Volume II, at p. 298; William Frank Wiatrek, Volume VI, at pp. 128–34 and 136–39; Linda K. Lynd, Volume VI, at pp. 183–85; Todd Lawrence Ellison, Volume VIII, at pp. 141–43; and Kathleen Frytz Stein, Volume IX, at pp. 134–35.

323. The entire set of juror questionnaires answered by the twelve venire members who served as petit jurors at petitioner's 1989 trial appears at pages 25–144 of S.F. Trial, Transcript, Volume I.

324. Petitioner's complaint about his trial counsel's failure to voir dire *every* one of the twelve venire persons who served as petit jurors on petitioner's "non-triggerman" status ignores the fact that the prosecution examined each of those same persons, in defense counsels' presence, regarding that very subject. There is nothing professionally deficient in a trial counsel's decision not to re-plow ground on voir dire that has already been more than amply tilled.

325. *Government of the Virgin Islands v. Benjamin*, 736 F.Supp. 1337, 1345 (D.Virgin Islands 1990), *affirmed*, 922 F.2d 831 (3rd Cir.1990) [Table].

326. *See Romero v. Lynaugh*, 884 F.2d 871, 878 (5th Cir.1989); *cert. denied*, 494 U.S. 1012, 110 S.Ct. 1311, 108 L.Ed.2d 487 (1990): ("The selection of a jury is inevitably a call upon experience and intuition. The trial lawyer must draw upon his own insights and empathetic abilities.").

327. Petitioner does *not* allege any facts showing that his trial counsel's ability to intelligently exercise peremptory challenges was negatively impacted by virtue of a failure to more thoroughly voir dire any members of the jury venire. Even if petitioner made such an assertion, for at least two reasons, that claim would not satisfy the prejudice prong of *Strickland*. First, such conclusory assertions are far too speculative to furnish a basis for federal habeas relief. *See Kinnamon v. Scott*, 40 F.3d at 735, (holding that a petitioner's speculative complaints of ineffective assistance by appellate counsel did not warrant federal habeas relief); *Anderson v. Collins*, 18 F.3d at 1221, (holding that, without a specific, affirmative showing of precisely what evidence or testimony was rendered unavailable due to a trial counsel's failure to investigate, develop, and present same, i.e., a showing of exactly what the missing evidence or testimony would have been, a court cannot even begin to apply the *Strickland* analysis because it is very difficult to determine whether the defendant was prejudiced by any such deficiencies in counsel's performance); *United States v. Pineda*, 988 F.2d at 23; *Koch v. Puckett*, 907 F.2d at 530; *Russell v. Lynaugh*, 892 F.2d at 1213; *United States v. Woods*, 870 F.2d at 288 n. 5; and *Ross v. Estelle*, 694 F.2d at 1011–12 & n. 2. Second, interference with the use of peremptory challenges does not violate a federal constitutional right. *See Herman v. Johnson*, 98

identify any member of his petit jury against whom he now alleges his trial counsel should have exercised a peremptory challenge. In short, petitioner has not identified any objectionable juror whom his counsel was forced to accept as a result of any deficiency by said counsel during voir dire.[328] Petitioner has also failed to allege any specific facts showing a reasonable probability that, but for the failure of his trial counsel to more thoroughly voir dire the jury venire, the composition of his jury would have been any more favorable than that of the actual jury that convicted and sentenced petitioner to death in June 1989.[329] Petitioner's conclusory assertions that a greater emphasis on his "non-triggerman" status during defense counsel's voir dire might have better educated the eventual petit jurors on this point is far too speculative an argument to justify federal habeas relief.[330]

More significantly, petitioner has alleged no specific facts showing a reasonable probability that, but for the failure of his trial counsel to more thoroughly voir dire the jury venire, the outcome of either phase of petitioner's 1989 trial would have been any different. As explained above, the testimony of Cynthia West regarding the petitioner's leadership role in the murder of Joey Hernandez was compelling, as were her graphic descriptions of the petitioner's primary role in her robbery and rape. The petitioner's propensity for future violence was established almost as a matter of law at the punishment phase

F.3d at 174, (holding that peremptory challenges are not a constitutional right). *Petitioner does not identify any unacceptable member of the jury venire whom he was unable to strike peremptorily due to the trial court's erroneous failure to strike another potential juror for cause and the exhaustion of his peremptory strikes. Petitioner fails to identify any member of the petit jury which decided his case whom he now believes could have been successfully challenged for cause had his trial counsel done a better job of conducting voir dire.*

**328.** On the contrary, this Court's own independent review of voir dire reveals that (1) juror Leonard Benitez (a) initially expressed reservations about making a decision that could cost another person their life, (b) indicated that he might require more than one prosecution witness to convince him to convict a defendant of a capital offense, (c) made strong assertions during voir dire that he could not impose the death penalty on a defendant unless the defendant was the actual triggerman, and (d) so frustrated the prosecution that the prosecution directed a challenge for cause against him, *see* S.F. Trial, Volume II, at pp. 13–14, 33–36, 38–41, and 69–70; (2) juror Linda Davis also indicated hesitancy to impose the death penalty and a desire for more than a single prosecution eyewitness, *see* S.F. Trial, Volume II, at pp. 164–65 and 177–78; (3) juror Venoy Jones also expressed a reluctance to impose the death penalty, *see* S.F. Trial, Volume II, at pp. 267–68; (4) juror William Wiatrek (a) testified that he previously been arrested for DWI but later had that charge reduced to public intoxication and (b) displayed such a strong reluctance to convict a defendant for capital murder based on the law of parties that the prosecution directed a challenge for cause against him, *see* S.F. Trial, Volume VI, at pp. 90–91, 111–12, 116–22, 122–26, and 128–34; (5) juror Reginald Williams (a) served a drug rehabilitation counselor on a part-time basis, (b) expressed grave reser-

vations about convicting a defendant for capital murder based on only one eyewitness's testimony, and (c) had a childhood friend who had gone to prison for murder, *see* S.F. Trial, Volume VIII, at pp. 101, 106, and 131–32; and (6) juror Elizabeth Barrett Garza displayed a great deal of difficulty with the concept of convicting a defendant for capital murder based on the law of parties, *see* S.F. trial, Volume VIII, at pp. 157–58. In conclusion, petitioner's petit jury included a number of individuals whom defense counsel could have reasonably believed to have been sympathetic to at least some aspects of the defense's position at trial. This was *not* a "hanging jury" by any stretch of the imagination.

**329.** *See Teague v. Scott*, 60 F.3d at 1172–73, (holding that complaints about trial counsel's performance at voir dire failed to satisfy the prejudice prong of *Strickland* absent specific factual allegations showing that any biased venire members actually served on the jury); *Clark v. Collins*, 19 F.3d at 965, (holding that absent some specific allegation that bias somehow tainted the actual petit jury, a defendant's conclusory complaints about his trial counsel's conduct of voir dire do not satisfy the prejudice prong of *Strickland* ); and *Sawyer v. Butler*, 848 F.2d 582, 589 (5th Cir.1988), *affirmed*, 497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990), ("Unsupported allegations and pleas for presumptive prejudice are not the stuff that *Strickland* is made of.").

**330.** *See Kinnamon v. Scott*, 40 F.3d at 735, (holding that a petitioner's speculative complaints of ineffective assistance by appellate counsel did not warrant federal habeas relief); *Anderson v. Collins*, 18 F.3d at 1221; *United States v. Pineda*, 988 F.2d at 23; *Koch v. Puckett*, 907 F.2d at 530; *Russell v. Lynaugh*, 892 F.2d at 1213; *United States v. Woods*, 870 F.2d at 288 n. 5; and *Ross v. Estelle*, 694 F.2d at 1011–12 & n. 2.

of trial by the testimony of numerous prison guards and petitioner's Florida rape victim. "If the facts adduced at trial point so overwhelmingly to the defendant's guilt that even the most competent attorney would be unlikely to have obtained an acquittal, then the defendant's ineffective assistance claim must fall." [331] The evidence introduced at petitioner's 1989 trial included testimony regarding the life sentence Villanueva had received despite the likelihood that Villanueva had delivered the fatal blow to Joey Hernandez. Petitioner's 1989 jury chose not to engage in jury nullification and imposed a death sentence upon petitioner. Given the strong case the prosecution presented at petitioner's 1989 trial regarding petitioner's primary role in the murder of Joey Hernandez and petitioner's propensity for future violence, there is simply no reasonable probability that, but for the failure of petitioner's trial counsel to voir dire the jury venire regarding their views on the relevance of Villanueva's life sentence, the petitioner's 1989 jury would have answered either of the special sentencing issues negatively.

For the foregoing reasons, none of the petitioner's complaints about the performance of his 1989 trial counsel during voir dire satisfy either prong of *Strickland.* Accordingly, the petitioner's fourth claim herein, and second assertion of ineffective assistance by his trial counsel, does not warrant federal habeas corpus relief.

### 3. *Failing to Object to Prosecutor's Voir Dire Statement Re Irrelevance of Co-Defendant's Sentence*

Petitioner argues that his trial counsel failed to object during the voir dire of juror Paul L. Wilson to an allegedly erroneous statement by the prosecutor to the effect that the sentence received by petitioner's co-defendant was irrelevant to any issue at the punishment phase of petitioner's trial.[332]

#### a. *No Deficient Performance*

There was nothing deficient in the failure of petitioner's trial counsel to object to the prosecutor's explanation of the law relevant to the punishment phase of a Texas capital murder trial. Attorney Raymund Fuchs, petitioner's co-counsel at the 1989 trial, testified at the state habeas hearing held in July, 1995 that he personally did *not* believe the prosecutor's statement was erroneous as a matter of law.[333] Petitioner's primary defense counsel at the 1989 trial, attorney Terry McDonald, testified at that same hearing that, had he raised an objection to the prosecution's statement and the state trial court had overruled that objection, that juror would have known that the trial court had placed its imprimatur behind the prosecution's position.[334] Thus, petitioner's trial counsel had

**331.** *Green v. Lynaugh*, 868 F.2d 176, 177 (5th Cir.1989), *cert. denied*, 493 U.S. 831, 110 S.Ct. 102, 107 L.Ed.2d 66 (1989).

**332.** *See* First Amended Petition, at pp. 48–55; and Petitioner's Response, at pp. 18–19.
More specifically, the exchange between venire member Wilson and the prosecutor during voir dire to which petitioner now claims his trial could have objected was as follows:
Q Another important factor to consider, especially in cases where you have more than one individual involved in a particular crime, the only thing that you can use to base the type of punishment a person would get when you answer those questions are the defendant's actions himself, his past record, and things that apply to him personally, not things that apply to other people that may have been involved in the crime. Would you agree with that?
A Yes.
Q And you also are not allowed or supposed to consider to be qualified as a juror, let's say, what type of punishment or sentence that another person got, another actor got, whether

he was tried in another case. All right. Even though it involved the same transaction. Okay. Do you agree with that?
A Yes.
Q That would take away from what you are supposed to do as a member of a jury when you assess punishment based upon what he does, a defendant does in a case. All right. Can you follow that rule?
A Yes.
S.F. Trial, Volume IV. Voir Dire Examination of Paul L. Wilson, at pp. 138–39.

**333.** *See* S.F. State Habeas Hearing, Testimony of Raymund Fuchs, at p. 176.

**334.** *Id.*, Testimony of Terry McDonald, at pp. 236–38. Attorney McDonald testified that the defense's strategy at the punishment phase of petitioner's 1989 trial was to attempt to win a life sentence for petitioner by emphasizing that the petitioner had *not* delivered the fatal blow and, as a fall back position, that it would be unfair to impose a death sentence on petitioner when

objectively reasonable tactical reasons why they chose not to make the objection in question. Moreover, as explained below, such an objection would have been fruitless. The failure of petitioner's trial counsel to make such a meritless objection did not cause the performance of said counsel to fall below an objective level of reasonableness.[335]

### b. *No Prejudice*

As explained in great detail in Section V.B.1.c. above, evidence that a capital murder defendant's co-defendant or accomplice received a life sentence based on that co-defendant or accomplice's own role in the same capital murder does *not* fall within the scope of "constitutionally relevant mitigating evidence" as defined by the Fifth Circuit in its post–*Penry* opinions. Evidence of a co-defendant's sentence does *not* relate to the defendant's own character, background, or role in the offense.[336] A defendant's criminal conduct can *not* logically be "attributable" to a sentence subsequently imposed upon a co-defendant, accomplice, or other joint participant in the prior criminal activity.[337] Thus,

the complaint raised by petitioner is legally without merit. Any objection of the nature urged by petitioner in this cause would have been futile had petitioner's trial counsel made such an objection during petitioner's 1989 voir dire.

Despite the foregoing, petitioner's trial counsel did, in fact, introduce evidence regarding Villanueva's life sentence at the punishment phase of petitioner's 1989 trial[338] and did, in fact, argue that this evidence warranted a life sentence for petitioner.[339] However, the petitioner's jury was faced with overwhelming evidence regarding the primacy of the petitioner's role in the murder of Joey Hernandez and the petitioner's demonstrated propensity for future violence. Thus, petitioner's jury had before it the evidence of Villanueva's life sentence but instead chose to impose a sentence of death upon petitioner. In a capital sentencing proceeding, the prejudice analysis focuses on whether there is a reasonable probability that, absent counsel's errors, a life sentence would have been imposed.[340] Under the facts of this case, there

---

Villanueva had received a life sentence. *Id.*, at pp. 238–39.

**335.** *See Sones v. Hargett,* 61 F.3d at 415 n. 5: "Counsel cannot be deficient for failing to press a frivolous point."; *United States v. Gibson,* 55 F.3d at 179: "Counsel is not required by the Sixth Amendment to file meritless motions."; *Koch v. Puckett,* 907 F.2d at 527: "counsel is not required to make futile motions or objections."; and *Murray v. Maggio,* 736 F.2d at 283: "Counsel is not required to engage in the filing of futile motions."

**336.** *See Brogdon v. Blackburn,* 790 F.2d at 1169–70.

**337.** *See Turner v. Johnson,* 106 F.3d at 1189, (holding that "for evidence to have mitigating relevance, there must be a nexus between the mitigating evidence and the criminal act"); *Harris v. Johnson,* 81 F.3d at 539, (holding that no *Penry* instruction was necessary where there was no evidence showing that the defendant's borderline intelligence bore a nexus to his criminal actions); *Allridge v. Scott,* 41 F.3d at 223, (holding that no *Penry* instruction was necessary in the absence of evidence showing that the defendant's criminal conduct was attributable to the mental illness and abuse the had defendant suffered during a previous incarceration); *Lackey v. Scott,* 28 F.3d at 489, (holding that evidence of the defendant's low intelligence and history of childhood abuse was not relevant for *Penry* purposes where there was no evidence showing the

defendant's criminal act was attributable to same); *Madden v. Collins,* 18 F.3d at 307–08, (holding that evidence the defendant suffered from an anti-social personality, dyslexia, and a troubled childhood was not relevant for *Penry* purposes absent a showing that the defendant's criminal conduct was attributable to same); *Russell v. Collins,* 998 F.2d at 1292–93, (holding that evidence of a single instance of violence by the petitioner's stepfather when petitioner was in his teens, unaccompanied by any other evidence linking the petitioner's crime to that incident, was insufficient to qualify as constitutionally relevant mitigating evidence); *Barnard v. Collins,* 958 F.2d at 638–39, (holding that, in order to warrant a *Penry* instruction, evidence that a defendant had a troubled childhood must be accompanied by evidence that the defendant's childhood experiences had a psychological effect on the defendant, i.e., that the defendant's criminal conduct was attributable to his disadvantaged background); and *Graham v. Collins,* 950 F.2d at 1033, (holding that "mitigating" evidence must be able to raise an inference "that the crime is attributable to the disability").

**338.** *See* S.F. Trial, Volume XVII, Testimony of Manuel Villanueva, at pp. 145–47.

**339.** *Id.*, Volume XVIII, at pp. 42–46 and 48–50.

**340.** *See Strickland v. Washington,* 466 U.S. at 695, 104 S.Ct. at 2069; *Carter v. Johnson,* 131 F.3d at 463; *Ransom v. Johnson,* 126 F.3d at

is simply no reasonable probability that, but for the failure of petitioner's trial counsel to object to the prosecutor's explanation in question during voir dire, the outcome of the petitioner's 1989 trial would have been any different. Nor did the failure of petitioner's defense counsel to make that objection render petitioner's 1989 trial fundamentally unfair or the result thereof unreliable. Thus, the failure of petitioner's trial counsel to object to the prosecutor's legally correct explanation of the law did not prejudice petitioner within the meaning of *Strickland.*

Accordingly, the petitioner's fifth claim herein, and third assertion of ineffective assistance by his trial counsel, does not satisfy either prong of *Strickland* and does not warrant federal habeas corpus relief.

### 4. Defense Counsel's "Waiver" of Lesser–Included Offense Instruction

■ Petitioner argues that his trial counsel rendered ineffective assistance by

effectively waiving the lesser-included offense instructions at the guilt-innocence phase of trial.[341]

### a. No Deficient Performance

A careful review of the entire closing argument presented by petitioner's 1989 defense counsel at the guilt-innocence phase of trial establishes that the argument about which petitioner now complains was consistent with the defense strategy at that phase of trial and far from professionally deficient or objectively unreasonable.[342] Attorney Fuchs testified at the July, 1995, state habeas hearing that the defense's trial strategy at the guilt-innocence phase of trial was to focus on Villanueva as the person responsible for the murder and to suggest that Villanueva had acted independently of the petitioner.[343] Attorney McDonald testified at the same state habeas hearing, confirmed attorney Fuchs's testimony regarding the nature of the defense's strategy at the guilt-innocence phase

723; *Green v. Johnson,* 116 F.3d at 1122, (holding that the proper inquiry is whether the defendant has demonstrated a reasonable probability that the jury would not have imposed the death sentence in the absence of errors by counsel); and *Belyeu v. Scott,* 67 F.3d at 538.

**341.** *See* First Amended Petition, at pp. 55–60; and Petitioner's Response, at p. 19.

More specifically, petitioner complains about the following argument made by attorney Terry McDonald at the close of the guilty-innocence phase of his 1989 trial:

MR. MCDONALD: You in a few moments are going to see some very gruesome photographs. Mr. De Martino is going to come here. When we talked to you some—depending on where you came in order—some three or four weeks ago, we talked to you about a decision that each and every one of you is going to be called upon to make. It is not an easy decision and I'm not going to thank you for your duty, because it is your duty. You have chosen to serve. You have each taken an oath, but the one thing you will do is return a true verdict. I submit to you, each and every one of you, that what you have heard in this courtroom in the last week has not been evidence of the guilt of George Cordova.

I'm not going to talk to you about lesser included offenses like Mrs. Delavan and Mr. Fuchs did. I'm not going to talk to you about "Well, the actual killing of Joey Hernandez was obviously done by Manuel Villanueva with the knife." They never put a knife in this man's hand. Let's get bogged down in the law

of parties. That is the law, and if some of you want to consider it, that's fine. I submit to you that this is a straight up or straight down decision.

If you think that they have proven their case beyond a reasonable doubt and you don't have a doubt based on reason and you think this is the type of evidence that people in this country should be convinced of, then go back in there and find him guilty of capital murder. But if you have a reasonable doubt, if you think that citizens of this country should not be convicted on this kind of evidence, and that I submit to you would be a true verdict, you return that true verdict and you come back in and you tell the State of Texas "I find George Cordova not guilty." Thank you.
S.F. Trial, Volume XVI, at pp. 68–69.

**342.** In considering whether counsel's closing argument was ineffective, a reviewing court must consider the closing statements in their entirety. *See Carter v. Johnson,* 131 F.3d at 466; and *Teague v. Scott,* 60 F.3d at 1173.

**343.** *See* S.F. State Habeas Hearing, Testimony of Raymund Fuchs, at p. 186. Attorney Fuchs also testified at that same hearing that he and attorney McDonald had interviewed petitioner's family and investigated other possible defensive strategies including mistaken identity and the possibility that petitioner's then-deceased younger brother Tooty had been mistaken for the petitioner by Cynthia West but they were unable to find any evidence to support those defensive theories. *Id.,* at pp. 179–85 and 206–09.

of trial, and also testified that (1) their strategy at the close of that phase of trial was for him to argue for complete exoneration while attorney Fuchs would argue in favor of conviction for only a lesser-included offense, (2) his own goal at that point in the trial was to urge the jury to look beyond the law of parties and to exonerate petitioner, and (3) he did not believe that the defense had "waived" any lesser-included offense instructions by so doing.[344] During closing argument at the guilt-innocence phase of petitioner's 1989 trial, attorney Fuchs argued that (1) the prosecution had failed to prove that the petitioner had possessed the specific intent to kill Joey Hernandez, (2) all of the physical evidence regarding Joey Hernandez's murder was linked to Villanueva, not the petitioner, and (3) there were internal inconsistencies and inaccuracies in the testimony of Cynthia West.[345] Attorney McDonald then argued that (1) Cynthia West had gone through a traumatic experience, her initial identification of her assailants did not match petitioner's physical appearance, her testimony contained other internal inconsistencies, and, therefore, her testimony identifying petitioner as one of her assailants

was not credible, (2) the concept of "guilt by association" should not be used to convict petitioner of murder, (3) mere presence alone is not sufficient to convict one of a crime, (4) the petitioner's three sisters had each testified that the petitioner was elsewhere at the time of the offense, (5) the petitioner's escape from custody was not evidence of a guilty conscience, and (6) for the foregoing reasons, the jury should acquit the petitioner entirely.[346]

Given the nature of the evidence presented at the guilt-innocence phase of petitioner's 1989 trial, the strategic decision by petitioner's defense counsel to argue for *both* an outright acquittal, as well as a conviction for only one or more of the lesser-included offenses, was well within the realm of professionally competent decision-making to which this Court must give due deference.[347] There was nothing objectively unreasonable in arguing *both* that Cynthia West's identification of the petitioner was untrustworthy and that, even if one accepted West's identification, the prosecution's evidence failed to show that petitioner had possessed the specific intent to murder Joey Hernandez.[348]

**344.** *Id.,* Testimony of Terry McDonald, at pp. 226–30 and 263–64.

**345.** *See* S.F. Trial, Volume XVI, at pp. 23–34.

**346.** *Id.,* at pp. 34–69.

**347.** As explained above, attorney Fuchs, one of petitioner's 1989 trial counsel, testified at the July, 1995, state habeas hearing that (1) the petitioner had testified during the state habeas proceedings prior to his 1989 retrial that he had *not* been present at the time and place of Joey's Hernandez's murder, (2) because of that fact, they believed that any testimony by the petitioner indicating that he was present at the time and place of the crime but that he had not intended to kill Joey would have been readily subject to impeachment based on that prior inconsistent testimony and (3) the petitioner consistently refused to admit that he had played any role in the murder or that he had even been to Espada Park on the night of the crime. *See* S.F. State Habeas hearing, Testimony of Raymund Fuchs, at pp. 140, 188–89, 198–99, and 201. Petitioner's refusal to admit his involvement in the incident on August 4, 1979 at Espada Park effectively deprived petitioner's 1989 trial counsel of any practical means of presenting *direct* testimony regarding petitioner's mental state at the time of the offense. Under such circumstances, it was extremely prudent for petitioner's 1989 trial coun-

sel to avoid placing exclusive reliance on the possibility petitioner's jury would convict him of only a lesser-included offense.

**348.** Petitioner's current criticism of the strategic decisions by his 1989 trial counsel are made with the benefit of hindsight, which is always twenty/twenty. A reasonable defense counsel would have noted the availability of both defensive theories. As explained above in Section IX.C. in connection with petitioner's complaint about the sufficiency of the evidence supporting the jury's answer to the first special sentencing issue, there was more than ample evidence from which the jury could reasonably infer that the petitioner had acted "deliberately" with regard to his own conduct that caused the death of Joey Hernandez. But most of that evidence came from the testimony of West. Thus, it was a reasonable trial tactic for petitioner's 1989 trial counsel to argue at the guilt-innocence phase of trial *both* that West's testimony was unreliable but, even if her testimony was credible, that the same testimony did not establish the petitioner had specifically intended to kill Joey Hernandez. Petitioner's current complaints to the contrary are unconvincing. "In the trial of lawsuits, as in war, victory has a thousand fathers, defeat is an orphan." *Kirkpatrick v. Butler,* 870 F.2d 276, 285 (5th Cir.1989), *cert. denied,* 493 U.S. 1051, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990), *quoting* Presi-

This is precisely the sort of objectively reasonable, tactical decision-making to which this Court must defer in its review of the performance of trial counsel.[349]

### b. *No Prejudice*

Furthermore, given the nature and weight of the evidence introduced at the guilt-innocence phase of trial, the strategic decision by petitioner's 1989 trial counsel to argue for both an outright acquittal and a conviction for only a lesser-included offense did *not* prejudice petitioner within the meaning of *Strickland.* The evidence introduced at that phase of trial consisted not only of West's eyewitness identification of the petitioner as the leader of the gang that murdered Joey Hernandez, robbed, terrorized, and repeatedly raped her, and then drove off with Joey's car, but also included the defendant's escape from justice and the physical evidence linking Villanueva to Hernandez's murder and robbery. There is simply no reasonable probability that, but for the fact that petitioner's counsel argued *both* for both outright acquittal and a conviction on only a lesser-included offense at the guilt-innocence phase of his 1989 trial, the outcome of that proceeding would have been any different. By so argu-

ing, petitioner's trial counsel placed two separate, but not mutually exclusive, defensive theories before the jury and that jury rejected both. Given the evidence then before the jury, there is no reasonable probability that, had petitioner's defense counsel presented only the lesser-included offense theory, the jury would have acquitted the petitioner of capital murder.[350] Nor did the strategic decision by petitioner's 1989 defense counsel to present both of those defensive theories to the jury render petitioner's 1989 trial fundamentally unfair or the result thereof unreliable.

Accordingly, the petitioner's sixth claim herein, and fourth assertion of ineffective assistance by his trial counsel, does not satisfy either prong of *Strickland* and does not warrant federal habeas corpus relief.

### 5. *Defense Counsel's Punishment Phase Closing Argument*

██ Petitioner argues that his trial counsel rendered ineffective assistance by making numerous disparaging statements concerning petitioner during the course of closing argument at the punishment phase of trial.[351]

dent John F. Kennedy, who in turn *quoted* Count Galeazzo Ciano, The Ciano Diaries 1939–43.

**349.** This Court is quite confident that, had petitioner's 1989 trial counsel failed to urge both of these somewhat inconsistent positions in their closing arguments at the guilt-innocence phase of trial, petitioner would now be before this Court urging an ineffective assistance claim premised upon that failure.

**350.** Petitioner introduced no direct evidence at the guilt-innocence phase of his 1989 trial regarding his state of mind in connection with the fatal assault upon Joey Hernandez. The prosecution's evidence on that subject consisted primarily of West's testimony regarding the brutal nature of the assault that the tire-tool-wielding petitioner and the knife-wielding Villanueva had initiated and inflicted upon Hernandez. The jury also had before it the medical examiner's graphic testimony and the photographic evidence regarding the extent of the injuries to Joey Hernandez. The jury was free, and apparently did, reasonably infer from the ferocity of that assault that both the petitioner and Villanueva had intended to kill Hernandez. Under such circumstances, there is no reasonable probability that a defense based solely on the petitioner's lack of specific intent to kill Hernandez would have proven any more successful than the strategy of combining such

an argument with an attack on the credibility of West's identification of the petitioner.

**351.** *See* First Amended Petition, at pp. 60–65; and Petitioner's Response, at pp. 19–20.

More specifically, petitioner complains that attorney McDonald, his 1989 co-counsel, concluded his closing argument with the following observations:

* * * May it please the State, I don't know what to say to you. I really don't. Since you returned your verdict, this comes as no surprise to Mr. Fuchs and myself. We knew what the State was going to present. This may answer one question some of you may have had when we had the first phase of trial, why didn't George get on the stand? I would look at that. I would not believe a word he said if I was a juror.

That's hie life up there. It's not a pretty one. After Mrs. Isenberg testified, I was ready to pull out a gun and shoot him myself. I think that is a natural inclination. The problem with that is, that is not what the law says. No matter if you feel in your heart and soul, that is still not what the law says. And unless each of us believes in the law and follows the law, we are no better than the George Cordova's of the world. He had no right to do what he did. These probation officers that came in, Mr.

### a. *No Deficient Performance*

A careful review of the entire closing argument presented by petitioner's 1989 defense counsel at the punishment phase of trial establishes that the argument about which petitioner now complains was far from professionally deficient or objectively unreasonable.[352] Attorney Terry McDonald testified during the July, 1995, evidentiary hearing held in petitioner's most recent state habeas corpus proceeding that he made the statements critical of the petitioner's actions for the strategic purpose of establishing some degree of credibility with the jury after the "devastating" testimony by petitioner's Florida victim regarding the petitioner's assault, robbery, and sexual assault of her.[353] Petitioner's co-counsel, attorney Raymund Fuchs testified during that same hearing that he and attorney McDonald had prepared thoroughly for trial and were not surprised by any of the evidence introduced at trial *but* that they were surprised by the *impact* of that same testimony at the punishment phase of trial.[354] "[C]ounsel may make strategic decisions to acknowledge the defendant's culpability and may even concede that

> Woodward, 11 years old. At the age of 11 he's in effect written off. I mean, there is no hope. There is school teachers. There is 5th grade teachers. When this is all over and done with. go ahead and hug your kids. And when you are teaching school and you have got a kid that is a problem, for God's sake, don't write him off. Because if you do, he may sit in a chair like that someday.
>
> Since your verdict I've thought "What can I say to these twelve people to save a human life?" First of all, is that human life worth saving? I don't know. Mrs. Delavan doesn't think it is worth saving. Mr. De Martino doesn't think it is worth saving. And maybe many of you don't think it is worth saving. Fortunately, I'm not sitting where you are. I don't have to make that decision, but each and every one of you do.
>
> I can tell you what the easy decision is. The easy decision is to say yes to both of those questions because you've got a lot. Boy, you have got a lot of reasons to say yes. I mean—and for anybody to stand up here and say, you know, you don't have reasons that you can base your answers on, is a damn fool. So why should you answer no?
>
> I'll tell you why. For one simple reason, And I don't care what Mrs. Delavan say or what Mr. De Martino says about what happened in Espada Park or what happened on a country road in Florida. The one thing I know is, this man had the opportunity to kill two human beings. There was nothing to stop him from taking the life of Cynthia West Ortega or the life of Vicki Isenberg, nothing.
>
> More importantly, when he was in Florida, ha had already been arrested, confined, identified. Do you think the same—"Don't look at me." That if he was a killer, he would trust that? Manuel Villanueva has taken a human life. He's plunged a knife into Joey Hernandez and taken his life. The medical examiner when shown the photograph said it happened there on the parking lot in Espada Park, the deliberate taking of a human life.
>
> Remember when you were asked the difference between deliberate and intentional. And these prosecutors gave you the example, some-
>
> body that goes into a Seven Eleven with a gun and a clerk makes a move and they shoot and kill and they intentionally cause the death. That's their example of an intentional killing. Remember their example of a deliberate killing? They tied the clerk up. They leave and they say "My God, that is the witness. I can't leave a witness," and they go back and kill the clerk. That is a deliberate killing.
>
> This man based upon your verdict and based upon the testimony, had an opportunity on two different occasions to do exactly what the State gave you in that hypothetical, to kill the only witness, to take that human life, and he didn't. I don't know why, but I know he didn't. Future dangerousness, second question. They talked about society, acts of violence, that it doesn't have to be next week or does not have to be next year.
>
> Well, obviously George Cordova can't avoid getting into trouble and committing acts of violence in the penitentiary. He's established a life's pattern of immoral, illegal acts. Plenty of reasons, but where up there on that chart is there anything to indicate to you that that man has deliberately taken a human life? I don't envy your task. Manuel Villanueva is alive today because one person, human being, had the power to say "No, I'm not going to ask that this person be killed."
>
> If Sam Ponder had continued picking a jury and the trial had proceeded, I submit to you that Manuel Villanueva would not be alive today. One individual made that decision and preserved a human life. I hope among the 12 of you, there is one such person. Thank you.

S.F. Trial, Volume XVIII, at pp. 46–50.

**352.** In considering whether counsel's closing argument was ineffective, a reviewing court must consider the closing statements in their entirety. See *Carter v. Johnson,* 131 F.3d at 466; and *Teague v. Scott,* 60 F.3d at 1173.

**353.** See S.F. State Habeas Hearing, Testimony of Terry McDonald, at pp. 232–33 and 264.

**354.** *Id.,* Testimony of Raymund Fuchs, at p. 193.

the jury would be justified in imposing the death penalty, in order to establish credibility with the jury." [355]

This case provides a convincing illustration of why great judicial deference is necessary in the review of trial counsel's strategic decision-making. At the time of petitioner's 1989 trial, his two defense counsel were experienced trial lawyers who had both prosecuted and defended numerous criminal cases, including capital murder cases.[356] Unlike this Court, petitioner's 1989 trial counsel had the opportunity to witness firsthand not only the testimony of the various witnesses at trial but also the impact that testimony and the other evidence had upon the jury. Both of petitioner's trial counsel found the petitioner's Florida victim's graphic testimony regarding the petitioner's post-escape crimes to have been very significant—not only for its content but also for the impact that testimony had upon the jury. The evidence at the punishment phase of petitioner's trial established that the petitioner had pleaded guilty to four separate felony criminal charges arising out of his assault, robbery, and sexual assaults upon his Florida victim.[357] Given the petitioner's guilty pleas to the Florida offenses, the heinous nature of those crimes, and the tremendous impact that petitioner's trial counsel perceived that evidence had on petitioner's jury, the decision by petitioner's trial counsel to acknowledge the violent, reprehensible, nature of petitioner's criminal conduct in an effort to gain some degree of

rapport with the jury did not fall outside the broad range of objectively reasonable, professionally competent assistance.

Petitioner's trial counsel admitted the petitioner had done some horrible things and that the natural inclination of many persons would be to lash out at the petitioner. However, said counsel also emphasized that (1) the jurors had each taken an oath to decide the case based on the law, (2) the law required them to focus on the special issues before them, (3) the evidence showed that the petitioner had twice spared the lives of his rape victims and was thus not completely without positive virtues, (4) the evidence regarding the petitioner's "deliberateness" in connection with the murder of Joey Hernandez was weak, (5) it was Manuel Villanueva who had actually killed Joey Hernandez, and (6) voting to take the petitioner's life would reduce them to the same level as that of the petitioner and Villanueva.[358] Given the evidence then before the petitioner's jury, the decision to acknowledge the weighty evidence regarding the heinous nature of the petitioner's crimes and the petitioner's capacity for violence was well within the realm of reasonable, professionally competent performance at petitioner's 1989 trial counsel.[359]

### b. *No Prejudice*

The horrific details of petitioner's Florida crimes were presented to the petitioner's 1989 jury with "devastating" effect by the victim of those heinous offenses. The other

---

**355.** *Carter v. Johnson*, 131 F.3d at 466.

**356.** *See* S.F. State Habeas Hearing, Testimony of Raymund Fuchs, at pp. 117–20; and Testimony of Terry McDonald, at pp. 215–18.

**357.** *See* S.F. Trial, Volume XVII, Testimony of Vicki Isenberg–Meurville, at pp. 133–34; Volume XVII, Testimony of Cruz Morua, at pp. 40–45; and State's Exhibits 86 and 97.

**358.** *See* S.F. Trial, Volume XVIII, at pp. 46–50.

**359.** *See Carter v. Johnson*, 131 F.3d at 466, (holding that defense counsel may reasonably combine acknowledgments of the defendant's culpability and the need for punishment with pleas for mercy and arguments for a life sentence).

Given the "devastating" nature of the testimony of Vicki Isenberg–Meurville at the punishment

phase of petitioner's 1989 trial, petitioner's trial counsel faced three possible courses of action: (1) ignore the obvious impact that testimony made upon the jury; (2) somehow attempt to limit the incendiary effect that testimony apparently had on the jury; or (3) forthrightly admit the damaging nature of that testimony but argue that other evidence still warranted a life sentence for petitioner. Attorney McDonald chose to employ a combination of the second and third options available to him. His closing argument emphasized that the petitioner had left both Cynthia West and Mrs. Meurville alive after he sexually assaulted them, reminded the jury that the prosecution's evidence that the petitioner had acted "deliberately" in connection with the murder of Joey Hernandez was weak, and urged the jury not to give up on the petitioner even though many others had done so. Given the evidence then before the jury, attorney McDonald's closing argument did not transgress the objective standard of reasonableness.

evidence before the petitioner's jury at the punishment phase of his 1989 trial included the details of the petitioner's joint assault with Villanueva upon an unarmed Joey Hernandez, the petitioner's brutal robbery and rape of Cynthia West, the petitioner's repeated acts of violence and impropriety while incarcerated, the petitioner attempted escape from a Florida County Jail, and the petitioner's escape from a fourth-floor Bexar County Jail cell. This evidence was itself far more damaging and "prejudicial" to petitioner's chances of getting a negative jury answer to either of the two special sentencing issues than anything attorney McDonald said or could have said in his closing arguments.

In a capital sentencing proceeding, the prejudice analysis focuses on whether there is a reasonable probability that, absent counsel's errors, a life sentence would have been imposed.[360] The fact that attorney McDonald chose to acknowledge the obviously damaging nature of the prosecution's evidence did not prejudice the petitioner within the meaning of *Strickland.* There is simply no reasonable probability that, but for attorney McDonald's comments recognizing that the petitioner had committed multiple aggravated sexual assaults, displayed a strong propensity for future violence, been the product of a difficult childhood, and been written off by society at the age of 11, the outcome of the punishment phase of petitioner's 1989 trial would have been any different. Attorney McDonald's recognition of petitioner's bad acts and the natural human impulse to condemn such acts was coupled with appeals for both reliance on the rule of law and mercy. He emphasized that Villanueva had received a life sentence for what attorney McDonald characterized as a more significant role in the murder of Joey Hernandez and appealed to the jury's sense of the inherent unfairness of condemning petitioner when Villanueva had escaped the executioner. The strategic decision by attorney Mc-

Donald to acknowledge the many negative aspects of the evidence then before the jury added little to the impact that evidence obviously made upon the jury. There is no reasonable probability that, but for attorney McDonald's uncomplimentary statements about petitioner during closing argument, the outcome of the punishment phase of petitioner's 1989 trial would have been different. Nor did the strategic decision by attorney McDonald to make those concessions render petitioner's 1989 trial fundamentally unfair or the result thereof unreliable. The compelling evidence supporting the jury's affirmative answers to the two special sentencing issues was not rendered any more overwhelming by attorney McDonald's observations.[361]

Accordingly, the petitioner's seventh claim herein, and fifth assertion of ineffective assistance by his trial counsel, does not satisfy either prong of *Strickland* and does not warrant federal habeas corpus relief.

6. *Failure to Seek and Obtain Discovery Re the Reasons Why Villanueva Received a Life Sentence*

 In his final assertion of ineffective assistance, petitioner argues that his trial counsel should have (1) more fully investigated the Villanueva's mental health records and the reasons why Villanueva had received a life sentence and (2) used that information to impeach Sam Ponder's testimony regarding same.[362] As explained above in Section VIII, in connection with petitioner's *Brady* claim, after the defense called Villanueva to testify at the punishment phase of petitioner's 1989 trial, the prosecution called as a rebuttal witness Sam Ponder, the Assistant Bexar County District Attorney who had prosecuted Villanueva. Ponder testified that (1) he recalled that Villanueva had the mental capacity of a seven-year-old, (2) he concluded from his review of the evidence that Villa-

---

**360.** *See Strickland v. Washington,* 466 U.S. at 695, 104 S.Ct. at 2069; *Carter v. Johnson,* 131 F.3d at 463; *Ransom v. Johnson,* 126 F.3d at 723; *Green v. Johnson,* 116 F.3d at 1122, (holding that the proper inquiry is whether the defendant has demonstrated a reasonable probability that the jury would not have imposed the death

sentence in the absence of errors by counsel); and *Belyeu v. Scott,* 67 F.3d at 538.

**361.** *See Green v. Lynaugh,* 868 F.2d at 177.

**362.** *See* First Amended Petition, at pp. 77–81; and Petitioner's Response, at pp. 20–21.

nueva was not capable of an original thought, (3) he believed that Villanueva had acted at the petitioner's direction during the killing of Joey Hernandez, and (4) while Villanueva had been found competent to stand trial, he did not believe it was appropriate to execute a person who suffered from as debilitating a mental impairment as Villanueva's.[363] Petitioner points to testimony given by Dr. John C. Sparks at the state habeas hearing which indicated that on some mental examinations Villanueva had tested well above the seven-year-old level of intellectual functioning cited by Ponder.[364] Petitioner argues that his 1989 trial counsel should have secured Villanueva's mental health records and used the information contained therein to impeach Ponder with regard to Ponder's erroneous perception of the degree of mental impairment suffered by Villanueva.

### a. No Deficient Performance

The first problem with petitioner's complaints about this aspect of his 1989 trial counsel's performance is that both of petitioner's 1989 trial counsel testified at the July, 1995, state habeas hearing that, although they could not specifically recall looking at the copies of Villanueva's mental health records filed in Villanueva's criminal case, they had obtained access to Villanueva's criminal case file.[365] It was established at that same evidentiary hearing that copies of all of Villanueva's mental health records had been filed as public records in Villanueva's state criminal case file several years prior to petitioner's 1989 trial.[366] Thus, petitioner has not presented this Court with any specific factual allegations showing that his trial counsel were unaware of the mental health records regarding Villanueva.

The second problem with petitioner's complaints of ineffective assistance regarding the impeachment of Ponder is that both of petitioner's 1989 trial counsel testified at the state habeas hearing that they believed that Ponder's reasons for choosing not to seek the death penalty for Villanueva were irrelevant to their efforts to seek a life sentence for petitioner. Attorney Fuchs testified that (1) their strategy was to raise a moral issue regarding the fairness of imposing a death sentence on petitioner after Villanueva had received a life sentence, (2) Villanueva's precise mental age or level of intellectual functioning was not relevant to the thrust of their fairness argument, (3) the wisdom or error in Ponder's decision not to seek the death penalty for Villanueva was irrelevant to their fairness argument, (4) detailed information showing that Villanueva was functioning intellectually above the level indicated by Ponder during his testimony would not have helped them obtain a life sentence for petitioner, (5) impeaching Ponder regarding his reasoning in deciding not to seek a death

**363.** See S.F. Trial, Volume XVIII, Testimony of Sam Ponder, at pp. 6–20.

**364.** See S.F. State Habeas Hearing, Testimony of Dr. John C. Sparks, at pp. 16–67.

As explained above, Dr. Sparks testified at the petitioner's July, 1995, state habeas hearing that (1) Villanueva had been evaluated by nine different mental health professionals, most of whom were concerned primarily with the issue of whether Villanueva was competent to stand trial, (2) he had examined Villanueva in September, 1982 and had concluded that Villanueva was competent to stand trial, (3) he diagnosed Villanueva as having antisocial personality pattern, having used opiates in an episodic manner prior to arrest, and having borderline intellectual functioning, (4) Villanueva had tested just above the mentally retarded level on IQ tests, (5) in 1979, Villanueva was diagnosed as exhibiting dissocial behavior, suffering from mild mental retardation with psycho-social deprivation, and possessing borderline intellectual functioning, (6) in July, 1980, Villanueva was diagnosed as mildly retarded, (7) in August, 1980, Villanueva was examined and found to have below average intelligence but to be fully capable of consulting with counsel, (8) in several different examinations undertaken in the late–1970's Villanueva was diagnosed as displaying borderline mental retardation, being a severe sociopath and very dangerous, but still competent to stand trial, (9) Dr. Sparks believed that Villanueva was functioning intellectually within a range of from ages eight or nine to ages twelve or thirteen, (10) on some tests, particularly those involving reading and on written examinations, Villanueva had tested at the age of seven years and ten months, and (11) Villanueva was essentially illiterate. Id., at pp. 19–42.

**365.** See S.F. State Habeas Hearing, Testimony of Raymund Fuchs, at pp. 160–61; and testimony of Terry McDonald, at pp. 254 and 267–68.

**366.** See S.F. State Habeas Hearing, Testimony of Mary White, at pp. 330–36; and State's Exhibits 1 and 2 from that hearing.

sentence for Villanueva would not have helped petitioner's chances of obtaining a life sentence, and (6) Villanueva's sentence was relevant only insofar as they could use that sentence as a basis for their fairness argument.[367] Attorney McDonald testified that (1) their main goal at the punishment phase of trial was to show the unfairness of imposing different sentences on Villanueva and petitioner, *not* to show that Ponder had made a mistake in deciding not to seek the death sentence for Villanueva, (2) the reasons why Ponder had made his decision were irrelevant to petitioner's sentence, and (3) *only* the fact that Villanueva had received a life sentence was relevant to their efforts to secure the same sentence for petitioner.[368] Thus, petitioner's 1989 trial counsel had legitimate, strategic reasons for choosing not to impeach Ponder regarding his reasons for not seeking a death sentence for Villanueva. When a trial counsel's decision not to pursue further investigation into a potential defense or into an area of potential mitigating evidence is based on investigation and consultation with the defendant which leads the attorney to believe that further investigation would be fruitless, that decision may not be challenged as unreasonable.[369] An attorney's strategic choices, usually based on information supplied by the defendant and from a thorough

investigation of relevant facts and law are virtually unchallengeable.[370] The extent of an attorney's investigation into an area must be viewed in the context of the defendant's cooperation with the attorney's investigation and with a heavy measure of deference to counsel's judgments.[371] Therefore, the alleged failure of petitioner's 1989 trial counsel to adequately investigate Villanueva's mental health and juvenile record did not cause the performance of said counsel to fall below an objective level of reasonableness.

The third problem with petitioner's complaints about his 1989 trial counsel's failure to impeach Ponder is that the evidence in question was far from precise regarding the exact level of Villanueva's intellectual functioning. Dr. Sparks testified that these records showed the petitioner had functioned within a range of ages eight to thirteen on several tests of verbal and intellectual skill.[372] Dr. Sparks also testified, however, that there were indications in those same records that Villanueva was functioning barely above the mentally retarded range on many tests and some indications that Villanueva had displayed a seven or eight-year-old level of functioning on written tests.[373] Insofar as petitioner now claims his trial counsel should have used Villanueva's mental health records to impeach Ponder, any such impeachment

**367.** *Id.,* Testimony of Raymund Fuchs, at pp. 153–54 and 163–68.

**368.** *Id.* Testimony of Terry McDonald, at pp. 252–56.

**369.** *See Carter v. Johnson,* 131 F.3d at 465; *Ransom v. Johnson,* 126 F.3d at 723; *Boyle v. Johnson,* 93 F.3d at 187–88; *West v. Johnson,* 92 F.3d at 1406–09; and *Andrews v. Collins,* 21 F.3d at 623.

**370.** *See Ransom v. Johnson,* 126 F.3d at 721; *Boyle v. Johnson,* 93 F.3d at 187–88, (holding that an attorney's decision not to pursue a mental health defense or to present mitigating evidence concerning the defendant's possible mental illness was reasonable where counsel was concerned that such testimony would not be viewed as mitigating by the jury and that the prosecution might respond to such testimony by putting on its own psychiatric testimony regarding the defendant's violent tendencies); *West v. Johnson,* 92 F.3d at 1406–09, (holding that a trial counsel's failure to conduct further investigation into the defendant's head injury and psychological problems was reasonable where interviews

with the defendant and the defendant's family failed to produce any helpful information); and *Bryant v. Scott,* 28 F.3d at 1415, *citing Strickland v. Washington,* 466 U.S. at 691, 104 S.Ct. at 2066; and *Andrews v. Collins,* 21 F.3d at 623, (holding that counsel acted reasonably in failing to further pursue the defendant's mental capacity or background where counsel had no reason to believe that further investigation would be useful).

**371.** *See Carter v. Johnson,* 131 F.3d at 465; and *Randle v. Scott,* 43 F.3d at 225, (holding that trial counsel was not ineffective for failing to investigate the validity of the defendant's prior conviction where the defendant was aware that the prior conviction had been reversed but failed to disclose same to his counsel and, instead, instructed his counsel to cease investigation into the matter so as to expedite the defendant's entry of a guilty plea).

**372.** *Id.,* Testimony of Dr. John C. Sparks, at pp. 37–38.

**373.** *Id.,* at pp. 28, 31, 36, and 40–41.

would have been limited to criticizing Ponder's recollection, many years after the fact, of the precise level of Villanueva's intellectual functioning. Even if Villanueva had been functioning well above the "seven-year-old" level, contrary to what Ponder had testified, there was no dispute that Villanueva was functioning significantly below his actual physical age. Thus, the impeachment value of the evidence summarized by Dr. Sparks would have been very meager, at best.

Given the foregoing, especially defense counsels' trial strategy underlying the introduction of evidence of Villanueva's life sentence, the decision by petitioner's 1989 trial counsel *not* to use the public records regarding Villanueva's mental examinations to impeach Ponder did not cause the performance of said counsel to fall below an objective level of reasonableness. On the contrary, as the testimony of those same attorneys makes clear, their tactical focus was on the inherent unfairness of sentencing petitioner to death while Villanueva, whom they contended delivered the fatal blow, had received a life sentence. The decision not to attempt to impeach Ponder was as rational and reasonable tactical decision consistent with their trial strategy.

### b. *No Prejudice*

Petitioner's 1989 trial counsel did not "prejudice" petitioner within the meaning of *Strickland* by failing to impeaching Sam Ponder as to his reasons for showing mercy toward Villanueva. In a capital sentencing proceeding, the prejudice analysis focuses on whether there is a reasonable probability that, absent counsel's errors, a life sentence would have been imposed.[374] Petitioner has not alleged any facts showing that, but for the failure of his trial counsel to impeach Ponder, the outcome of the punishment phase of petitioner's trial would have been any different. On the contrary, any effort to impeach Ponder regarding his reasons for choosing not to seek the death sentence for Villanueva could have undermined the prem-

ise supporting petitioner's trial counsel's "fairness" argument.

If, as petitioner now contends, Ponder's decision to not seek the death sentence for Villanueva was based on Ponder's erroneous perception of both Villanueva's role in the offense and Villanueva's level of intellectual functioning, the prosecution could have used that information to argue during the petitioner's sentencing proceeding that Villanueva's life sentence was a clear error and that the jury should not allow petitioner to benefit from such a travesty of justice. It is conceivable that evidence showing that Villanueva had benefitted from an erroneous decision by Ponder not to seek a death sentence might have offended or antagonized petitioner's jury and made them more likely to impose the death sentence upon petitioner. As the very least, evidence indicating that Ponder had *mistakenly* shown mercy toward Villanueva would have undermined the efforts of petitioner's trial counsel to encourage the petitioner's jury to show similar mercy toward petitioner. Thus, there were sound, strategic reasons why petitioner's 1989 trial counsel chose not to challenge the reasons behind Ponder's decision to show mercy toward Villanueva. Petitioner was not prejudiced by the failure of his 1989 trial counsel to impeach Ponder regarding his rationale for not seeking a death sentence for Villanueva. Impeaching Ponder on those grounds would not have enhanced petitioner's chances of obtaining a life sentence.

Accordingly, the petitioner's tenth claim herein, and sixth assertion of ineffective assistance by his trial counsel, does not satisfy either prong of *Strickland* and does not warrant federal habeas corpus relief.

### XI. *Cumulative Error*

█ In his thirteenth and final claim for relief, petitioner argues that the cumulative effect of the foregoing alleged errors by his trial counsel and the state trial court warrant

---

**374.** *See Strickland v. Washington,* 466 U.S. at 695, 104 S.Ct. at 2069; *Carter v. Johnson,* 131 F.3d at 463; *Ransom v. Johnson,* 126 F.3d at 723; *Green v. Johnson,* 116 F.3d at 1122, (holding that the proper inquiry is whether the defen-

dant has demonstrated a reasonable probability that the jury would not have imposed the death sentence in the absence of errors by counsel); and *Belyeu v. Scott,* 67 F.3d at 538.

federal habeas relief.[375] However, federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors so infected the entire trial that the resulting conviction violates due process.[376] The cumulative error doctrine provides relief only when the *constitutional* errors committed in the state trial court so fatally infected the trial that they violated the trial's fundamental fairness.[377] Insofar as petitioner asserts a "cumulative error" theory as a separate ground for relief, that argument is foreclosed by the Fifth Circuit's opinion in *Derden v. McNeel*[378] and its progeny. In order to satisfy the cumulative error rule in the Fifth Circuit, a federal habeas petitioner must show that (1) the state trial court actually committed errors, (2) the errors are not procedurally barred, (3) the errors rise to the level of constitutional deprivations, and (4) the record as a whole reveals that an unfair trial resulted from those errors.[379] As this Court's discussion of the many details of petitioner's trial set forth at great length above makes clear, none of the alleged errors by the petitioner's state trial court or alleged deficiencies in the performance of petitioner's trial counsel identified by petitioner rise to the level of a violation of petitioner's constitutional rights. This Court independent review of the record of petitioner's trial, as a whole, reveals that proceeding was *not* unfair in any constitutional sense. In this case, petitioner attempts to rely upon the collective force and effect of the various alleged errors committed by his state trial court in presiding over petitioner's capital murder trial as an independent basis for federal habeas relief. However, a petitioner who attempts to cumulate trial court errors that do not rise to the federal constitutional dimension has presented nothing to cumulate.[380] As the Fifth Circuit once succinctly put it, "[t]wenty times zero equals zero."[381] For the foregoing reasons, petitioner's final ground for relief is without merit.

## XII. *Certificate of Probable Cause to Appeal*

Before an unsuccessful federal habeas corpus petitioner may appeal the denial of his petition, he or she must first obtain a Certificate of Probable Cause to appeal.[382] The Fifth Circuit has imposed upon the District Courts the duty to *sua sponte* address the issue of whether a federal habeas corpus petitioner is entitled to a Certificate of Probable Cause to appeal ["CPC"], even in those instances in which a federal habeas petitioner has *not* directed a request for a CPC to the District Court.[383] For federal habeas petitioners not subject to the

**375.** *See* First Amended Petition, at pp. 95–97; and Petitioner's Response, at pp. 21–23.

**376.** *Nichols v. Scott*, 69 F.3d at 1275, *quoting, Derden v. McNeel,* 978 F.2d 1453, 1454 (5th Cir.1992), *cert. denied,* 508 U.S. 960, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993).

**377.** *Spence v. Johnson,* 80 F.3d at 1000.

**378.** 978 F.2d 1453 (5th Cir.1992), *cert. denied,* 508 U.S. 960, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993).

**379.** *See Derden v. McNeel,* 978 F.2d at 1458.

**380.** *See Yohey v. Collins,* 985 F.2d 222, 229 (5th Cir.1993).

**381.** *Mullen v. Blackburn,* 808 F.2d 1143, 1147 (5th Cir.1987).

**382.** *See* Rule 22(b), Federal Rules of Appellate Procedure.

**383.** *See Hill v. Johnson,* 114 F.3d 78, 81–82 (5th Cir.1997); and *Muniz v. Johnson,* 114 F.3d 43, 45 (5th Cir.1997). Because petitioner filed this federal habeas corpus petition prior to the effective date of the AEDPA, that statute does not apply to this proceeding. *See Hallmark v. Johnson,* 118 F.3d 1073, 1076 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 576, 139 L.Ed.2d 415 (1997). Moreover, regardless of whether petitioner herein is required to obtain a Certificate of Appealability, or its predecessor the "Certificate of Probable Cause," as a prerequisite to appealing the denial of a federal habeas petition, the legal standard which this Court must employ in determining whether to grant permission for filing of an appeal from the denial of petitioner's federal habeas corpus petition is the same. *See Hill v. Johnson,* 114 F.3d at 80.

AEDPA, the Certificate of Probable Cause requirement remains in effect.[384] A CPC will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right.[385] To make such a showing, the petitioner need not show that he should prevail on the merits, but rather must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues in a different manner; or that the questions are adequate to deserve encouragement to proceed further.[386] This Court has painstakingly re-examined all of the pleadings filed by the petitioner herein and has scrutinized each of petitioner's claims herein, as well as the respondent's asserted defenses. This Court has denied relief with regard to all of petitioner's claims, finding in many instances that petitioner's claims are foreclosed by established Supreme Court and Fifth Circuit precedent and well-settled legal principles.[387] Having reviewed petitioner's claims herein for the purpose of determining whether petitioner qualifies for a CPC, this Court concludes that, despite the length and breadth of petitioner's claims for relief none of his claims herein makes a substantial showing of the denial of a constitutional right. None of the petitioner's claims herein are either debatable among jurists of reason, potentially subject to a contrary resolution by a reasonable court in a different manner, or worthy of encouragement to proceed further. Therefore, this Court will deny petitioner a CPC.

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in petitioner's first amended petition for federal habeas corpus relief,[388] as supplemented by petitioner's response to respondent's motion for summary judgment,[389] is **DENIED.**

2. All other pending motions are **DISMISSED AS MOOT.**

3. Petitioner is **DENIED** a Certificate of Probable Cause to appeal.

4. The stay of execution granted by this Court on October 23, 1995 [390] is **VACATED.**

5. The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.

---

384. *See Lucas v. Johnson*, 132 F.3d at 1072–73; *Goodwin v. Johnson*, 132 F.3d at 169 n. 1; and *Hallmark v. Johnson*, 118 F.3d at 1076.

385. *See Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983); *Hallmark v. Johnson*, 118 F.3d at 1076; *Lackey v. Johnson*, 116 F.3d at 151; *Washington v. Johnson*, 90 F.3d 945, 949 (5th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1259, 137 L.Ed.2d 338 (1997); *Newby v. Johnson*, 81 F.3d 567, 569 (5th Cir.1996); and *Harris v. Johnson*, 81 F.3d at 538.

386. *See Barefoot v. Estelle*, 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4; *Lucas v. Johnson*, 132 F.3d at 1072–73; *Hallmark v. Johnson*, 118 F.3d at 1076; *Drinkard v. Johnson*, 97 F.3d at 755; *Washington v. Johnson*, 90 F.3d at 949; *Newby v. Johnson*, 81 F.3d at 569; *Harris v. Johnson*, 81 F.3d at 538; and *Crank v. Collins*, 19 F.3d 172, 174 (5th Cir.1994), *cert. denied*, 512 U.S. 1214, 114 S.Ct. 2699, 129 L.Ed.2d 825 (1994).

387. None of petitioner's claims of ineffective assistance satisfy *either* prong of *Strickland* analysis, much less both. The testimony of petitioner's 1989 trial counsel at the evidentiary hearing held July, 1995 in petitioner's most recent state habeas corpus proceeding refutes each of petitioner's ineffective assistance claims, as well as petitioner's *Brady* claim. Petitioner's other complaints about his 1989 trial are either contrary to well-settled legal principles or refuted by the record from that trial, including the overwhelming evidence supporting both his conviction and death sentence.

388. *See* docket entry no. 11.

389. *See* docket entry no. 15.

390. *See* docket entry no. 5.